# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

RENDELL ROBINSON,

                            Plaintiff,                    Civil Action No.
                                                         9:18-CV-1232 (DNH/DEP)

        v.

JOHN SLAVEN, *et al.,*[1]

                            Defendants.

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

**[last known address]**[2]
RENDELL ROBINSON, *Pro Se*
400 East 30th Street
New York, NY 10016

---

[1]      According to documents executed by defendants' counsel, the proper spelling of the name of the defendant identified as "D. Gumlaw" is "David Gumlaw," while the defendant identified as "Shaven" is "John Slaven." Dkt. Nos. 6, 7. Accordingly, the clerk of the court will respectfully be directed to modify the court's records to reflect the proper spellings of the names of these two defendants.

[2]      On March 25, 2019, I issued a report in which I recommended that the action be dismissed in its entirety, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, based upon plaintiff's failure to prosecute and to comply with this court's orders and local rules of practice. Dkt. No. 21. The day after that report was issued, however, the court received notification of plaintiff's new address, Dkt. No. 22, and the matter was returned to me to address the merits of defendants' motion via a text order issues on March 26, 2019. Dkt. No. 23. That text order, which was sent to the address plaintiff provided on March 26, 2019, was returned to the court as undeliverable on April 11, 2019. Dkt. No. 25.

<u>FOR DEFENDANT</u>:

HON. LETITIA JAMES       KONSTANDINOS D. LERIS, ESQ.
New York State Attorney General   Assistant Attorney General
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE


<u>ORDER, REPORT, AND RECOMMENDATION</u>

This is a civil rights action brought pursuant to 42 U.S.C. §1983 by *pro se* plaintiff Rendell Robinson, a former New York State prison inmate who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), against three corrections officers employed by the DOCCS. In his complaint, plaintiff asserts that the three corrections officers violated his constitutional rights arising under the Eighth Amendment, based upon an incident that occurred on April 9, 2015 at the prison in which he was confined on that date.

In response to plaintiff's complaint, defendants have moved for dismissal of his claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that his claims are barred by the statute of limitations and that the claims cannot be saved by equitable tolling. In the alternative, defendants argue that plaintiff's complaint fails to state a claim

2

of excessive force as to one of the corrections officers. For the reasons that follow, I recommend that defendants' motion, which plaintiff has not opposed, be granted.

I.    BACKGROUND[3]

Plaintiff, a former New York State prison inmate, was previously confined to the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. Dkt. No. 1 at 4-5. On April 9, 2015, he was transported from that facility, via a five-hour van ride, to the Coxsackie Correctional Facility ("Coxsackie"), located in Coxsackie, New York, for medical treatment at the facility's Residential Medical Unit ("RMU"). *Id.* During that transport, plaintiff was restrained by the use of handcuffs, a waist chain, and leg irons. *Id.* at 4.

When plaintiff arrived at Coxsackie, the transporting officer from Clinton, defendant David Gumlaw, a corrections officers, removed

---

[3]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See generally Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964). Portions of the background have also been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *accord*, *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

plaintiff's waist chain and leg irons, but did not remove the handcuffs. Dkt. No. 1 at 5. As plaintiff and C.O. Gumlaw waited in the inmate waiting room, plaintiff requested several times for his handcuffs be loosened. *Id.* at 5-7. C.O. Gumlaw denied the request and, upon becoming "upset" at plaintiff's third request, replaced plaintiff's waist chain. *Id.* at 6-7.

C.O. Gumlaw and defendant Michael Mussen, Jr., a corrections officer assigned to Clinton, escorted plaintiff to a small room off the "back hallway of Coxsackie R.M.U." Dkt. No. 1 at 8. At this point, defendant John Slaven, a corrections sergeant stationed at Coxsackie, appeared, instructed the other officers to kill plaintiff, and then "walked away to the same direction he had approached [plaintiff] from." *Id.* at 10, 12; *cf. id* at 19-20 (noting that Sgt. Slaven denied being "present during the beginning of this incident").

C.O. Mussen and Gumlaw, along with the other unidentified DOCCS corrections officers, proceeded to assault plaintiff. Dkt. No. 1 at 10-11. Following the assault, during which he was slapped, punched, kicked, thrown to the ground, and struck with a wooden baton, plaintiff required medical attention for his injuries. *Id.* at 10-11, 15-16. As relief, plaintiff seeks, *inter alia*, damages in the amount of $500,000. *Id.* at 37.

## II.   PROCEDURAL HISTORY

This action was initiated by the submission of a forty-page complaint plus exhibits, which was received by the court on October 17, 2018,[4] accompanied by a motion for leave to proceed *in forma pauperis*. Dkt. Nos. 1-3. By decision and order dated December 3, 2018, District Judge David N. Hurd granted plaintiff permission to proceed without prepayment of fees and reviewed the sufficiency of the complaint in accordance with 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 4. Judge Hurd also ordered the dismissal of certain of plaintiff's claims, but determined that plaintiff's Eighth Amendment excessive force and failure to intervene claims required a response from defendants. *Id.*

On February 4, 2019, two of the defendants named in plaintiff's complaint moved to dismiss plaintiff's claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 10. In their motion, defendants argued that plaintiff's claims are time-barred, and further that plaintiff's complaint fails to allege facts sufficient to establish a plausible excessive force claim against Sgt. Slaven. *See generally* Dkt. No. 10.

---

[4]     The complaint was signed on October 7, 2018 and accompanied by a cover letter dated October 14, 2018. Dkt. No. 1 at 40; Dkt. No. 1-2. The envelope containing those materials was postmarked on October 15, 2018. Dkt. No. 1-3.

By letter dated February 24, 2019, plaintiff advised that he did not intend to file a response to the motion. Dkt. No. 13 at 3. Following service of the summons and complaint upon the third named defendant, the court granted counsel's request for that defendant to join in the pending motion to dismiss. Dkt. Nos. 17, 18. The matter is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b); *see also* Dkt. No. 23.

III.    DISCUSSION

A.    Legal Standard Governing Motion to Dismiss

It is well-settled that "[a] motion to dismiss on the basis that an action is barred by the statute of limitations is analyzed under Federal Rule of Civil Procedure 12(b)(6), not 12(b)(1)." *Garner v. DII Indus., LLC*, 08-CV-6191, 2010 WL 456801, at *1 (W.D.N.Y. Feb. 4, 2010) (citing *Ghartey v. St John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)).[5] A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard that, though unexacting, "demands more

---

[5]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. Iqbal, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 570).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (internal quotation marks omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cty. Dep't of Soc.*

*Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

### B.    Statute of Limitations and Equitable Tolling

Defendants argue that plaintiff's claims are barred by the statute of limitations applicable to claims brought pursuant to 42 U.S.C. § 1983 in New York. Dkt. No. 10-1 at 6-9. While they acknowledge that plaintiff is entitled to the benefit of tolling of the statute of limitations during the pendency of grievance proceedings necessary to satisfy plaintiff's exhaustion of remedies requirement, they argue that even when a toll is applied, his claims are still time-barred. *Id.* at 8-9. Although plaintiff declined to respond to defendants' motion, *see* Dkt. No. 13 at 3, he addressed this issue in his complaint, contending that his action was properly commenced as a result of equitable tolling. Dkt. No. 1 at 26-27.

### 1.    Generally

Because the statute of limitations is an affirmative defense, it is axiomatic that " '[c]omplaints need not anticipate, or attempt to plead around, potential affirmative defenses.' " *Cooper Crouse-Hinds, LLC v. City of Syracuse*, 16-CV-1201, 2018 WL 840056, at *4 (N.D.N.Y. February 18, 2018) (alteration in original) (quoting *High Falls Brewing Co., LLC v. Boston Beer Corp.*, 852 F. Supp. 2d 306, 310 (W.D.N.Y. 2011)).

"Requiring [the] plaintiff[] to allege in a complaint facts sufficient to overcome a statute of limitations affirmative defense would shift the burden to raise and prove the affirmative defense from defendants, as the burden is allocated and imposed by Rule 8(c)(1) of the Federal Rules of Civil Procedure, to [the] plaintiff[]." *Kattu v. Metro Petroleum, Inc.*, No. 12-CV-54, 2013 WL 4015342, at *4 (W.D.N.Y. Aug. 6, 2013).

The "applicable statute of limitations for [section] 1983 actions arising in New York requires claims to be brought within three years." *Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995); *accord Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("The statute of limitations applicable to claims brought under . . . [section] 1983 in New York is three years."). A section 1983 cause of action accrues " 'when the plaintiff knows or should know of the injury that is the basis of the cause of action.' " *Covington v. City of New York*, 916 F. Supp. 282, 285 (S.D.N.Y. 1996) (quoting *Woods v. Candela*, 13 F.3d 574, 575 (2d Cir. 1994)). In determining when a particular claim accrues, a court must focus on when a "plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir.1980).

10

The Second Circuit has held that a prisoner is entitled to equitable tolling of claims brought under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), reasoning that prisoners would otherwise face a "catch-22" of either filing an action prior to exhausting all administrative remedies and risk dismissal for failure to exhaust, or wait until all administrative remedies are exhausted and risk dismissal based on untimeliness. *Gonzalez v. Hasty*, 651 F.3d 318, 323-24 (2d Cir. 2011). Under this rule, the equitable tolling period begins to run when a plaintiff first raises his administrative claim, and ends when the plaintiff's administrative remedies are deemed exhausted. *Id.* at 324; *see also Povoski v. Lacy*, No. 9:14-CV-97, 2017 WL 9511094, at *6-*7 (N.D.N.Y. Dec. 13, 2017) (Hummel M.J.), *report and recommendation adopted by* 2018 WL 547392 (N.D.N.Y. Jan. 17, 2018) (Sannes, J.). The statute of limitations, however, is only tolled during the period in which a prisoner is "actively exhausting" his administrative remedies. *Gonzalez*, 651 F.3d at 322 (citing *Brown v. Valoff*, 422 F.3d 926, 942-43 (9th Cir. 2005); *Clifford v. Gibbs*, 298 F.3d 328, 332 (5th Cir. 2002); *Johnson v. Rivera*, 272 F.3d 519, 522 (7th Cir. 2001); *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000)). The statute of limitations is not tolled during the period between the accrual of the claims and when the plaintiff began the

administrative remedy process. *Gonzalez*, 651 F.3d at 324 (citing *Brown*, 209 F.3d at 596).

Finally, because the *pro se* plaintiff was incarcerated at the time of commencement, the "prisoner mailbox rule" applies to determine the date the action was commenced. Under this rule, a *pro se* litigant's pleading is deemed filed on the date that the prisoner delivers the pleading to prison officials for filing. *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir.1993) (citing *Houston v. Lack*, 487 U.S. 266, 270 (1988)). This rule "is justified by the litigant's dependence on the prison mail system and lack of counsel to assure timely filing with the court." *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001); *see also Garraway v. Broome Cty., N.Y.*, No. 5:03-cv-0681, 2006 WL 931729, at *3 (N.D.N.Y. Apr. 7, 2006) (McAvoy, J.).

In cases where it is unclear when the inmate conveyed a complaint or petition to prison officials, the "date of delivery is presumed to be the date that the inmate signs his or her complaint." *Brown v Smithem*, No. 15-CV-1458, 2017 WL 1155825, at *4 (Feb. 28, 2017) (Hummel, M.J.) *report and recommendation adopted by* 2017 WL 1155827 (N.D.N.Y. Mar. 27, 2017) (Sannes, J.) (citing *Johnson v. Connolly*, No. 9:07-CV-0158, 2008 W L 724167, at *7 (N.D.N.Y. Mar. 17, 2008) (Kahn, J., *adopting report and recommendation of* Lowe, M.J.)); *see also Shaw v. Superintendent, Attica*

*Corr. Facility*, No. 03-CV-0610, 2007 WL 951459, at *3 n.3 (N.D.N.Y. March 28, 2007) (McCurn, J.). However, this presumption does not apply when there is evidence that the complaint was not sent for filing, or mailing, until a later date. *See Brown*, 2017 WL 1155825, at *4 (holding that the date of filing was the date the cover letter, not the date the complaint was signed).

2.    Analysis

Plaintiff's cause of action accrued on April 9, 2015, the date of the incident forming the basis of plaintiff's excessive force claim. Dkt. No. 1 at 4; *see generally Merrihew v. Town of Ulster*, No. 04-CV-1027, 2005 WL 1660113, at *2-*3 (N.D.N.Y. July 7, 2005) (Kahn, J.) (explaining that plaintiff's excessive force claim accrued on the date the conduct and harm underlying his claim occurred). Plaintiff's complaint was signed October 7, 2018, and it was accompanied by a cover letter dated October 14, 2018. Dkt. No. 1 at 40; Dkt. No. 1-2. The complaint was received by the court on October 17, 2018, in an envelope that was postmarked October 15, 2018. Dkt. No. 1-3. Because it is not outcome determinative, I will assume, without deciding, that plaintiff commenced this action on October 7, 2018. Dkt. No. 1 at 40.

In order for plaintiff's claims to be considered timely, the three-year statute of limitations must have been tolled for at least 182 days, since plaintiff filed his complaint on October 7, 2018 and, absent tolling, the limitations period expired on April 9, 2018 (April 9, 2018 to and including October 7, 2018 = 182 days). Accordingly, the length of that exhaustion period—that is, the period of time between when plaintiff initiated his administrative claims and when he exhausted those claims—must be at least 182 days in order to salvage his claims.

Following the incident on April 9, 2015, plaintiff filed an administrative grievance pursuant to the DOCCS Inmate Grievance Program ("IGP") on April 28, 2015, nineteen days after the alleged assault. Dkt. No. 1 at 26. The statute of limitations was not tolled "during the period in between the accrual of those claims and when [plaintiff] began the administrative remedy process." *Gonzalez*, 651 F.3d at 324. That is, the statute of limitations ran for eighteen days (April 9, 2015 to and excluding April 28, 2015 = 18 days) prior to April 28, 2015—the date upon which plaintiff first raised his administrative claims and which demarcates the commencement of the equitable tolling period. *See Povoski*, 2017 WL 9511094, at *6-*7 (explaining that the equitable tolling period begins when the plaintiff first raises his administrative claim).

Because plaintiff's grievance complained of employee harassment, it bypassed the first step of the IGP, where the grievance would have been reviewed by the inmate grievance resolution committee ("IGRC"), and was forwarded directly to the superintendent of Clinton for review. *See* 7 N.Y.C.R.R. § 701.8(b), (c). On May 20, 2015, the superintendent issued an adverse determination on plaintiff's grievance. Dkt. No. 1-1 at 2-4. On May 26, 2015, plaintiff appealed the superintendent's determination to the DOCCS Central Office Review Committee ("CORC"), the third and final step of the IGP. *See* 7 *See* N.Y.C.R.R. § 701.5(d)(1)(i).

That body upheld the superintendent's determination on October 21, 2015. Dkt. No. 1-1 at 6; *see also* Dkt. No. 1 at 27. Although there is no evidence with respect to when plaintiff received that determination, in the complaint, plaintiff agrees that October 21, 2015, the date upon which the CORC issued its decision, represents the end of the equitable tolling period. Dkt. No. 1 at 27. As a result, the statute of limitations was tolled for the 177-day period that plaintiff was in the process of "actively exhausting" his administrative remedies (April 28, 2015 to and including October 21, 2015 = 177 days). *See Gonzalez*, 651 F.3d at 322 n.2.

Therefore, because the statute of limitations period was equitably tolled for 177 days—but three years and the time between April 9, 2015

15

and October 7, 2018 is 182 days over three years—this action is time-barred by the applicable statute of limitations period. Although I am mindful District Judge Hurd flagged the statute of limitations issue, but recommended that plaintiff's claims proceed "[o]ut of an abundance of caution, and mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed," Dkt. No. 4 at 8, with the benefit of defendants' additional briefing on this issue, and now that plaintiff has been given an opportunity to be heard regarding the matter, I respectfully recommend that plaintiff's complaint be dismissed as time-barred.[6]

III.   SUMMARY, ORDER, AND RECOMMENDATION

Despite the application of an equitable tolling period, plaintiff commenced this action outside the three-year statute of limitations period that is applicable to claims brought under section 1983 in New York. It is therefore hereby respectfully

RECOMMENDED that defendants' motion for dismiss (Dkt. No. 10) be GRANTED, and plaintiff's complaint (Dkt. No. 1) be DISMISSED in its entirety.

---

[6]   In light of this recommendation, I have not addressed defendants' alternative argument with respect to defendant Slaven. Dkt. No. 10-1 at 9-10.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[7] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993). It is hereby

ORDERED that the clerk of the court is respectfully directed to modify the court's records to change defendant D. Gumlaw to "David Gumlaw," and defendant Shaven to "John Slaven," as set forth in footnote number one; and it is further

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:     April 16, 2019
           Syracuse, New York

---

[7]     If you are proceeding *pro se* and are served with this order, report, and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order, report, and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

2017 WL 1155825
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dennis BROWN, Plaintiff,

v.

Sgt. SMITHEM; et al., Defendant.

No. 15-CV-1458 (BKS/CFH)
|
Signed 02/28/2017

**Attorneys and Law Firms**

Dennis Brown, Ogdensburg, NY, pro se.

Denise P. Buckley, Ryan E. Manley, New York State
Attorney General, Albany, NY, for Defendant.

## REPORT-RECOMMENDATION AND ORDER [1]

Christian F. Hummel, U.S. Magistrate Judge

 **\*1** Plaintiff pro se Dennis Brown ("Brown"), an inmate
who was, at all relevant times, in the custody of the New
York State Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to
42 U.S.C. § 1983 ("§ 1983") alleging that defendants
Sergeant ("Sgt.") Smithem, Correction Officer ("C.O.")
J. Coburn, C.O. Clearwater, C.O. Dequarto, C.O.
Friedman, C.O. Travis, C.O. Hetcher, C.O. Meinecke,
and John Does violated his rights under the First and
Eighth Amendments. [2] See Dkt. No. 1 ("Compl."). [3] At
all relevant times, Brown was incarcerated at Five Points
Correctional Facility ("Five Points C.F."). Presently
pending is defendants' motion pursuant to Federal Rule
of Civil Procedure ("Fed. R. Civ. P.") 12(c) to dismiss the
complaint on the ground that Brown's complaint is barred
by the statute of limitations. Dkt. No. 34. Brown filed a
response. Dkt. No. 45. Defendants did not file a reply. For
the following reasons, it is recommended that defendants'
motion be granted.

### I. Background

### A. February 7, 2012 Grievance

Beginning in January 2012, Coburn and Friedman
harassed Brown by pat-frisking him in an aggressive
manner on a daily basis. Compl. ¶ 11. Brown submitted a
grievance against Coburn and Friedman on February 7,
2012. Id. ¶ 10. A couple days after Brown submitted this
grievance, Coburn brought the grievance to Brown's cell
and told him that he will have his friends assault Brown
if Brown continues to submit grievances against him and
Friedman. Id. Coburn then tore up the grievance and left.
Id.

### B. March 2012 Request to Move
to a Different Housing Unit

On March 3, 2012, Brown spoke to non-party C.O. Jemel
and requested to be moved to a different housing unit
because of constant harassment from Friedman. Compl.
¶ 13. C.O. Jemel sent Brown to speak with non-party
Sgt. Mickish. Id. Brown told Sgt. Mickish that he was
being harassed, retaliated against, and that Coburn and
Friedman, along with other unidentified officers, were
tampering with his grievances and complaints. Id. Brown
was moved to a different housing unit several days later.
Id. ¶ 14. In his new housing unit, Brown continued to
see Coburn and Friedman, who harassed and threatened
him because of complaints he had written to the Deputy
Superintendent of Security and the Superintendent. Id.
Coburn and Friedm an still subjected Brown to daily
aggressive pat-frisks. Id. Brown further claims that his cell
was searched constantly and he would find his property
damaged. Id.

### C. September 2012 Cell Searches

 **\*2** Friedman searched Brown's cell on September 6
and September 8, 2012. Compl. ¶ 15. After one search,
Brown found that his hot pot and some food items were
"destroyed." Id. Friedman refused to give Brown a cell
search slip. Id.

### D. October 2012 Cell Searches

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

On October 16, 2012, Friedman searched Brown's cell, destroyed his property, and threatened to have officers assault him because he was still "complaining to the administration about her and Coburn." Compl. ¶ 16. On October 25, 2012, Friedman searched Brown's cell and destroyed two sneakers. Id. ¶ 17. When Brown asked why Friedman had destroyed his sneakers, she threatened to "cut" him. Id.

### E. October 28, 2012 Excessive Force Incident

On October 28, 2012, Smithem arrived at Brown's cell and told him that he was being moved to the Special Housing Unit ("SHU"). Compl. ¶ 18. Brown inquired as to why he was being taken to the SHU, and Smithem told him that it was because he harassed Friedman and Coburn, and complained about pat frisks. Id. Brown requested that Smithem "get the video camera" before moving him. Id. Smithem refused. Id. Smithem, Clearwater, and Dequato then escorted Brown down the south hall corridor. Id. When they reached the laundry room area, Coburn appeared and slammed Brown's head against the wall. Id. Brown fell to the floor and Coburn, along with the other officers, kicked him and stomped his face. Id. Coburn pulled Brown's legs back, sat on him, and punched his head. Id. Before Brown passed out, Smithem told him that the beating was "what [he] gets for writing [ ] officers up." Id. Brown later woke up in the clinic and was examined by a nurse. Id.

After Brown was taken to the SHU, he wrote grievances and complaints against Smithem and the other correction officers who assaulted him. Compl. ¶ 19. Brown delivered the grievances, along with complaints addressed to the "superintendent" and "commissioner", to a SHU officer on November 3, 2012. Id. The next day, November 4, 2012, defendants Travis, Hetcher, and Meinecke entered Brown's cell, searched it, and confiscated Brown's legal documents and a pen. Id. ¶ 20. When Brown inquired as to the officers' actions that day, Travis showed Brown that he possessed the grievance that Brown attempted to file the previous day. Id. Travis told Brown that he would kill him "in the box" if he ever attempted to file another grievance or complaint against an officer. Id. Travis left with the complaints and grievances, and Brown asserts the "grievances were never processed." Id.

Brown received a pen from an unidentified officer on November 5, 2012. Compl. ¶ 23. The next day, unidentified officers entered Brown's cell and took the pen from him, stating that they were taking the pen because he writes up officers. Id. A couple days later, Brown received another pen but it did not work. Id. When Brown told an unidentified officer that the pen did not work, the officer told him to write with his blood. Id. Due to not receiving a functioning pen, Brown asserts that he was unable to file appeals or communicate with the courts or his family. Id.

### F. November 2012 False Misbehavior Report

In November 2012, Friedman issued Brown a false misbehavior report in retaliation for the complaints he had filed against her. Compl. ¶ 21. At the hearing on the misbehavior report, Brown told the hearing officer, non-party Wendland, that Friedman had issued a false misbehavior report. Id. Wendland found Brown guilty and sentenced him to six months in the SHU. Id. ¶ 22.

## II. Discussion [4]

### A. Motion to Dismiss Under Fed. R. Civ. P. 12(c)

**\*3** Motions for dismissal under Fed. R. Civ. P. 12(c) are evaluated under the same standard as motions to dismiss for failure to state a claim upon which relief may be granted under Fed. R. Civ. P 12(b)(6). Rubeor v. Town of Wright, 191 F. Supp. 3d 198, 202-03 (N.D.N.Y. 2016) (citing Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010)). Thus, in considering defendants' motion to dismiss plaintiff's complaint, the Court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009)) (internal quotation marks omitted). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " [Iqbal, 556 U.S. at 678](quoting [Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)](explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also [Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009)](holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible....") (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." [Iqbal, 556 U.S. at 679](.

Where, as here, a party seeks judgment against a <u>pro se</u> litigant, a court must afford the non-movant special solicitude. See [Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006)](. As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

<u>Id.</u> (internal quotation marks, citations, and footnote omitted); see also [Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008)]( ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged

to construe his pleadings liberally." (internal citations omitted)).

## B. Statute of Limitations

Defendants assert that Brown's surviving claims are barred by the applicable statute of limitations. Dkt. No. 34-1 at 4-7. Brown argues that he filed his complaint within the statute of limitations period because the claims he asserted were continuing violations which did not accrue until the last discriminatory act ended. Dkt. No. 45 at 4.

While there is no statute of limitations provision in [§ 1983](, [42 U.S.C. § 1988]( provides that state law may apply if it is not inconsistent with the Constitution or federal law. [42 U.S.C. § 1988(a)](; [Moor v. Cnty. of Alameda, 411 U.S. 693, 702–03 (1973)](. In New York, the applicable statute of limitations for a [§ 1983]( suit is three years, derived from the general or residual personal injury laws of the forum state. See [N.Y. C.P.L.R. § 214(5)](; [Owens v. Okure, 488 U.S. 235, 249–50 (1989)](; [Rom er v. Leary, 425 F.2d 186, 187 (2d Cir. 1970)](; [Lugo v. Senkowski, 114 F. Supp. 2d 111, 113 (N.D.N.Y. 2000)]( (applying [Owens]( in establishing a three-year statute of limitation for [§ 1983]( claims). Thus, Brown's Eighth Amendment excessive force and First Amendment retaliation claims are subject to New York's three-year statute of limitations.

**\*4** Federal law governs the determination of the accrual date for purposes of a [§ 1983]( claim. [Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002)](. T he claim accrues "when the plaintiff knows or has reason to know" of the harm. [Id.]( (citations and internal quotation marks omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." [Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980)](. Additionally, "a pro se prisoner's [§ 1983]( complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials." [Tapia–Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999)]( (citing [Houston v. Lack, 487 U.S. 266, 270 (1988)](; [Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993)]().

### 1. Date of Filing of the Complaint

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

In the Court's initial review of Brown's complaint pursuant to 28 U.S.C. § 1915(e), the Court determined, under the "prison mailbox rule", that Brown had filed his complaint on October 16, 2015—the date that he signed the complaint. Dkt. No. 11 at 4 n.5. Under the "prison mailbox rule," the date of filing is the date that an inmate delivers his or her complaint to a prison guard for mailing. Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001). That date of delivery is presumed to be the date that the inmate signs his or her complaint. Johnson v. Connolly, No. 9:07-CV-0158 (LEK/GHL), 2008 WL 724167, at *7 (N.D.N.Y. Mar. 17, 2008).

Defendants argue that plaintiff wrote, in his cover letter addressed to the Court dated December 4, 2015, that he was "sorry" for submitting his complaint late. See Dkt. No. 34-1 at 5; Dkt. No. 1-2. Additionally, the envelope containing the cover letter and complaint bears the date of December 7, 2015. Dkt. No. 1-3. Thus, defendants argue that the date of filing for the purpose of the Court's analysis should be December 4, 2015—the date that Brown signed the cover letter. Dkt. No. 34-1 at 5. The Court agrees.

The presumption that the day that Brown signed his complaint is the date that the complaint was delivered to a prison official for mailing need not apply here because Brown readily admits in his response to defendants' motion that he did not send his complaint to the Court until December 4, 2015. See Dkt. No. 45 at 10. Brown explains that he failed to append the proper amount of postage when he attempted to mail his complaint on October 16, 2015. Id. at 9-10. Thus, the package containing his complaint was returned to him sometime between November 19, 2015 and November 27, 2015. [5] Id. at 9-10. Brown asked his "legal assistant" to type a new cover letter and sent the package—with the correct postage appended—on December 4, 2015. Id. at 10. Thus, the Court finds that December 4, 2015 is the correct date of filing.

### 2. Continuing Violation Doctrine

The continuing violation doctrine delays the accrual date for a claim challenging a discriminatory policy " 'until the last discriminatory act in furtherance of [the discriminatory policy].' " Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) (quoting

Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994)) (additional citation omitted). Thus, "the continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date.' " Id. (quoting Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999)).

#### a. First Amendment Retaliation Claims

**\*5** Brown asserts First Amendment retaliation claims against Friedman, Coburn, Clearwater, Dequarto, Smithem, Travis, Hetcher, Meinecke, and John Doe. See Compl. ¶¶ 10-11, 14-18, 20-21, 23. According to the dates of the retaliatory acts alleged in Brown's complaint, the accrual dates for these claims are as follows: February 2012; March 2012; September 6 and 8, 2012; October 16, 25, and 28, 2012; and November 4 and 6, 2012. See id.

The Second Circuit has held that "[t]he mere fact that the effects of retaliation are continuing does not make the retaliatory act itself a continuing one." Gonzalez v. Hasty, 802 F.3d 212, 222 (2d Cir. 2015) (citation omitted). "First Amendment retaliation claims typically accrue at the time that the allegedly wrongful conduct occurred." Albritton v. Morris, No. 13-CV-3708 (KMK), 2016 WL 1267799, at *10 (S.D.N.Y. Mar. 30, 2016) (citing Smith v. Campbell, 782 F.3d 93, 101 (2d Cir. 2015)) (additional citation omitted). Therefore, the statute of limitations "begins to run when the defendant has 'engaged in enough activity to make out an actionable claim.' " Gonzalez, 802 F.3d at 22 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111 (2002)). In contrast, the continuing violation doctrine only applies "to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." Id. (citing Morgan, 536 U.S. at 114-15). The continuing violation doctrine does not apply to "discrete unlawful acts." Albritton, 2016 WL 1267799, at *10 (quoting Gonzalez, 802 F.3d at 220).

Here, Brown's First Amendment retaliation claims all concern discreet acts. On February 7, 2012, Brown claims Coburn threatened him after he filed a grievance complaining of harassment and excessive pat frisks. Compl. ¶ 10. Brown further claims that the harassment and aggressive pat frisks perpetrated by Coburn, Friedman, and John Does started in January 2012 and "continued daily." Id. ¶ 11. On September 6 and 8, 2012, and October 16 and 25, 2012, Friedm an performed retaliatory cell searches. Id. ¶¶ 15-16. On October 28, 2012,

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

Coburn, Clearwater, Dequarto, and Smithem assaulted Brown in retaliation for his filing grievances. Id. ¶ 18. On November 3 and 4, 2012, Travis, Hetcher, Meinecke, and John Doe took Brown's pens and interfered with his ability to file grievances in retaliation for Brown's filing grievances. Id. ¶¶ 19-20. On November 4, 2012, Friedman issued Brown a false misbehavior report. Id. ¶ 21.

Here, Brown has not pled facts sufficient to show that he was suffering from an ongoing wrong. To show a continuing violation, Brown "must 'allege both the existence of an ongoing policy ... and some non-time-barred acts taken in the furtherance of that policy.' " Shomo, 579 F.3d at 182 (quoting Harris, 186 F.3d at 250). All of the discrete acts allegedly committed by defendants are time-barred, and to the extent that Brown vaguely asserts continuing harassment, such claims are insufficient to state a claim of a continuing violation of his rights. See Albritton, 2016 W L 1267799, at *11 (finding no indication of an ongoing wrong where the plaintiff complained of discrete acts including writing "false ticket[s]", threats, and other acts of harassment). Although Brown asserts that he suffered from continuing harassment, such an allegation does not transform the discrete acts already alleged in his complaint into a continuing violation, as the statute of limitations for those discrete acts accrued on the date that "all of the elements necessary to state the claim are present." Smith v. Campbell, 782 F.3d 93, 101 (2d Cir. 2015). Thus, the Court finds that Brown's First Amendment retaliation claims accrued on the dates alleged in Brown's complaint, [6] and are time-barred.

### b. Eighth Amendment Excessive Force

**\*6** To the extent that Brown alleges a continuing violation based on his claim that Coburn, Clearwater, Dequarto, and Smithem used excessive force against him, such a claim also fails to establish a continuing violation of his rights. See Compl. ¶ 18. The alleged use of excessive force on October 28, 2012 is best described as a "discrete, separate act[ ]" that accrued on that date. MacFarlane v. Ewald, No. 10-CV-2877 (JFB)(ARL), 2016 WL 4076585, at *3 (E.D.N.Y. Aug. 1, 2016) (finding that the plaintiff's allegations of two separate excessive force incidents were discrete acts and not sufficient to establish a continuing violation). Thus, the Court finds that Brown's Eight

Amendment excessive force claim accrued on October 28, 2012, and is time-barred by the statute of limitations.

### C. Equitable Tolling

Equitable tolling of the statute of limitations is applicable in certain situations where the Court determines that a plaintiff should, in fairness, be excused from his or her lateness in filing a complaint. Gonzalez, 651 F.3d at 322. " 'Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances.' " Id. (quoting Veltri v. Bldg. Serv. 32B–J Pension Fund, 393 F.3d 318, 322 (2d Cir. 2004)).

Here, defendants argue that equitable tolling does not apply because Brown never filed a grievance, and therefore never triggered the tolling of the applicable statute of limitations. Dkt. No. 34-1 at 6-7. Brown has raised multiple reasons that he claims entitle him to equitable tolling of the statute of limitations. See Dkt. No. 45 at 6-11. First, Brown points to the fact that he had knee replacement surgery on March 26, 2013, which required a one-month hospitalization. Id. at 6-7. Then, he was sent to the SHU at Upstate Correctional Facility. Id. at 7. Following this period of incarceration, Brown spent another month in the infirmary following complications from his knee surgery. Id. On July 5, 2013, Brown was transferred to Five Points C.F., where he claims to have been harassed. Id. After arriving at Five Points C.F., he discovered that his legal and medical papers were missing or damaged. Id. He continued to suffer from numerous ailments caused by defendants that required visits to the infirmary and outside hospitals. Id. at 8. Brown claims that he was only able to work on his federal complaint when he met another inmate who agreed to help him prepare his papers in October 2014. Id. Brown then underwent a second surgery on September 23, 2015 and was kept in the hospital until mid-October. Id. at 8-9. Brown finally mailed his complaint on October 16, 2015, but the package was returned due to insufficient postage. Id. at 9-10. Thus, Brown did not file his complaint until the date he mailed it with the correct postage on December 4, 2015. Id. at 10. Based on these hardships allegedly suffered by Brown, he claims that the statute of limitations should be tolled. Id. at 10-11.

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

### 1. Exhaustion of Administrative Remedies

Concerning federal complaints that fall under the Prison Litigation Reform Act, the Second Circuit has held that the applicable statute of limitations is tolled while an inmate is exhausting administrative remedies. [7] Gonzalez, 651 F.3d at 323. An inmate incarcerated at a New York State correctional facility exhausts administrative remedies utilizing the three-step process promulgated by DOCCS regulations. [8] Abney v. McGinnis, 380 F.3d 663, 668-69 (2d Cir. 2004). The applicable statute of limitations is tolled during the time that an inmate is " 'actively exhausting' his administrative remedies." Melendez v. Greiner, 477 Fed.Appx. 801, 803 (2d Cir. 2012) (quoting Gonzalez, 651 F.3d at 322 n.2).

 *7 Brown does not argue in his response to defendants' motion that the statute of limitations should be tolled while he pursued administrative remedies. However, in the days following the February 7, 2012 incident with Friedman, Coburn, and John Does, and the October 28, 2012 assault, Brown claims that defendants intercepted and destroyed his grievances. Compl. ¶¶ 10, 20. He claims that he wrote to Five Points C.F. supervisors regarding Coburn's destruction of the grievance he wrote on February 7, 2012. Id. ¶ 12. He also claims that, during his disciplinary hearing in November 2012, he complained to the hearing officer regarding defendants and other officers taking his grievances and writing materials. Id. ¶ 22. Nevertheless, Brown's response to defendants' motion argues that the statute of limitations should be equitably tolled because of the myriad health issues that he experienced during his incarceration. Dkt. No. 45 at 5-12.

The plaintiff bears the burden of showing that he or she is entitled to equitable tolling. See Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007). Therefore, Brown must show that he "was actively exhausting" his administrative remedies during the period in question, otherwise "his burden will go unmet." Davis v. Jackson, No. 15-CV-5359 (KMK), 2016 W L 5720811, at *8 (S.D.N.Y. Sept. 30, 2016) (citation omitted). Further, Brown must show that he brought this action "within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel claim have ceased to be operational." Abbas, 480 F.3d at 642 (internal quotation marks and citation omitted).

Here, Brown has not addressed defendants' argument that equitable tolling does not apply because Brown never raised an administrative claim. See Dkt. No. 34-1 at 7. Indeed, under the Second Circuit's rule, "the equitable tolling period begins when a plaintiff first raises his administrative claim, and ends when the plaintiff's administrative remedies are deemed exhausted." Povoski v. Lacy, No. 9:14-CV-97 (BKS/CFH), 2016 W L 908899, at *4 (N.D.N.Y. Feb. 8, 2016) (citing Gonzalez, 651 F.3d at 324).

Brown admits that he failed to exhaust his administrative remedies, but argues that he was threatened with bodily harm, and that his writing materials were confiscated, preventing him from filing grievances. Dkt. No. 1-4 at 3. Although "reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling[,] ... every inmate is [not] entitled to equitable tolling merely because he resides in an environment that intrinsically works to his disadvantage." Davis, 2016 WL 5720811, at *11. Brown alleges in his complaint that, on two separate occasions, correction officers intercepted and destroyed his grievances. Compl. ¶¶ 10, 20. However, Brown was able to file a grievance without difficulty in July 2013, after Five Points C.F. allegedly lost his legal and medical papers. Dkt. No. 45 at 7. Additionally, in his response to defendants' motion, Brown claims that he was unable to file his complaint timely because he was suffering from multiple medical issues. See id. at 6-11. He makes no mention of any difficulties filing grievances. Additionally, when Brown did attempt to file his complaint, it was returned to him due to inadequate postage. Id. at 9-10. Brown made no allegation that the complaint was filed late due to interference from prison officials, or fear of retaliation.

Based on the foregoing, the Court finds that Brown has failed to meet his burden in showing that he is entitled to equitable tolling during the time he pursued administrative remedies.

### 2. Brown's Medical Condition

The Second Circuit has held that "equitable tolling may be appropriate where the plaintiff's failure to comply with the statute of limitations is attributable to the plaintiff's medical condition." Brown v. Parkchester S. Condos., 287

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155825

F.3d 58, 60 (2d Cir. 2000). However, a plaintiff's medical condition must be so severe as to affect the plaintiff's cognitive functioning and ability to communicate, so much so that they are rendered unable to pursue their legal rights. See id. at 61 (allowing an evidentiary hearing to determine whether the plaintiff's suffering three strokes impaired his ability to pursue his legal rights); Arbas v. Nicholson, 403 F.3d 1379, 1381 (Fed. Cir. 2005) (describing a stroke, head trauma, and a heart attack as possible ailments that would impair a person's ability to diligently pursue their legal rights).

 *8 Here, Brown argues that because he was hospitalized multiple times during his incarceration, he was unable to pursue his legal rights. Dkt. No. 45 at 6-11. The Court finds Brown's argument unavailing. First, Brown's most recent claim began to accrue on November 4, 2012—the date that Friedman allegedly issued a false misbehavior report. Compl. ¶ 21. His earliest claim began to accrue on February 7, 2012, when Friedman threatened him. Id. ¶ 10. Brown claims that he could not pursue these claims because he had knee replacement surgery on March 26, 2013—nearly five months after the most recent claim accrued. Dkt. No. 45 at 6. Brown was then placed in the SHU, and hospitalized again from May 16, 2013 through June 21, 2013. Id. at 6-7. Brown claims that his legal papers were lost when he was transferred to Five Points C.F. on July 5, 2013 and claims that he kept "going back and forth either to the clinic, infirmary or an outside hospital[,]" but provides no explanation as to why he waited until October 16, 2015 to attempt to file his complaint. Id. at 7-9. Brown's chronological medical history fails to show "how [his] condition adversely affected [his] capacity to function generally or in relationship to the pursuit of [his] rights[.]" Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000). Because Brown has not shown that his hospitalizations and surgeries impeded his ability to successfully file his federal complaint, he has not met his burden in proving that the statute of limitations should be equitably tolled.

See Rhodes v. Sheahan, No. 9:13-CV-00057, 2016 WL 890081, at *8 (N.D.N.Y. Jan. 12, 2016) (finding that the plaintiff failed to establish how his spinal surgery prevented him from filing his habeas petition in a timely manner).

Based on the foregoing, the Court finds that Brown has failed to meet his burden in showing that he is entitled to equitable tolling due to his medical condition.

### III. Conclusion

For the reasons stated above, it is hereby:
**RECOMMENDED** that defendants' motion for dismissal (Dkt. No. 34) pursuant to Fed. R. Civ. P. 12(c) of plaintiff Dennis Brown's complaint (Dkt. No. 1) be **GRANTED**; and it is further

**RECOMMENDED** that this case be **DISMISSED** in its entirety as to all claims and all defendants; and it is further

**ORDERED** that the Clerk serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties m ay lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Sm all v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

### All Citations

Not Reported in Fed. Supp., 2017 WL 1155825

---

Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    Multiple claims against other DOCCS officials were dismissed by District Judge Brenda K. Sannes upon initial review of the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B). See Dkt. No. 11.

3    The complaint filed by Brown is missing a page and has pages out of order. See Compl. After the Court directed Brown to file a complaint that complies with the Court's Local Rules, Brown filed a supplement to his complaint on March 2, 2016. Dkt. No. 10. The supplement was added to Brown's complaint. See Dkt. No. 1-4.

**Brown v. Smithem, Not Reported in Fed. Supp. (2017)**

2017 WL 1155825

4    All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

5    Brown is not sure exactly which date the package was returned to his cell because he was hospitalized during this time. Dkt. No. 45 at 10.

6    The accrual dates are as follows: February 2012; March 2012; September 6 and 8, 2012; October 16, 25, and 28, 2012; and November 4 and 6, 2012. Compl. ¶¶ 10-11, 14-18, 20-21, 23.

7    The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

8    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. at N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Smithem, Not Reported in Fed. Supp. (2017)

2017 WL 1155827

2017 WL 1155827
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dennis BROWN, Plaintiff,
v.
Sgt. SMITHEM, et al., Defendants.

9:15-CV-01458 (BKS/CFH)
|
Signed 03/27/2017

**Attorneys and Law Firms**

Dennis Brown, 96-A-3118, Riverview Correctional Facility, P.O. Box 247, Ogdensburg, NY 13669, Plaintiff, pro se.

Denise P. Buckley, Esq., Hon. Eric T. Schneiderman, Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

## MEMORANDUM-DECISION AND ORDER

Hon. Brenda K. Sannes, United States District Judge:

**\*1** Plaintiff Dennis Brown, a New York State inmate, commenced this civil rights action asserting claims under 42 U.S.C. § 1983 arising out of his incarceration at Five Points Correctional Facility. Dkt. No. 1. In his Complaint, Plaintiff alleges that the Defendants violated his rights under the First and Eight Amendments. On August 18, 2016, Defendants filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) on the grounds that Plaintiff's Complaint is barred by the statute of limitations. Dkt. No. 34. Plaintiff opposed the motion. Dkt. No. 45. This matter was referred to United States Magistrate Judge Christian F. Hummel who, on February 28, 2017, issued a Report-Recommendation and Order recommending that Defendants' motion be granted and that this case be dismissed in its entirety. Dkt. No. 54. Magistrate Judge Hummel advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the

failure to object to the report within fourteen days would preclude appellate review. Dkt. No. 54, p. 18.

Following the Report-Recommendation, Plaintiff filed a one-page later letter. Dkt. No. 55. Although the letter does not indicate that Plaintiff intends it to be an objection to the Report-Recommendation, the Court has reviewed it to determine whether, read liberally, it might be so construed. *Id.* In the letter, Plaintiff reiterates the assertions he made in the cover letter to the Complaint, Dkt. No. 1-2, the contents of which he also quoted in his response to the motion to dismiss. Dkt. No. 45, pp. 4, 6–7. Since the letter, even construed liberally, fails to raise a specific objection and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 366 (S.D.N.Y. 2007) ("If ... the party ... simply reiterates her original arguments, the district court reviews the report and recommendation only for clear error." (internal quotation marks omitted)); *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Report-Recommendation is adopted in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 54) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 34) is **GRANTED** and this case **DISMISSED** in its entirety; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2017 WL 1155827

2018 WL 840056
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

COOPER CROUSE-HINDS, LLC,
Cooper Industries, LLC, Plaintiffs,

v.

CITY OF SYRACUSE, NEW YORK, County
of Onondaga, New York, Defendants.

16-CV-1201 (MAD/ATB)
|
Signed 02/12/2018

**Attorneys and Law Firms**

SQUIRE PATTON BOGGS LLP, OF COUNSEL:
BRIAN D. STARER, ESQ., VICTOR GENECIN, ESQ.,
30 Rockefeller Plaza, 23rd Floor, New York, New York
10112-0015, Attorneys for Plaintiffs.

SQUIRE PATTON BOGGS LLP, OF COUNSEL:
D. REES ALEXANDER, ESQ., DANELLE M.
GAGLIARDI, ESQ., REBEKAH M. SINGH, ESQ.,
VINCENT ATRIANO, ESQ., 41 S. High Street, Suite
2000, Columbus, Ohio 43215, Attorneys for Plaintiffs.

HANCOCK ESTABROOK, LLP, OF COUNSEL:
JOHN G. POWERS, ESQ., HOLLY K. AUSTIN,
ESQ., PAUL J. TUCK, ESQ., 1500 AXA Tower I, 100
Madison Street, Syracuse, New York 13202, Attorneys for
Defendant City of Syracuse.

CITY OF SYRACUSE CORPORATION COUNSEL,
OF COUNSEL: CHRISTINE M. GARVEY, ESQ., 233
East Washington Street, Room 300 City Hall, Syracuse,
New York 13202, Attorneys for Defendant City of
Syracuse.

ONONDAGA COUNTY DEPARTMENT OF LAW,
OF COUNSEL: BENJAMIN M. YAUS, ESQ., John H.
Mulroy Civic Center, 421 Montgomery Street, 10th Floor,
Syracuse, New York 13202, Attorneys for Defendant
Onondaga County.

THE WLADIS LAW FIRM, PC, OF COUNSEL:
KEVIN C. MURPHY, ESQ., 6312 Fly Road, East
Syracuse, New York 13057, Attorneys for Defendant
Onondaga County.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

## I. INTRODUCTION

**\*1** On March 31, 2017, Plaintiffs Cooper Crouse-
Hinds, LLC ("CCH"), and Cooper Industries, LLC
("CI"), filed the amended complaint in this action against
Defendants City of Syracuse (the "City") and County
of Onondaga (the "County"). *See* Dkt. No. 26. This
action arises out of the disposal of hazardous waste at
landfills in Syracuse, New York. Plaintiffs seek relief
pursuant to the Comprehensive Environmental Response,
Compensation, and Liability Act ("CERCLA"), the
New York Hazardous Waste Disposal Site Remedial
Program Law ("State Superfund Law"), the New York
Environmental Conservation Law, and the New York Oil
Spill Act ("Navigation Law"), as well as common law
causes of action. The City and the County filed separate
motions to dismiss, which are presently before the Court.
*See* Dkt. Nos. 29, 30. For the following reasons, the
motions are granted in part and denied in part.

## II. BACKGROUND

The Crouse-Hinds Company, the predecessor to
Plaintiffs, was founded in 1897 and manufactured
electronic equipment. *See* Dkt. No. 1 at ¶ 14. In
approximately 1911, the Crouse-Hinds Company built
a manufacturing facility in Syracuse, New York. *See
id.* at ¶ 15. Between 1911 and 1948, the Crouse-Hinds
Company acquired property (the "Site") adjacent to the
manufacturing facility that would later be used for the
disposal of trash, including solid waste, foundry sands and
cores, scrap wood, and other debris. *See id.* at ¶¶ 16-17.
That property was divided into two separate landfills, each
of which contained disposal facilities: the North Landfill,
which is located in the Town of Salina, and the South
Landfill, which is located in the City of Syracuse. *See id.*
at ¶¶ 17-18. The North and South Landfills are bisected by
Seventh North Street, and the Ley Creek runs along the
northwestern edge of the Site. *See id.* The North Landfill
was in use from the mid-1950s until 1989, and the South
Landfill was in use from 1960 until 1969. *See id.* at ¶ 18.
The Site is now owned by CCH. *See id.* at ¶ 19. In 1981,

CI aquired ownership of the Crouse-Hinds Company, and the two later merged into Cooper Industries, Inc., which is now CI. *See id.* at ¶ 14.

**A. The City and the County**

On November 4, 1960, the Crouse-Hinds Company and the City of Syracuse Department of Public Works ("Syracuse DPW") entered into a written indenture agreement ("1960 Indenture") allowing Syracuse DPW to use the South Landfill for waste disposal at no cost. *See id.* at ¶ 20. In the 1960 Indenture, Syracuse DPW agreed to

> release, indemnify and save harmless the Owner from and against any and all such loss, injury and damage and any and all claims demands, actions, judgments, costs, expenses (including, without limitation, reasonable counsel fees) and liabilities of every name and nature which may arise or result directly or indirectly from or by reason of any such loss, injury or damage or from or by reason of the failure of the City fully to keep, perform, observe and fulfill any of the covenants, conditions or restrictions herein contained to be kept, performed, observed and fulfilled by the City.

**\*2** *See* Dkt. No. 26-2 at 3. Pursuant to the 1960 Indenture, Syracuse DPW widened, deepened, and cleaned out streams and culverts at the Site; it built and restored drainage ditches at the Site; and it cleaned out the Ley Creek Channel. *See* Dkt. No. 26 at ¶¶ 22-23. In connection with that work, Syracuse DPW dredged sediments and debris containing hazardous substances and petroleum, and the sediments and debris were dumped at the Site. *See id.* at ¶ 25. From approximately 1961 through 1965, Syracuse DPW dumped a total of roughly 520,000 cubic yards of municipal, commercial, and industrial wastes in the South Landfill, which accounts for approximately one half of all waste dumped in the South Landfill. *See id.* at ¶ 27.

On multiple occasions in the early 1960s, the Crouse-Hinds Company notified Syracuse DPW that it was disposing of waste in a manner that did not comply with the 1960 Indenture. *See id.* at ¶¶ 28-31. In August 1965, Syracuse DPW ceased disposal activities at the South Landfill, but it did not address the conditions at the Site as required by the 1960 Indenture. *See id.* Subsequently, Syracuse DPW leased a property that is adjacent to the North Landfill and was owned by a separate company. *See id.* at ¶ 32. To facilitate use of that property, the Crouse-Hinds Company transferred a 100-foot-wide strip of land along the edge of the North Landfill to Syracuse DPW. *See id.* at ¶ 33. Syracuse DPW built a road to access the new property using fill that included contaminated sediments. *See id.* Syracuse DPW dumped waste at that property from approximately 1965 through 1970. *See id.* at ¶ 32.

On August 30, 1972, the Crouse-Hinds Company entered into an Option Agreement with Onondaga County that transferred to the County a 1.4-acre strip of property located on the western border of the North Landfill and adjacent to Ley Creek. *See id.* at ¶ 36. The agreement also granted the County a right of way along the western side of the South Landfill, and it allowed the County to widen and deepen the Ley Creek channel. *See id.* As part of that work, the County spread contaminated dredged spoils from Ley Creek over portions of the South Landfill, which released hazardous substances including PCBs and petroleum at the Site. *See id.* at ¶ 37. The 1972 Option Agreement provided that

> the County shall defend, save harmless and indemnify Crouse-Hinds from and against any and all claims against Crouse-Hinds and any and all loss, costs, damages or expenses (including without limitation reasonable counsel fees) which Crouse-Hinds may suffer, sustain or incur by reason of bodily injury (or claims thereof) to any persons whomsoever, or any damages to the real or personal property of Crouse-Hinds or of any other person, firm or corporation (or claims thereof) arising or which shall be claimed to have arisen out

of the County's use of the premises described herein.

*See* Dkt. No. 26-3 at 6. In the early 1970s, the Crouse-Hinds Company notified the County that the County had improperly disposed of dredged spoils contaminated with PCBs and other hazardous substances at the Site, as well as locations upstream of the Site that led to further contamination of the Site. *See id.* at ¶¶ 43-46.

The Crouse-Hinds Company and its successors did not use PCBs in their operations. *See id.* at ¶ 43. Therefore, all of the PCB contamination of the Site was a result of actions taken by the City and the County. *See id.* Due to Defendants' disposal of contaminated sediments at and near the Site, the United States Environmental Protection Agency ("EPA") has identified both the City and the County as "potentially responsible parties" under CERCLA. *See id.* at ¶ 46.

**B. Remedial Activities**
In 1985, the New York State Department of Environmental Conservation ("NYSDEC") designated the Site as a Class 2 Inactive Hazardous Waste Disposal Site under the State Superfund Program. *See id.* at ¶ 47. On May 14, 2004, CI entered into a Consent Order with NYSDEC ("2004 Order") pursuant to which CI undertook sampling investigations and studies, as well as interim response measures at the Site. *See id.* at ¶ 48. CCH was not a party to the 2004 Order, but it may have incurred costs related to the 2004 Order's implementation. *See id.* at ¶¶ 48-49. CI's investigatory work included obtaining and analyzing samples from various locations at the Site, including surface soils, surface water, groundwater, and leachate. *See id.* at ¶ 51. The sampling revealed sediment exceeding NYSDEC standards for numerous hazardous substances, including benzene, chlorobenzene, 1,4-dichlorobenzene, PCBs, benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, chrysene, indeno(1,2,3,-cd)pyrene, phenol, arsenic, cadmium, and chromium. *See id.* at ¶ 54. CI's interim response measures included preventing the migration of contaminated sediments, evaluating and removing free-phase petroleum product, and installing a security fence. *See id.* at ¶ 52.

**\*3** On February 27, 2011, NYSDEC held a public meeting attended by representatives of the County and the City where it discussed a Proposed Remedial Action Plan for the Site. *See id.* at ¶ 55. On March 31, 2011, NYSDEC issued a decision summarizing its findings and outlining a remediation plan for the Site. *See id.* at ¶ 56. CCH agreed to the plan and entered into a consent order with NYSDEC ("2011 Order") on August 29, 2011, but CI was not a party to the agreement. *See id.* at ¶ 57. The 2011 Order included language providing for release of CCH's liability to the state "[u]pon the Department's issuance of a Certificate of Completion." *See id.* at 57. Plaintiffs took action in accordance with the 2011 Order and began remediation work in October 2012. *See id.* at ¶ 59. Between December 2012 and November 2013, Plaintiffs undertook significant work, including the excavation and offsite disposal of approximately 650 tons of PCB-contaminated waste and 5,150 tons of petrolium-impacted soils. *See id.* at ¶¶ 59, 63.

In April 2014, NYSDEC approved an additional Remedial Design plan for the Site, which required the capping of the North and South landfills, the creation of buffer zones protecting Ley Creek and wetland areas, the excavation and disposal of hot spots, and the restoration of wetlands and drainage channels. *See id.* at ¶ 64. CCH disposed of an additional 825 tons of PCB-contaminated waste from the North Landfill in 2015, and the capping of the North and South Landfills is now complete. *See id.* at ¶¶ 65-66. To date, Plaintiffs have spent $11.9 million to investigate and remediate contamination at the Site, and long-term operation and maintenance over the next thirty years are estimated to cost an additional $1.14 million. *See id.* at ¶ 68.

Prior to filing the complaint in this action, Plaintiffs attempted to secure contributions from the City and the County. *See id.* at ¶ 70. During those negotiations, CCH, the City, and the County entered into an agreement tolling all "potential legal and contractual claims" for the period from August 25, 2014 through October 3, 2016. *See id.* at ¶ 70. To date, neither the City nor the County has made any financial contribution to remediating contamination at the Site. *See id.* at ¶ 69.

**C. Procedural History**
On October 4, 2016, CCH filed the complaint in this action. *See* Dkt. No. 1. On March 31, 2017, Plaintiffs filed the amended complaint, which named CI as a Plaintiff.

*See* Dkt. No. 26. In the amended complaint, Plaintiffs state the following causes of action: (1) cost recovery under CERCLA, (2) contribution under CERCLA, (3) declaratory relief under CERCLA and New York law, (4) breach of contract and contractual indemnity against the City, (5) breach of contract and contractual indemnity against the County, (6) contribution under the New York State Superfund Law, (7) strict liability under the New York Spill Act, (8) contribution under the New York Navigation Law, and (9) unjust enrichment. *See* Dkt. No. 26 at ¶¶ 72, 86, 93, 97, 110, 122, 128, 137, 143. Defendants filed two separate motions to dismiss. *See* Dkt. Nos. 29, 30. The City adopted all applicable arguments made in the County's brief, and the County did the same in regard to the City's brief. *See* Dkt. No. 30-1 at 25; Dkt. No. 29-1 at 21. Plaintiffs opposed the motions, *see* Dkt. Nos. 33, 34, and Defendants filed replies, *see* Dkt. Nos. 35, 36.

## III. LEGAL STANDARD

### A. Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to [Federal Rule of Civil Procedure 12(b)(6)](#) tests the legal sufficiency of the party's claim for relief. *See [Patane v. Clark](#)*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See [ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.](#)*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See [Ashcroft v. Iqbal](#)*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See [Mangiafico v. Blumenthal](#)*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *[Chambers v. Time Warner, Inc.](#)*, 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also [Sutton ex rel. Rose v. Wachovia Secs., LLC](#)*, 208 Fed. Appx. 27, 29-30 (2d Cir. 2006) (noting that, on a motion to dismiss, a court may take judicial notice of documents filed in another court).

**\*4** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* [Fed. R. Civ. P. 8(a)(2)](#), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief,' " *[Bell Atl.](#)*

*[Corp. v. Twombly](#)*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *[id.](#) at 555* (citation omitted), and present claims that are "plausible on [their] face," *[id.](#) at 570*. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *[Iqbal](#)*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *[Twombly](#)*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *[Twombly](#)*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *[id.](#) at 570*.

### B. Statute of Limitations

The statute of limitations is an affirmative defense, and it is well established that "[c]omplaints need not anticipate, or attempt to plead around, potential affirmative defenses." *[High Falls Brewing Co., LLC v. Boston Beer Corp.](#)*, 852 F. Supp. 2d 306, 310 (W.D.N.Y. 2011). "Requiring plaintiffs to allege in a complaint facts sufficient to overcome a statute of limitations affirmative defense would shift the burden to raise and prove the affirmative defense from defendants, as the burden is allocated and imposed by [Rule 8(c)(1) of the Federal Rules of Civil Procedure](#), to plaintiffs." *[Kattu v. Metro Petroleum, Inc.](#)*, No. 12-CV-54, 2013 WL 4015342, \*4 (W.D.N.Y. Aug. 6, 2013).

Therefore, a statute of limitations defense must generally wait until after the motion-to-dismiss stage. *See id.* However, a complaint may be dismissed under Federal Rule of Procedure 12(b)(6) as barred by a statute of limitations where the complaint clearly shows that the plaintiff's claim is barred. *See [Messeroux v. Maimonides Med. Ctr.](#)*, No. 11-CV-5343, 2013 WL 2414690, \*1 (citing *[Leonhard v. United States](#)*, 633 F.2d 599, 609 n.11 (2d Cir. 1980)); *see also [Harris v. City of New York](#)*, 186 F.3d 243, 250 (dismissing claims as time-barred at the pleading stage is "appropriate only if a complaint clearly shows the claim is out of time").

### IV. DISCUSSION

#### A. CERCLA

Enacted in 1980 in response to New York's Love Canal Disaster, [1] CERCLA "is a remedial statute 'designed to encourage prompt and effective cleanup of hazardous waste sites' by 'assuring that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.' " *MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387, 392-93 (N.D.N.Y. 2013) (quoting *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010)). "In furtherance of these purposes, the statute imposes strict liability on owners and facility operators, on persons who arranged for the disposal or treatment of hazardous waste at the relevant site, and on persons who transported hazardous waste to the site." *Price Trucking Corp. v. Norampac Indus., Inc.*, 78 F.3d 75, 80 (2d Cir. 2014) (citing 42 U.S.C. § 9607(a)(1)–(4)).

Under CERCLA, States and the federal government may "initiate comprehensive cleanups and ... seek recovery of expenses associated with those cleanups" from property owners, who are strictly liable for the hazardous materials on their property. *Niagara Mohawk*, 596 F.3d at 120. To relieve the burden on property owners, CERCLA permits them to "seek reimbursement of their cleanup costs from others in the chain of title or from certain polluters— the so-called potentially responsible parties ('PRPs')." *Id.* citing (42 U.S.C. § 9607(a)). That recourse is available through three separate provisions in CERCLA: §§ 107(a), 113(f)(1), and 113(f)(3)(B). *See id.*

**\*5** Section 107(a) authorizes parties—including the United States, a state, or a PRP—to seek reimbursement for costs incurred remediating pollution at a property. *See* 42 U.S.C. § 9607(a)(4). However, parties may recover remediation costs only if the actions they take are consistent with the National Contingency Plan, which is "the federal government's roadmap for responding to the release of hazardous substances." *Niagara Mohawk*, 596 F.3d at 121. Section 113(f)(3)(B), on the other hand, "provides a right of contribution to PRPs that have settled their CERCLA liabilty with a state or the United States through either an administrative or judicially approved settlement." *Id.* (citing 42 U.S.C. § 9613(f)(3)(B)). Finally, § 113(f)(1) provides a right of contribution to PRPs that

have been sued under §§ 106 or 107. *See* 42 U.S.C. § 9613(f)(1).

Plaintiffs may seek reimbursement of remedial costs under either § 107(a) or § 113(f) but not both. "Each CERCLA right of action carries with it its own statutory trigger, and each is a distinct remedy available" to persons in different situations. *Bernstein v. Bankert*, 733 F.3d 190, 202 (7th Cir. 2013); *see also MPM Silicones*, 931 F. Supp. 2d at 394 ("[T]he remedies in §§ 107(a) and 113(f) complement each other by providing causes of action 'to persons in different procedural circumstances' ") (quoting *United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007)). If a PRP has been sued under §§ 106 or 107, it may recover contributions pursuant to § 113(f)(1). *See Bernstein*, 733 F.3d at 202. If a PRP has resolved its liability to the federal or state government in an administrative or judicially approved settlement, it may recover contributions pursuant to § 113(f)(3)(B). *See id.* Only if neither of those two conditions are present may a PRP bring a cost recovery action under § 107. *See id.*; *see also DMJ Assocs., L.L.C. v. Capasso*, 181 F. Supp. 3d 162, 169 (E.D.N.Y. 2016) ("Accordingly, some of the [plaintiffs'] costs are recoverable only under § 107, while some are separately recoverable only under § 113. Consistent with the Supreme Court's holding in [*United States v. Atlantic Research Corp.*, 551 U.S. 128 (2007)], none of the listed costs are recoverable under both sections simultaneously").

#### *1. Availability of §§ 107 and 113(f)(3)(b)*

Defendants argue that Plaintiffs are precluded from bringing certain claims under § 107 in this case. *See* Dkt. No. 29-1 at 6. In particular, Defendants argue that the 2004 Order resolved CI's liability for the costs incurred in complying with that order, which constitutes a statutory trigger requiring CI to proceed under § 113(f)(3)(B), not § 107. *See id.* at 13. Similarly, Defendants argue that CCH cannot bring a § 107 claim for costs related to the 2011 Order because the 2011 Order resolved CCH's liability for those costs, and CI may therefore only recover those costs through a claim under § 113(f)(3)(B). *See id.* at 11-12.

#### a. The 2004 Order

In 2004, CI entered into a Consent Order with NYSDEC in which CI agreed to investigate the contamination at the

Site and implement interim response measures to address contamination. *See* Dkt. No. 26 at ¶ 48. CI incurred response costs in complying with the 2004 Order. *See id.* at 49. Defendants argue that the 2004 Order resolved CI's liability for response actions taken in relation to the 2004 Order. *See* Dkt. No. 29-1 at 13. However, Defendants do not cite to any language in the order resolving CI's liability; indeed, it appears that no such language exists. As Plaintiffs point out, the 2004 Order specifically states, "Nothing contained in this Order shall be construed as barring, diminishing, adjudicating, or in any way affecting any of the Department's rights." Dkt. No. 29-3 at 13.

**\*6** As the Court notes above, § 113(f)(3)(B) is the proper procedural mechanism for a "person who has resolved its liability to the United States or a state for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement." [42 U.S.C. § 9613(f)(3)(B)](). But a consent order with the federal or state government does not necessarily qualify as an "administrative or judicially approved settlement" that would require a PRP to proceed under § 113(f)(3)(B). If, for example, a PRP enters into a consent order, but "the consent order [does] not purport to resolve CERCLA liability," then the consent order does "not qualify as an administrative settlement under § 113." *[Niagara Mohawk]()*, 596 F.3d at 125; *[HLP Props., LLC v. Cons. Edison Co. of N.Y., Inc.](),* No. 14-CV-1383, 2014 WL 6604741, \*7 (S.D.N.Y. Nov. 21, 2014) ("[A] consent order is an administrative settlement of liability for purposes of § 113 where the plaintiff undertook to remediate a contaminated site in exchange for an express resolution of liability under CERCLA and the DEC's covenant not to sue under 'State or Federal statutory or common law' ") (quoting *[Niagara Mohawk](),* 596 F.3d at 126). Because the 2004 Order does not resolve CI's liability, CI may proceed under § 107.

### b. The 2011 Order

In 2011, CCH entered into a consent order with NYSDEC to address the contamination at the Site. *See* Dkt. No. 26 at ¶¶ 56-58. Under the 2011 Order, CCH agreed to take actions to investigate, remove, and safely dispose of hazardous waste in the short term, as well as to take long-term remedial actions at the Site. *See id.* at ¶ 58. CCH has incurred financial costs in carrying out the actions outlined in the 2011 Order. *See id.* Unlike the

2004 Order, the 2011 Order contains language potentially resolving CCH's liability under CERCLA. Specifically, the 2011 Order states, "Upon the Department's issuance of a Certificate of Completion as provided at [6 NYCRR 375-1.9]() and [375-2.9](), Respondent [CCH] shall obtain the benefits conferred by such provisions, subject to the terms and conditions described therein." Dkt. No. 29-4 at 6. [2] Under the 2011 Order, CCH's release from liability is conditional in that it only occurs "[u]pon the Department's issuance of a Certificate of Completion." *See id.* Thus far, CCH has not received a certificate of completion from NYSDEC. *See* Dkt. No. 33 at 10. The question, then, is whether a conditional release from reliability is sufficient to trigger the requirement that a PRP proceed under § 113(f)(3)(B). Or is liability resolved only after the certificate of completion is issued?

There is a great deal of inconsistency among the cases addressing consent orders that conditionally resolve a PRP's CERCLA liability and whether those consent orders trigger the requirement to proceed under § 113(f)(3)(B). Indeed, there is a circuit split on this issue. *Compare [Fla. Power Corp. v. FirstEnergy Corp.](),* 810 F.3d 996, 1001 (6th Cir. 2015) (holding that consent orders in the case "do not resolve plaintiff's liability because resolution of liability is conditioned on plaintiff's performance and does not take immediate effect"); *and [Bernstein v. Bankert](),* 733 F.3d 190, 210 (7th Cir. 2013) (holding that the plaintiff had not resolved its liability with the EPA because the consent order's release of liability was conditioned the plaintiff's complete performance); *with [Asarco LLC v. Atl. Richfield Co.](),* 866 F.3d 1108, 1125 (9th Cir. 2017) (holding that a PRP resolves its liability to the government where a settlement agreement decides the PRP's obligations with certainty and finality, and a "covenant not to sue or release from liability conditioned on completed performance does not undermine such a resolution").

The Second Circuit has not yet weighed in on the issue, [3] and district courts in this circuit have come to differing conclusions. *Compare [DMJ Assocs.](),* 181 F. Supp. 3d at 167 ("Since no final report was issued due to the [consent order's] termination prior to the completion of all remedial action, the [plaintiffs] had not been released from liability" and therefore could proceed under 107(a)); *with [HLP Props.](),* 2014 WL 6604741, at \*5 ("[A]greements providing for future resolution of CERCLA liability constitute administrative settlements for purposes of § 113"); *and [Chitayat v. Vanderbilt Assoc.](),* 702 F. Supp. 2d 69, 81

(E.D.N.Y. 2010) (finding that a consent order resolved liability even though it did "not offer [the plaintiff] a present release from liability but rather the release [was] contingent upon years of Compliance with the Consent Order").

**\*7** Perhaps because the circuit split arose after the motions to dismiss were fully submitted, the parties did not thoroughly address the issue in their briefs. Furthermore, the question of whether CCH resolved its liability through the 2011 Order necessarily involves contract interpretation. *See Bernstein*, 733 F.3d at 213 ("Whether or not liability is resolved through a settlement simply is not the sort of question which can or should be decided by universal rule. Instead, it requires a look at the terms of the settlement on a case-by-case basis"); *Asarco*, 866 F.3d at 1122 (holding that an agreement must "decide[ ] with finality the scope of a PRP's legal exposure and obligations" in order to resolve liability). The parties did not brief that issue. Therefore, at this time the Court declines to determine whether the 2011 Order resolved CCH's liability and requires it to proceed under § 113(f)(3)(B).

### 2. Failure to State a Claim Under § 107
Defendants also seek to partially dismiss CCH's claim for cost recovery under § 107. *See* Dkt. No. 29-1 at 12-13. In particular, Defendants argue that CCH fails to allege that it incurred any costs outside of the costs incurred complying with the 2011 Order. *See* Dkt. No. 36 at 4. Indeed, CCH was not a party to the 2004 Order, and the amended complaint alleges only that "CCH also may have incurred response costs in connection with implementation of the 2004 Consent Order." Dkt. No. 26 at ¶ 49. Therefore, Defendants argue, CCH fails to state a claim for cost recovery under § 107 as to any costs other than the costs incurred in complying with the 2011 Order.

To make a prima facie case for liability under § 107, a plaintiff must show that: "(1) the defendant is an 'owner' or is otherwise liable under 42 U.S.C. § 9607(a)(1)-(4); (2) the site is a 'facility' as defined by 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or the threat; and (5) the costs and response conform to the National Contingency Plan." *Price Trucking Corp. v. Norampac Indus., Inc.*, 748 F.3d 75, 80 (2d Cir. 2014).

Here, Defendants argue that CCH failed to plead a necessary element of its § 107 claim because it failed to identify with certainty or specificity any costs incurred under the 2004 Order. But CCH does not need to specifically identify costs related to the 2004 Order at this stage; CCH separately established the fourth element of a § 107 claim by alleging that it incurred costs under the 2011 Order. Therefore, Defendants motion to dismiss CCH's § 107 claim as to costs related to the 2004 Order is denied.

### 3. Statute of Limitations
Under CERCLA, there are different statute of limitations periods for claims under §§ 107 and 113. The statute of limitations for a contribution claim under § 113 is three years, while the limitations period for cost recovery claims under § 107 is six years. *See* 42 U.S.C. § 9613(g). [4] Defendants argue that CI's § 113 claim is time-barred because it is based on costs incurred in complying with the 2004 Order.

The statute of limitations on a § 113(f)(3)(B) claim begins to run at the time that a PRP settles its CERCLA liability with the state or federal government. *See* 42 U.S.C. § 9613(g)(3); *see also* HLP Props., 2014 WL 6604741, at *7 (noting that for a claim under § 113, "the 'triggering event' for the statute of limitations period was the date that the [plaintiffs] 'resolved their CERCLA liability' "). In this case, however, Plaintiffs clearly allege that CI did not resolve any liability through either the 2004 Order or the 2011 Order. CI was a party to the 2004 Order, but Plaintiffs allege that the 2004 Order "did not contain any language purporting to resolve Plaintiffs' potential liability to the State with respect to the Site." Dkt. No. 26 at ¶ 48. As for the 2011 Order, Plaintiffs admit in their opposition that any release of liability would "apply only to CCH (the "Respondent") and not to CCH's affiliates such as CI." Dkt. No. 33 at 10. Since neither agreement resolves CI's liability, the statute of limitations for any potential § 113 claim has not yet been triggered.

**\*8** But this raises a separate issue regarding CI's § 113 claim: there do not appear to be any facts alleged in the amended complaint that support a § 113 on CI's behalf. Nothing in the complaint indicates that CI has—or even could—resolve its liability through either the 2004 Order or the 2011 Order. Therefore, it appears that Plaintiffs have failed to state a § 113(f)(3)(B) claim on CI's behalf. A court may dismiss a complaint *sua sponte* for failure

to state a claim on which relief can be granted, but "it may not properly do so without giving the plaintiff an opportunity to be heard." *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991). Therefore, the Court orders Plaintiffs to provide a supplemental brief to the Court explaining why CI's § 113 claim should not be dismissed for failure to state a claim. *See MPM Silicones, LLC v. Union Carbide Corp.*, 931 F. Supp. 2d 387, 396 (N.D.N.Y. 2013) (dismissing the plaintiff's § 113(f) claim *sua sponte* after requesting supplemental briefing from the plaintiff explaining why its 113(f) claim was not barred). Plaintiffs must submit the supplemental brief within thirty (30) days of the date of this Memorandum-Decision and Order.

**B. State Law Claims**

*1. Notice of Claim*

The general rule in federal court is that "state notice-of-claim statutes apply to state-law claims." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (citing *Felder v. Casey*, 487 U.S. 131, 151 (1988)). A notice-of-claim statute generally provides that no action may be brought on or maintained against certain government entities without first providing written notice of the claim. New York's notice-of-claim statute requires a plaintiff to serve a notice of claim "within ninety days after the claim arises," N.Y. Gen. Mun. Law § 50-e(1)(a), and that notice must state the nature of the claim, as well as "the time when, the place where and the manner in which the claim arose," *id.* § 50-e(2). Nowhere in the amended complaint do Plaintiffs allege that they filed any notice of claim or otherwise complied with a notice-of-claim statute.

a. City of Syracuse

The City begins by arguing that Plaintiffs' breach of contract and indemnification claims should be dismissed because Plaintiffs failed to file a notice of claim. *See* Dkt. No. 30-1 at 15. Again, Plaintiffs do not assert that they filed any notice of claim in this case. Instead, they make three different arguments for why the notice-of-claim requirement does not apply to their contract claims: (1) compliance with notice-of-claim statutes is an affirmative defense; (2) the New York notice-of-claim statute does not apply to breach of contract claims; and (3) applying the notice-of-claim requirements in the Syracuse Charter would violate the Contracts Clause of the United States Constitution. *See* Dkt. No. 34 at 13-16.

As for their first assertion, Plaintiffs are incorrect—compliance with notice-of-claim statutes is a pleading requirement, not an affirmative defense. "Service of a notice of claim ... is a condition precedent to commencing an action...." *Maxwell v. City of New York*, 29 A.D.3d 540, 541 (2d Dep't 2006). "New York's law requires a plaintiff to plead in the complaint that: (1) the plaintiff has served the notice of claim; (2) at least thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy*, 164 F.3d at 793. "Notice of claim requirements 'are construed strictly by New York state courts,' " and the "[f]ailure to comply with these requirement ordinarily requires a dismissal for failure to state a cause of action." *Id.* at 793-94 (quoting *Murray v. LeRoy Cent. Sch. Dist.*, 67 N.Y.2d 775, 775 (1986)).

Plaintiffs' second argument also misses the mark. Plaintiffs correctly note that the New York General Municipal Law does not require plaintiffs to file a notice of claim in a breach of contract action. *See* N.Y. Gen. Mun. Law § 50-e(a) ("In any case *founded upon tort* where a notice of claim is required by law as a condition precedent....") (emphasis added)); *see also Finke v. City of Glen Cove*, 55 A.D.3d 785, 786 (2d Dep't 2008) ("The plaintiff's breach of implied contract and breach of license causes of action, however, are not subject to the notice of claim requirement"). For example, in *Strauss v. City of Glens Falls*, 140 A.D.3d 1411 (3d Dep't 2016), the court declined to dismiss a breach of contract claim because of the plaintiff's failure to file a notice of claim. In that case, the court noted that the notice of claim provisions in the Charter of the City of Glens Falls, like those of the General Municipal Law, did not apply to breach of contract claims. *See id.* at 1412.

**\*9** In this case, however, Plaintiffs are subject to the notice-of-claim provision in Syracuse City Charter § 8-115(3), which states:

> No action or special proceeding, for any cause whatever, except as hereinafter provided, relating to city property or involving the rights or interests of the city shall be prosecuted or maintained against the city unless it shall appear by and

as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action or special proceeding is founded be served on the city, in the same manner as a summons under the CPLR, within three (3) months after the accrual of such claim. The provisions of this section shall not apply to an action or special proceeding founded upon tort which shall be governed by the provision of sections 50-i and 50-e of the General Municipal Law.

See Dkt. No. 30-7 at 73. New York courts have consistently held that this provision applies to claims for breach of contract. In *Davis-Wallbridge, Inc. v. City of Syracuse*, 71 N.Y.2d 842, 843 (1988), the New York Court of Appeals dismissed the plaintiff's breach of contract claim because the plaintiff admittedly failed to comply with the notice-of-claim provision. *See id.*; *see also Tom L. La Mere & Assoc., Inc. v. City of Syracuse Bd. of Educ.*, 48 A.D.3d 1050, 1051 (4th Dep't 2008) (applying Syracuse's notice of claim provisions to a breach of contract claim). In this case, it is undisputed that Plaintiffs have not complied with Syracuse's notice of claim provision.

Finally, Plaintiffs argue that applying the Syracuse City Charter's current notice-of-claim provision would violate the Contracts Clause of the United States Constitution. According to Plaintiffs, the notice-of-claim provision in the Syracuse City Charter was not amended to apply to breach of contract claims until "1978 or 1981," well after the City entered into the 1960 Indenture with the Cooper Crouse Company. *See* Dkt. No. 34 at 14. Therefore, Plaintiffs argue, the Contracts Clause requires that claims in this case be subject to the version of the Syracuse City Charter that was in effect in 1960, prior to the amendment of the notice-of-claim provision. *See id.*

The United States Supreme Court considered and rejected a similar argument in *Oshkosh Waterworks Co. v. City of Oshkosh*, 23 S. Ct. 234 (1903). In that case, the plaintiff entered into a contract with the city of Oshkosh in 1883, eight years before the city amended its charter to include a notice-of-claim provision. *See id.* at 234. The plaintiff sued the city in 1900, but the suit was dismissed because the

plaintiff failed to file a notice of claim. *See id.* The Court upheld the dismissal, holding that "the changes made by the revised charter of Oshkosh, in respect of remedies for the enforcement of claims against that city, provided for its creditors a substantial and adequate remedy, and therefore did not impair the obligation of contracts with that municipal corporation." *See id.* at 447. It is now well established that "a plaintiff's claim is governed by the notice of claim statute in effect when his or her claim accrued." *Aponte v. Bellevue Hosp. Ctr.*, 183 A.D.2d 594, 595 (1st Dep't 1992); *see also Ganess v. City of New York*, 207 A.D.2d 765, 767 (2d Dep't 1994) ("Because the infant plaintiff's cause of action accrued in 1973, the present case is governed by those provisions which were contained in the version of General Municipal Law § 50-e which was in effect prior to a 1976 amendment"). Therefore, Plaintiffs' breach of contract claim against the City must be dismissed.

**\*10** Later in its motion to dismiss, the City goes on to argue that "all of Plaintiffs' state law claims against the City" should be dismissed due to Plaintiffs' failure to file a notice of claim. *See* Dkt. No. 30-1 at 18. Plaintiffs do not address this contention, but the Court agrees and dismisses each of Plaintiffs' state law claims against the City because the Syracuse City Charter clearly states that a notice of claim must be filed where a party seeks to bring an action "for any cause whatever." Syracuse City Charter § 8-115(3).

### b. County of Onondaga

In New York, suits against counties are also subject to notice-of-claim requirements. New York County Law § 52 ("Section 52") provides that

> [a]ny claim or notice of claim against a county ... for damages arising at law or in equity ... alleged to have been caused in whole or in part by or because of any misfeasance, omission of duty, negligence, or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal

law.... Every Action upon such claim shall be commenced pursuant to the provisions of section fifty-i of the general municipal law.

The text of Section 52 thus incorporates the notice of claim requirements of New York General Municipal Law §§ 50-e and 50-i, but it also broadens their scope. *See Anderson v. Nassau Cty. Dep't of Corrs.*, 558 F. Supp. 2d 283, 303 (E.D.N.Y. 2008) ("N.Y. County Law § 52(1) has broader application than General Municipal Law § 50-e"). Unlike Section 50-e, which applies only in "any case founded upon tort," Section 52 applies to "any claim ... of every name and nature." N.Y. County Law § 52(1).

The plain language of the statute seems to indicate that it applies to "any claim," including a claim for breach of contract. Indeed, at least one federal district court has come to that conclusion. *See Crippen v. Town of Hempstead*, No. 07-CV-3478, 2009 WL 803117, *16 (E.D.N.Y. 2009) (dismissing a breach of contract claim due to the plaintiff's failure to comply with Section 52's notice-of-claim provision). However, New York courts have determined that Section 52 "does not require a filing of a notice of claim in compliance with General Municipal Law § 50-e where the claim is for breach of contract." *Copece Contracting Corp. v. Erie County*, 115 A.D.2d 320, 320 (4th Dep't 1985); *see also Smith v. Rise E. Sch.*, 120 A.D.2d 726, 726 (2d Dep't 1986) ("We do not believe the Court of Appeals ... intended to construe County Law § 52 as requiring the serving of a notice of claim in actions to recover damages for breach of contract"); *O'Connell v. Onondaga County*, No. 09-CV-364, 2012 WL 12895022, *14 (N.D.N.Y. Feb. 9, 2012) ("[E]ven though County Law § 52 generally applies to any claim for damages against a county, breach-of-contract claims are not subject to the notice-of-claim requirements of County Law § 52" (citations omitted)).

Therefore, all of Plaintiffs state law claims against the County, except for their breach of contract claim, are subject to Section 52's notice-of-claim requirements and must be dismissed. *See e.g. Bartley v. County of Orange*, 111 A.D.3d 772, 773-74 (2d Dep't 2013) ("The assertion of a Navigation Law ... cause of action against the County, which could result in the County being held strictly liable for all cleanup costs and damages resulting from a

discharge of petroleum, is subject to the broad notice-of-claim requirements of County Law § 52").

### c. Summary

The Court dismisses the following claims due to Plaintiffs' failure to comply with the relevant notice-of-claim requirements: declaratory relief under New York Law (third cause of action), breach of contract and contractual indemnity against the City (fourth cause of action), contribution under the state superfund law (sixth cause of action), claims under the New York Navigation Law (seventh and eighth causes of action), and unjust enrichment (ninth cause of action). Therefore, Plaintiffs' only remaining state law claim is their fifth cause of action: breach of contract and contractual indemnity against the County.

### 2. Breach of Contract Against the County

**\*11** Plaintiffs' breach of contract action against the County arises from the County's alleged failure "to fully keep, perform, observe, and fulfill its respective covenants, conditions, and/or restrictions" under the 1972 Option Agreement with the Crouse-Hinds Company. Dkt. No. 26 at ¶ 116. The amended complaint appears to assert separate claims for breach of contract and contractual indemnity under what is labeled as the fifth cause of action. Essentially, Plaintiffs seem to allege that the County breached the 1972 Option Agreement by dumping contaminated dredged spoils at the Site, and that the County is also liable under the 1972 Option Agreement's indemnity clause because it failed to save CI harmless from loss, costs, damages, or expenses. *See id.* at ¶¶ 117-19. Defendants move to dismiss the breach of contract and contractual indemnity claims against the County as (1) barred by the statute of limitations and (2) preempted by CERCLA.

### a. Statute of Limitations

A claim for breach of contract is subject to a six-year statute of limitations. *See* N.Y. C.P.L.R. § 213(2). "In New York, a breach of contract cause of action accrues at the time of the breach," even when "no damage occurs until later." *Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993). Furthermore, "[k]nowledge of the

occurrence of the wrong on the part of the plaintiff is not necessary to start the Statute of Limitations running in [a] contract [action]." *Id.* (alterations in original) (quoting *Varga v. Credit-Suisse*, 5 A.D.2d 289, 292 (1st Dep't 1958)). A claim for indemnification, on the other hand, is subject to a six-year statute of limitations that begins to run "when the loss is suffered by the party seeking indemnity." *McDermott v. City of New York*, 50 N.Y.2d 211, 215 (1980); *see also Patel v. Exxon Corp.*, 284 A.D.2d 1007, 1008 (4th Dep't 2001) (an indemnification cause of action for recovery of remediation costs "will not commence until the cleanup costs are incurred"). Additionally, "[e]ach payment of remediation costs ... incurs a new loss for a plaintiff, creating a new indemnity claim with its own new statute of limitations (it *does not*, however, reset the clock on an already-expired indemnity claim)." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. 04-CV-5424, 2007 WL 1601491, *16 (S.D.N.Y. June 4, 2007).

To the extent that Plaintiffs assert a breach of contract claim against the county that is separate from the indemnification claim, that claim is barred by the statute of limitations. The amended complaint alleges that the County disposed of contaminated dredge spoils at or upstream from the Site in the "1970s and/or 1980s," but the amended complaint does not allege any more recent breaches of the 1972 Option Agreement. *See* Dkt. No. 26 at ¶¶ 39-45. Therefore, it is clear from the face of the amended complaint that Plaintiffs' breach of contract claim is time-barred.

As for Plaintiffs' indemnification claim, Plaintiffs' complaint was filed on October 4, 2016, and Plaintiffs allege that they repeatedly incurred remediation costs in the six years before the amended complaint was filed. *See id.* at ¶¶ 55-68. Therefore, Plaintiffs' indemnification claim is timely with respect to at least some of the costs incurred. While other costs may be barred by the statute of limitations, it is not appropriate for the Court to determine which costs are time-barred at this stage in the proceedings. *See Kattu v. Metro Petroleum, Inc.*, No. 12-CV-54, 2013 WL 4015342, *4 (W.D.N.Y. Aug. 6, 2013).

### b. Preemption

"The Supremacy Clause of the United States Constitution 'invalidates state laws that interfere with, or are contrary to federal law.' " *Bonilla v. Semple*, No. 15-CV-1614, 2016 WL 4582038, *5 (D. Conn. Sept. 1, 2016) (quoting U.S. Const. art VI, cl. 2). There are three different types of preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

**\*12** *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (citations and quotations omitted). CERCLA does not expressly preempt state law, nor is it so comprehensive as to preempt state law by occupying the entire field. *See Niagara Mohawk*, 596 F.3d at 138. CERCLA may, however, preempt state law where there is "preemption by conflict." *See id.* In particular, PRPs should not "have both a federal and a state law based claim for recovery of the same response expenditures." *Id.; see also MPM Silicones*, 931 F. Supp. 2d at 406 ("[W]hether state-law claims are preempted by CERCLA boils down to whether double recovery ... will occur").

At this stage in the litigation, it remains unclear which costs Plaintiff will be able recover under CERCLA, or even whether Plaintiffs will recover under §§ 107 or 113. Therefore, a finding that Plaintiffs' contract claim is preempted by CERCLA would be premature. Confronting a similar situation, the court in *Fitzgibbons* found that

> the record does not establish that recovery would be identical under Plaintiff's CERCLA and state-law claims; and, even assuming *arguendo* that the recovery would be identical, the possibility still exists that Plaintiff would ultimately be unable to recover under CERCLA. Accordingly, "it would seem imprudent to

dismiss state law claims outright on Rule 12 because of a mere *potential* for double recovery."

*Fitzgibbons*, 2011 WL 6218208, at *14 (quoting *New York v. W. Side Corp.*, 790 F. Supp. 2d 13, 26 (E.D.N.Y. 2011)). Thus, the Court declines to address the possibility of preemption at this time.

## V. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motions to dismiss (Dkt. Nos. 29, 30) are **DENIED in part** as to Plaintiffs' CERCLA claims and their contractual indemnification claim against the County, and **GRANTED in part** as to all other claims; and the Court further

**ORDERS** Plaintiffs to file a supplemental brief within **thirty (30) days** explaining why CI's § 113 claim should not be dismissed for failure to state a claim; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 840056

Footnotes

1    After serving as a dumping ground for toxic waste, a canal was filled and sold to the city of Niagara Falls and used as the site for a elementary school and playground—decades later state and federal government investigations revealed that the toxic waste had caused pervasive health problems, leading then-President Carter to declare a federal emergency. *See Niagara Mohawk*, 596 F.3d at 120 n.5 (citing Michael H. Brown, *Love Canal and the Poisoning of America*, ATLANTIC MONTHLY, Dec. 1979, at 33).

2    Among other provisions, 6 NYCRR section 375-2.9(a) states: "Upon receipt of the certificate of completion and subject to subdivision (b) of this section, the parties named on such certificate shall not be liable to the department upon any statutory or common law cause of action, except for one for natural resource damages...."

3    Defendants argue that the Second Circuit resolved the issue in *Niagara Mohawk* and held that a consent order with a conditional release of liability is sufficient to resolve liability for the purposes of § 113(f)(3)(B). *See* Dkt. No. 36 at 2. Indeed, the court in *Niagara Mohawk* stated that "NiMo settled its CERCLA liability with DEC by agreeing to identify and to remediate some of the hazardous substances." *Niagara Mohawk*, 596 F.3d at 128. While this sentence implies that the act of agreeing was sufficient to trigger § 113(f)(3)(B), the court goes on to say that "[o]nce NiMo *completed the Consent Order responsibilities*, Nimo was 'deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2)' and thus was 'entitled to seek contribution.' " *Id.* at 126 (emphasis added). Therefore, the Court does not agree that *Niagara Mohawk* resolved the question at hand.

4    The six-year statute of limitations under § 107 applies only to "remedial actions," which are "generally long-term or permanent containment or disposal programs." *Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006). On the other hand, "removal efforts," which are "typically short-term cleanup arrangements," are subject to a three year statute of limitations. *See id.*

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 456801
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.

Gail GARNER, The Estate
of Angelo Palermo, Plaintiff,
v.
DII INDUSTRIES, LLC, Mark M. Gleason
& Marcellene Malouf, Defendants.

No. 08–CV–6191–CJS.
|
Feb. 4, 2010.

**Attorneys and Law Firms**

Christina A. Agola, Esq., Rochester, NY, for Plaintiff.

Andrew L. Morrison, Esq., K & L Gates LLP, New York,
NY, Beth W. Bivans, Esq., K & L Gates LLP, Dallas, TX,
for Defendants.

DECISION & ORDER

CHARLES J. SIRAGUSA, District Judge.

**INTRODUCTION**

**\*1** Siragusa, J. This product liability case is before the
Court on Defendants' motion (Docket No. *32* ) to dismiss
for failure to state a cause of action. For the reasons below,
the application is granted.

**BACKGROUND**

Plaintiff filed her original complaint *pro se* and alleged
that Defendants were liable to her father's estate for his
death caused by exposure to asbestos. On November
14, 2008, the Court, interpreting Plaintiff's response to
Defendants' first motion to dismiss as a request to proceed
*pro se* as the representative of her father's estate, denied
the request. Plaintiff subsequently hired counsel, and on

March 27, 2009, filed an amended complaint (Docket
No. 28). On April 17, 2009, Defendants again moved
to dismiss, primarily on the ground that Plaintiff's claim
against them was barred by the statute of limitations. [1]

Viewing the allegations in the amended complaint as
true, the following are the relevant facts for consideration
of the present motion. The decedent, Angelo Palermo
("Palermo"), was a union insulation mason for twenty-
nine years from 1937 through 1966 in the construction
asbestos industry. He spray coated and handled asbestos-
containing products while working for one or more of the
Haliburton or Harbison–Walker entities. Palermo died on
April 23, 1966, at the age of 51 years. (Am. Compl. ¶¶ 14
& 34.) His death certificate listed the immediate cause of
death as acute liver failure due to "metastasis cancer due
to primary stomach (place of origin)." (Am.Compl.¶¶ 11–
15.)

On June 6, 2003, Palermo was posthumously diagnosed
with mesothelioma "by a tribunal of asbestos experts
who were part of the Extraordinary Claims Panel of the
Mansville Trust." (Am.Compl.¶ 17.) On April 4, 2006,
Plaintiff filed a claim with DII Industries, LLC, and, the
following day, filed a claim with the DII Trust, with regard
to her father's death. Defendants eventually rejected the
claims, and a *pro bono* evaluator confirmed Defendants'
denial. (Am.Compl.¶¶ 18–27.)

In her amended complaint, Plaintiff asserts three causes of
action. First, a claim that Defendants negligently caused
Palermo's death; second, a claim that defendants Mark M.
Gleason ("Gleason") and Marcellene Malouf ("Malouf")
breached a fiduciary duty owed to Plaintiff; and third,
a claim that defendant DII Industries, LLC Asbestos PI
Trust ("Trust") [2] was negligent in hiring and supervising
Gleason and Malouf. Gleason is described as a Trustee of
the Trust, and Malouf is described as the Trust's Executive
Director.

**STANDARDS OF LAW**

*Motion to Dismiss*
A motion to dismiss on the basis that an action is barred by
the statute of limitations is analyzed under Federal Rule of
Civil Procedure 12(b)(6), not 12(b)(1). *Ghartey v. St John's
Queens Hosp.,* 869 F.2d 160, 162 (2d Cir.1989). The U.S.
Supreme Court, in *Bell Atl. Corp. v. Twombly,* 550 U.S.

544 (2007), clarified the standard to be applied to a 12(b)(6) motion:

> **\*2** Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 1964–65 (citations and internal quotations omitted). *See also,* *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) ("To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (quoting *Bell Atl. Corp. v. Twombly* ) (footnote omitted); *Iqbal v. Hasty,* 490 F.3d 143, 2007 WL 1717803 (2d Cir. Jun. 14, 2007) (Indicating that *Bell Atl. Corp. v.. Twombly* adopted "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible[,]" as opposed to merely conceivable.)

When applying this standard, a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers,* 192 F.3d 52, 56 (1999), *cert. denied,* 531 U.S. 1052 (2000). On the other hand, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v.*

*Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995) (citing *In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 400–01 n. 3 (2d Cir.1994)).

### New York Statute of Limitations

The New York Civil Practice Law and Rules require that an "an action to recover damages for a personal injury" be commenced within three years. N.Y. C.P.L.R. § 214(5) (McKinney's 1986). The statute also addresses exposure to substances that caused the injury. In such case,

> the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

N.Y. C.P.L.R. § 214–c(2). In *Whitney v. Quaker Chem. Corp.,* 90 N.Y.2d 845 (1997), the New York Court of Appeals stated that,

> **\*3** In *Matter of New York County DES Litig.* (89 N.Y.2d 506), we recently held that the three-year limitations period for bringing an action to recover for the latent effects of exposure to a toxic substance commences "when the injured party discovers the primary condition on which the claim is based" (*id.,* at 509). We rejected the contention that the plaintiff must also discover that the injury has a nonbiological cause (*id.,* at 514).

*Whitney,* 90 N.Y.2d at 847. The Court further held, in *Wetherill v. Eli Lilly & Co. (In re N. Y. County DES Litig.),* 89 N.Y.2d 506 (1997), that,

It is apparent from this history that, in enacting a new "discovery" rule for the commencement of toxic torts, the Legislature had in mind only the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced. The dichotomy in the case law that the Legislature intended to address was that between impact or exposure on the one hand and resulting infirmity on the other. Given that narrow focus, the only reasonable inference is that when the Legislature used the phrase "discovery of the injury" it meant discovery of the physical condition and not, as plaintiff argues, the more complex concept of discovery of both the condition and the nonorganic etiology of that condition.

*Wetherill,* 89 N.Y.2d at 514.

## ANALYSIS

### *Jurisdiction*

Plaintiff alleges that the Court has jurisdiction to hear this case pursuant to: 28 U.S.C. § 1331 (federal question) and § 1343 (civil rights); 42 U.S.C. § 2000(e) [sic; probably a reference to 42 U.S.C. § 2000e (equal employment) ]; 29 U.S.C. §§ 206 (minimum wages) and 216 (penalties); and 28 U.S.C. § 1367 (supplemental jurisdiction). Plaintiff's claims, however, are for negligence, breach of fiduciary duty and negligent supervision. Her amended complaint fails to allege how jurisdiction lies under Federal law. The only possible connection is that the Trust was approved by a Bankruptcy Court pursuant to 11 U.S.C. § 524(g) (2005).

Defendants have attached [3] an amended order *In re: Mid–Valley, Inc,* No. 03–35592 JKF (Bankr.Ct.W.D.Penn. Jul. 21, 2004) to their memorandum in support of the motion to dismiss. In the attached order, the Bankruptcy

Court approved the Asbestos PI Trust [4] as a qualified settlement fund within the meaning of regulations issued pursuant to Internal Revenue Code § 468B and included a channeling injunction. [5] *Id.* at 8. Further, the amended order appointed, *inter alia,* Mark A. Gleason as an initial trustee. The amended order then discharged the Haliburton Entities and Harbison–Walker Entities. *Id.* at 10.

The Asbestos PI Trust document is separate and distinct from the DII Industries, LLC Asbestos PI Trust, Trust Distribution Procedures (December 16, 2004) ("TDP"). Paragraph 5.11 of the TDP states: "Claimants who elect nonbinding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in a judicial forum against the Asbestos PI Trust...." The TDP further states that individual suits filed against the Trust will be "treated as a personal injury case with all personal injury damages to be considered...." (TDP § 7.6.) The TDP does not address whether such a claim should be brought in a state, or federal, forum.

**\*4** Instead of addressing the question of subject matter jurisdiction, the parties simply argue the motion to dismiss on the assumption that this Court has jurisdiction. In their Reply Memorandum of Law, however, Defendants point out that Plaintiff does not dispute the applicability of the New York statute of limitations to this action. (Def.s' Reply Mem. of Law at 3–4.)

At oral argument of the motion, defense counsel disagreed that this matter is properly here under federal question jurisdiction, but stated his belief that the case could be here on diversity jurisdiction. Jason Little, Esq., appearing for Christina Agola, Esq., the counsel of record, stated that the complaint was drafted by Ms. Agola working with their client, Ms. Garner. Mr. Little argued that the diversity jurisdiction alleged in the first complaint was transferred to the amended complaint. The original complaint, though, alleges the following as its basis for federal jurisdiction: "Arises under Federal law of Bankruptcy Code 11." (Orig. Compl. at 1.) "It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *International Controls Corp. v. Vesco,* 556 F.2d 665, 668–69 (2d Cir.1977) (citations omitted); *see also, Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter,* 32 F.2d 195, 198 (2d Cir.1929) ("When a pleading is amended or withdrawn, the superseded portion ceases to

be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.").

The Court finds no factual basis alleged for Federal jurisdiction in the amended complaint, only a conclusory statement that jurisdiction is related to a laundry list of statutes. The argument that federal question jurisdiction is present is unsupported by any factual allegations in the amended complaint. Diversity jurisdiction is neither plead, nor are there any facts alleged from which it could be construed. The amended complaint does allege that Palermo's representative, his daughter, is a resident of New York, but fails to allege the citizenship of the defendants. Since this is not a cause of action concerning whether the Trust was properly formed under the Bankruptcy law, and since the Bankruptcy Court retained jurisdiction itself for those questions, the Court fails to

find any basis for federal question jurisdiction. Without a basis for subject matter jurisdiction, any opinion rendered on the substantive motion to dismiss would violate the Constitution's prohibition against issuing advisory opinions. *United Public Workers of America (C.I.O.) v. Mitchell,* 330 U.S. 75, 89 n. 19 (1947).

### CONCLUSION

For the foregoing reasons, Defendants' motion (Docket No. *32* ) to dismiss is granted. The Clerk is directed to enter judgment for Defendants and close the case.

**\*5** IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 456801

Footnotes

1   This case was originally to be transferred to the Eastern District of Pennsylvania for inclusion in MDL No. 875. However, the Judicial Panel on Multidistrict Litigation, in an order filed on October 10, 2008, vacated the conditional transfer, finding that "[t]he issues [in this cas] appear largely case-specific, and we are therefore persuaded that the motion to vacate should be granted." (Docket No. 12.)

2   The amended complaint's caption names only DII Industries, LLC, but in the body of the amended complaint describes the only party with that name more fully as "DII Industries, LLC Asbestos PI Trust ("Trust") ... a trust organized pursuant to Section 524(g) of the Bankruptcy Code. Since Defendants do not raise the issue of proper identification of the DI I defendant in the caption, the Court will assume that the party named in the caption as only "DII Industries, LLC" is a shorthand reference to the true party, the Trust. This, of course, makes the first cause of action problematic, since it does not appear from the pleading that the Trust employed Palermo.

3   Unlike Federal Rule of Civil Procedure 12's requirement that the Court constrain itself to the pleadings, when considering issues of subject matter jurisdiction the Court may look outside the pleadings. *See Filetech S.A. v. France Telcom S.A.,* 157 F.3d 922, 932 (2d Cir.1998) ( "Our rule is that, on a 'challeng[e][to] the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.' *Antares Aircraft, L.P. v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991).").

4   Section 7.11 of the Trust agreement states, "This Asbestos PI Trust Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law principles."

5   "[T]he 'channeling injunction' was conceived as a vehicle for solving the practical limitations of discharge. Bankruptcy courts have the ability to enter injunctions pursuant to Bankruptcy Code § 105(a). A channeling injunction is simply a specialized form of injunction. Pursuant to a channeling injunction, all mass tort litigation and claims are 'channeled' to a trust specifically established to resolve and pay these claims-a so-called mass tort bankruptcy trust. The channeling injunction also permanently enjoins present and future claimants from proceeding against the other potentially responsible parties. The result of a channeling injunction is that all claimants are required to assert their claims against a trust specially designed for this purpose." 1996 Norton Annual Survey of Bankruptcy Law, Robert J. Miller, "Chapter 11 Reorganization—A Viable Solution to the Problem of Mass Torts" at 3 (footnotes omitted).

**End of Document**                                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 931729
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony M. GARRAWAY, Plaintiff,

v.

BROOME COUNTY, NEW YORK; Ronald J.
Bill, Chief Civil Deputy; Broome County Sheriff's
Department; Dennis Rowlands, Deputy # 260;
and Chris Smith, Deputy # 223, Defendants.

No. 5:03-CV-0681.
|
April 7, 2006.

**Attorneys and Law Firms**

Anthony M. Garraway, Moravia, NY, pro se.

Aaron J. Marcus, Binghamton, NY, for Defendants.

## *DECISION and ORDER*

THOMAS J. McAVOY, Senior United States District
Judge.

## I. INTRODUCTION

*\*1* Plaintiff commenced this action pursuant to 42
U.S.C. § 1983 alleging that Defendants violated his
Fourth Amendment right against unreasonable search
and seizures and his Fourteenth Amendment right to
equal protection and due process. Defendants move for
summary judgement pursuant to Fed.R.Civ.P. 56 based
on the untimeliness of Plaintiff's claim and his failure to
state a cause of action. Plaintiff opposes arguing his claim
is timely under the "prison mailbox rule" and that there
are genuine issues of fact warranting a trial.

## II. BACKGROUND

Plaintiff claims that on or about May 15, 2000 he entered
into an oral agreement with Esther Gardner for a "month-
to-month lease" of a mobile home. Plaintiff contends that
he made a rent payment for the remainder of the month
and was given "the only key to the property so he could
move in." (Pl.'s Statement of Undisputed Facts at ¶ 1).
Gardner, however, states she never met or talked with

Plaintiff prior to May 31, 2000 and that she did not
lease any property to him. (Gardner Aff. ¶ 9.) Gardner's
daughter, Margaret Dunn, claims that Denise Houck,
Plaintiff's then girlfriend, contacted her a few weeks prior
to May 31, 2000 about renting the property. (Dunn Aff.
¶ 2.) Dunn claims she and Houck had an oral agreement
that Houck would not move in until she had paid Dunn
the first month's rent and a security deposit. Dunn gave
Houck permission to fix the property up prior to moving
in and gave Houck a key. Dunn states she never intended
to rent the property to Plaintiff, but rather to Houck and
her children. (Dunn Aff. ¶ 8.) No formal lease documents
were drawn up. There remains a factual dispute as to what
rental agreements, if any, were made between Plaintiff,
Houck, Gardner, and Dunn.

Dunn became aware that Houck had moved in without
making any rent or security deposit payments. (Dunn Aff.
¶ 5.) Dunn claims Houck told her she would have the rent
money within the next few days and, upon that belief,
Dunn allowed Houck to stay in the mobile home. *Id.*

On May 31, 2000, Gardner went to the mobile home and
saw that Houck and Plaintiff had moved in and had pit
bulls living on the property. Gardner claims she no longer
wanted Houck to lease the property and called the Broome
County Humane Society and the Broome County Sheriff's
Office to see what actions could be taken. (Gardner Aff.
¶ 5.)

When the Humane Society arrived, Plaintiff came outside
from within the mobile home and an argument ensued
between he and Gardner as to her request for the Humane
Society to remove Plaintiff's dogs. Shortly thereafter,
Defendant Sheriff's Deputy Rowlands arrived on the
scene and claims he was advised by Gardner that Plaintiff
did not belong on the property. (Rowlands Aff. ¶ 3.)

Defendant Sheriff's Chief Civil Deputy Bill claims he
responded to the scene after hearing a discussion of it on
his radio. Upon arrival, Bill claims he spoke with Gardner
who advised him that, while Plaintiff and Houck were
going to lease the property and had been given permission
to do some work inside the property, they had not been
given permission to move into the residence. Bill claims Houck
told him what Gardner said was true and that no money
had exchanged hands and there was no formal lease
agreement. (Bill Aff. ¶ 4.) Bill claims that he then advised
Houck that in his opinion she and Plaintiff were "not

in the residence legally" and that they would ultimately have to leave. Bill states that he advised Houck of the legal processes by which she could contest the landlord's representations. (Bill Aff. ¶ 4.)

**\*2** Defendant Sheriff's Deputy Smith claims that upon his arrival, Rowlands was interviewing Plaintiff who stated his name was Hubert A. Garraway and was refusing to offer any form of identification. Hubert Garraway is Plaintiff's brother. (Smith Aff. ¶ 3.) Smith claims he was advised by the Humane Society employees that Plaintiff's name was Anthony Garraway and that they had a number of prior dealings with him. (Smith Aff. ¶ 4.) Smith claims Plaintiff continued to give conflicting information as to his name, social security number and other identification information. Smith states that just prior to placing Plaintiff into custody on suspicion of committing criminal impersonation, he was advised of an active arrest warrant outstanding for Plaintiff from the Binghamton Police Department regarding a Criminal Mischief in the Fourth Degree charge. (Smith Aff. ¶ 6.) Smith claims he never entered or searched the mobile home.

Because Defendants suspected Plaintiff was lying about his identity, Rowlands entered the mobile home to find a form of personal identification for Plaintiff. Rowlands claims he entered the mobile home upon the belief that Plaintiff did not belong there and that Gardner had the authority to consent to the search. (Rowlands Aff. ¶ 8.) Rowlands claims the search entailed "nothing more than glancing over any papers or documents that might have been lying around the residence." (Rowlands Aff. ¶ 7.) Rowlands claims he did not remove any items from the property. *Id* .

Plaintiff offers a conflicting version of the events. Plaintiff claims that Houck was not present and that she was at work during the entire incident. Plaintiff admits he would not offer any form of identification to Defendants and that he stated he was Hubert. Plaintiff claims Defendant Smith unlawfully entered the mobile home and returned with letters written and sent to Anthony Garraway. Plaintiff claims Rowlands also unlawfully entered the mobile home, found Plaintiff's wallet within a pair of Plaintiff's pants and removed Plaintiff's license and social security card. Plaintiff claims these identification cards were obtained from an illegal search and were illegally seized. Plaintiff claims the identification cards were taken

from the property to the station where Plaintiff was processed.

It is undisputed that Plaintiff was arrested and charged with Criminal Impersonation in the Second Degree ([New York Penal Law § 190.25](#)) and Criminal Mischief in the Fourth Degree ([New York Penal Law § 145.00](#)). Following the incident, Gardner began a formal eviction proceeding and posted a 3-day notice on the door of the mobile home. Following the posting, Gardner believed no one remained in the mobile home. (Gardner Aff. ¶ 7.)

Plaintiff filed the instant claim pursuant to [42 U.S.C.1983](#) claiming a violation of his Constitutional Fourth Amendment right against unreasonable search and seizures and a violation of his due process right for being evicted from the property.

### III. STANDARD OF REVIEW

**\*3** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see [Tenenbaum v. Williams,](#)* [193 F.3d 581, 593 (2d Cir.1999)](#), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." [FED.R.CIV.P. 56(c)](#). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *[Anderson v. Liberty Lobby,](#)* [477 U.S. 242, 248 (1986)](#). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *[Celotex Corp. v. Catrett,](#)* [477 U.S. 317, 323 (1986)](#). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *[Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,](#)* [475 U.S. 574, 587 (1986)](#). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *[Rexnord Holdings, Inc. v. Bidermann,](#)* [21 F.3d 522, 525-26 (2d Cir.1994)](#), or on conclusory allegations or unsubstantiated speculation. *[Scotto v.. Almenas,](#)* [143 F.3d 105, 114 (2d Cir.1998)](#). With this standard in mind, the Court will address Defendants' motion

## IV. DISCUSSION

Plaintiff's Complaint alleges violations of his Constitutional right against illegal search and seizures by Defendants, and a violation of his Constitutional right to equal protection and due process by denying Plaintiff a legal eviction. (See Pl. Compl.). Plaintiff claims there was an oral rental agreement between he and Gardner and, therefore, Gardner did not have the authority to consent to a search of the mobile home. Plaintiff further claims Defendants threatened his family that if they were to return to the property they would be arrested for trespassing, thus resulting in an illegal eviction by Defendants. Defendants argue the Complaint should be dismissed because it is untimely under 42 U.S.C.S. § 1983. In addition, Defendants argue that the motion for summary judgment should be granted because no Fourth Amendment or due process rights have been violated and, assuming there was a violation, that they are entitled to qualified immunity.

### A. Timeliness of Plaintiff's Claim

There is a three year statute of limitations for actions arising under 42 U.S.C.1983. Plaintiff's claim arose from the incidents occurring on May 31, 2000. Defendants claim the filing date of June 4, 2003 renders the Complaint untimely. However, Plaintiff, in his position of being both *pro se* and incarcerated, is afforded protection by the "prison mailbox rule". This rule is justified under the rationale that in being *pro se* and incarcerated the plaintiff has no choice but to hand his notices to prison authorities to forward to the Court Clerk. Because the plaintiff loses control over the documents and must therefore rely on prison authorities to forward them on to the clerk, Courts have recognized the date plaintiffs hand over their documents to prison authorities as the effective "filing date", and not the date when the Court Clerk actually is in receipt of them. *See Houston v. Lack,* 487 U.S. 266 (1988).

**\*4** In the instant case, while the filing date as entered by the clerk is June 4, 2003, Plaintiff appears to have handed the Complaint over to prison officials prior to May 31, 2003, and by virtue of the "prison mailbox rule", filed the Complaint within the three year statute of limitations. [1]

### B. Fourth Amendment right against unreasonable search and seizures

Plaintiff claims his Fourth Amendment right against unreasonable search and seizures was violated when Defendants Rowlands and Smith, without permission from Plaintiff, unlawfully entered into the mobile home and unlawfully seized Plaintiff's property.

To claim a violation of a Fourth Amendment right against unreasonable search and seizures, Plaintiff has to show a legitimate expectation of privacy in the property. *California v. Ciraolo,* 476 U.S. 207 (1986). A legitimate expectation may be shown by establishing an actual subjective expectation of privacy and that the expectation is one that society is prepared to recognize as legitimate. *Id.* Thus, "a tenant's expectation of privacy in his apartment ceases to be 'objectively justifiable' when his occupancy ceases to be lawful, as determined by the terms of his lease...." *U.S. v. Ross,* 43 Fed. Appx. 751, 757 (6th Cir.2002). In *U.S. v. Allen,* 106 F.3d 695 (6th Cir.1997), for example, the court held a defendant lacked a legitimate expectation of privacy when he failed to remain current on his rental payments.

A search conducted without a warrant is considered per se unreasonable and, therefore, a violation of the Fourth Amendment unless the search falls within a specifically established exception. *See Katz v. United States,* 389 U.S. 347 (1967). One such exception is a warrantless search conducted with consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph,* ---S.Ct. ----, ----, 2006 WL 707380, at *3 (Mar. 22, 2006). Valid consent is established when one with actual authority over the property voluntarily gives consent to a search. *Schneckloth,* 412 U.S. 218. "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Randolph,* --- S.Ct. at ----, 2006 WL 707380 at *5. Generally, a lessor of real property has no authority to consent to a warrantless search of rental property which is subject to an existing lease. *See Chapman v. U.S.,* 365 U.S. 610 (1961); *U.S. v. Elliott,* 50 F.3d 180, 186 (2d Cir.1995). "A landlord does, however, have authority to consent to a search by police of dwelling units in his building that are not leased. Further, if the landlord has joint access or

control over certain areas of his apartment building for most purposes, he may validly consent to a search of those areas." *Id.*

### 1. Actual Authority to Consent

**\*5** The first issue is whether Plaintiff had actual authority over the mobile home as a result of a rental agreement. Plaintiff claims there was an oral lease agreement with Gardner and that he paid rent for the month of May. Gardner claims she never made such an agreement and never received any payments from Plaintiff. Dunn claims she and Houck had an oral lease agreement but that she was not authorized to live there yet and had made no rental payments. Based on the foregoing, there is a material dispute as to whether there was a lease agreement in effect at the time of the search and whether rental payments had been made. As a result, it remains unclear as to whether Plaintiff or Gardner had actual authority over the mobile home and was, therefore, authorized to give or refuse consent to the warrantless search.

### 2. Apparent Authority to Consent

Viewing the evidence in the light most favorable to Plaintiff, the Court will assume there was a valid lease agreement. Nevertheless, the Court finds that the search of the mobile home was still valid under *Illinois v. Rodriguez,* 497 U.S. 177 (1990) and the Supreme Court's more recent decision in *Randolph.* In *Rodriguez,* the Supreme Court held that law enforcement was permitted to conduct a search upon the apparent authority of a third party's consent, even if it turns out the third party did not in fact have actual authority. *Rodriguez,* 497 U.S. 177. Law enforcement may rely on the third party's consent so long as facts available to the officer at the time of the search would warrant a "person of reasonable caution in belief that consenting party had authority over premises." *See U.S. v. Perez,* 948 F.Supp. 1191 (S.D.N.Y.1996); *see also Anderson v. Decristofalo,* 494 F.2d 321 (2d Cir.1974); *Issa v. City of Glencoe,* 118 Fed. Appx. 103 (8th Cir.2004).

Here, the issue is whether Officer Rowlands had a reasonable good faith belief that Plaintiff was not on the property legally and was not there pursuant to a lease agreement and, therefore, Gardner had the authority to consent to a warrantless search of the mobile home. Plaintiff claims that because the Officers were allegedly called to the scene because of the pit bulls, and not for a landlord/tenant dispute, their belief that Plaintiff

had no legal right to be in the mobile home was unreasonable. Plaintiff claims Houck was not at the scene and Defendants could not therefore rely on her statements in determining if Plaintiff was in the mobile home legally. Defendants Smith, Rowlands and Bill claim that once each had arrived on the scene they were advised by Gardner that Plaintiff and Houck had moved into the mobile home without having permission to do so. (Smith Aff. ¶ 12, Rowlands Aff. ¶ 3, Bill Aff. ¶ 3.) Defendant Bill claims Houck was at the scene and advised him that what Gardner had said was true and that no formal lease agreement had been made and no money had exchanged hands. (Bill Aff. ¶ 4.) Irrespective of why Defendants arrived at the scene, according to their affidavits, it was clear that once they arrived they were dealing with a potential trespassing issue.

**\*6** Looking at the evidence in the light most favorable to Plaintiff, the Court will assume that Houck was not present. Similar to *Elliott* and *Decristofalo,* Gardner's statements to Defendant Bill could cause a reasonable officer to conclude that Plaintiff was not legally living in the property and that he was, as Defendant Bill concluded, either squatting or trespassing on the property. (Bill Aff. ¶ 5.) While Plaintiff claims he was objecting to the search and that he had a legal right to be there, Plaintiff also admitted to lying to Defendants about his true identity, for which he was charged with Criminal Impersonation in the Second Degree (N.Y.S PL § 145.00). (Smith Aff. ¶ 7, Garraway Aff. ¶ 12.) Plaintiff's continued conflicting answers to Defendants concerning his true identity gave them reasonable doubt as to his credibility in general. Therefore, this Court finds Defendant Rowlands' reliance on Gardner's representations that Plaintiff did not belong in the home, that there was not an oral lease agreement between she and Plaintiff, and that she was the true owner of the residence with authority to consent to a search thereon, was reasonable against Plaintiff's assertions. Based on the circumstances, Defendant Rowlands believed Gardner had authority to consent to the search and he searched the mobile home for information concerning Plaintiff's identity. While Plaintiff claims Smith took personal letters written by Plaintiff from the home as evidence of Plaintiff's true identity, Defendant Smith claims he never entered the mobile home. Looking at the evidence in the light most favorable to Plaintiff, and assuming that Defendant Smith searched the home as Plaintiff claims, Defendant Smith was privy to the same information that Defendant

Rowlands relied on in searching the home. *See Morgan v. Superintendent,* 88 F.Supp.2d 312, 318 (S.D.N.Y.2000) ("[W]here law enforcement authorities are cooperating, the knowledge of one is presumed shared by all ..." and "[t]he determination of whether probable cause to [act] exists can be based on the collective knowledge of all the officers involved ...".). Therefore, even if Defendant Smith did search the home it was based on the reasonable belief that Gardner had authority to consent to the search.

Because entry into the mobile home by Defendants was valid upon either the actual or apparent authority to consent by Gardner, the Court finds a "good faith defense" is available to Defendants who may or may not have been deceived as to who held the true legal interest in the home. If Plaintiff never had a lease agreement with Gardner (oral or written) or if Houck had an oral agreement with Dunn [2] but was not yet authorized to live there, then Gardner provided actual authority to consent to the search. Assuming there was an oral agreement between Houck and Dunn or between Plaintiff and Gardner, Defendants had reasonable grounds upon which to believe there was not a valid lease agreement and, therefore, that Gardner retained authority to consent to a search of the premises. Therefore, Plaintiff's claims of violations of his Fourth Amendment rights are dismissed.

### C. Due Process Rights

**\*7** Plaintiff next claims his Constitutional rights to equal protection and due process were violated when Defendants denied him the right to a legal eviction and the right to a fair trial and hearing before a judge to determine a civil dispute. (Pl. Complaint ¶ 5.) Plaintiff alleges Defendant Bill told him "he was kicking me and my family out of the residence at the request of the landlord and that if I ever returned he would personally arrest me." (Garraway Aff. ¶ 24.) Plaintiff claims Bill's threat of arrest was an act of illegal eviction, thereby denying him the right to a legal eviction by Gardner. Defendant Bill claims he never spoke with Plaintiff that day and that at no time did he threaten Plaintiff or Houck that they would be arrested if they did not leave. (Bill Aff. ¶ 6.) Bill claims that he believed Plaintiff and Houck were squatting or trespassing and, therefore, he advised Houck that she and Plaintiff were not there legally. Bill claims he advised Houck of the process by which she could contest Gardner's representations and told her how she could get an order by the town court to allow her to stay.

A wrongful eviction action can be brought against law enforcement officals who are accused of evicting tenants for the landlord. *See Collum v. Incorp. Village of Freeport,* 691 F.Supp. 637, 641 (E.D.N.Y.1998). The court held in *Collum* that "where an officer, without an eviction warrant, gives a tenant a choice between absenting himself from the premises and being arrested and the tenant chooses the former, a wrongful eviction has taken place. [However] ... a finding [that the officer] threatened arrest alone would be insufficient ... the jury would have to find that the threat forced plaintiff to choose between vacating the premises and being arrested." *Id.*

Here, the issue is whether Defendant Bill evicted Plaintiff. The answer is that he did not. Plaintiff was removed from the premises based on an arrest unrelated to his presence in the mobile home (i.e ., the warrant and criminal impersonation). [3] Taking the evidence in the light most favorable to Plaintiff, even if Defendant Bill did threaten to arrest Plaintiff if he was to return to the property, as discussed above, Defendants had a reasonable good faith belief that Plaintiff and Houck were not there legally and, therefore, were trespassing. Any remarks Defendant Bill may have made to Plaintiff or Houck in regards to arrest were warranted as he had a good faith belief that Plaintiff was engaged in the unlawful act of squatting or trespassing. In addition, in accordance with *Collum,* mere threats of arrest are insufficient to claim wrongful eviction. *Collum,* 691 F.Supp. 637. Bill had independent grounds upon which to arrest Plaintiff and remove him from the property. Therefore, Plaintiff's claim of a violation of his due process rights by an unlawful eviction of his family by Defendants is supported by insufficient evidence.

### D. Qualified Immunity

**\*8** As a general rule, police officers are entitled to qualified immunity if their conduct "does not violate clearly established constitutional rights, or it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994). Stated another way, officers are entitled to qualified immunity from liability for violating a plaintiff's civil rights unless it was "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Groh v. Ramirez,* 540 U.S. 551, 563 (2004).

As discussed above, this Court finds it was objectively reasonable for Defendants to believe their actions were not in violation of Plaintiff's constitutional rights. The Court therefore finds Defendants are entitled to qualified immunity.

### G. *Municipality Liability*

Lastly, Plaintiff claims Broome County is liable for the alleged Constitutional violations by Defendants through its failure to properly train Defendants. Defendants argue Plaintiff has not shown a custom or policy adopted by the municipality which caused the alleged violations.

In *§ 1983* claims, municipalities may not be held responsible under a theory of *respondeat superior. Board of the County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397 (1997). To impose liability onto a municipality the plaintiff must identify a municipal "policy" or "custom" that caused plaintiff's injury. *Id.* (citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1978)). An act performed pursuant to a "custom" may subject a municipality to liability on the theory that the practice is so widespread so as to have force of law. *Brown, 520 U.S. at 404.* One way to show a custom or policy has been adopted by the municipality is to prove the municipality failed to properly train defendants. In order to show failure to train by a municipality, the plaintiff must "identify a specific deficiency in the city's training program and establish that the deficiency caused a deprivation of his constitutional rights." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989). Here, Plaintiff claims, "Broome County Sheriff Department failed to train [Defendants]." (Pl. Mem. in Opp'n. to Def. Mot. Summ. J., 9). Plaintiff further claims "[a]nytime Defendant Bill is called to a similar civil dispute ... he will always threaten and illegally evict the tenant." *Id.* Plaintiff's conclusory allegations are insufficient to show specific deficiencies in the municipalities training program that resulted in the alleged violations of his rights. As a result, Plaintiff has failed to provide sufficient evidence to show an ongoing, widespread policy or custom of the municipality to violate citizens' Fourth and Fourteenth rights. Therefore, Plaintiff's claim against Broome County is dismissed.

### IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's action is DISMISSED.

**\*9** IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 931729

---

Footnotes

1  Respondents may, however, inquire as to the date Plaintiff actually handed over the papers and later raise this issue if it should appear that Plaintiff handed over the papers *after* May 31, 2003.

2  There is no indication in the record that any agreement between Houck and Dunn contemplated Plaintiff living in the mobile home. Similarly, there is no evidence in the record that, assuming Houck was legally residing in the mobile home, she permitted Plaintiff to reside there.

3  According to Plaintiff's version of the facts, Houck was not at the mobile home during the incident and she, therefore, would not have been subjected to removal or arrest. Even if Houck was present, as Defendants claim, Houck was not required to leave the home while the Defendants were there and was left at the home upon their departure. (Bill Aff. ¶ 7, Smith Aff. ¶ 13, Rowlands Aff. ¶ 3). In addition, there is insufficient evidence that Houck's ultimately left the mobile home as a direct result of any alleged threats of arrest made by Defendants.

---

**End of Document**                                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4015342
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Anand KATTU, Patricia King, Meghan Mian,
and Romesh Patel individually and on behalf
of all others similarly-situated, Plaintiffs,

v.

METRO PETROLEUM, INC., Defendant.

No. 12−CV−54−A.
|
Aug. 6, 2013.

**Attorneys and Law Firms**

Harvey P. Sanders, Sanders & Sanders, Cheektowaga, NY, for Plaintiffs.

Joel B. Schechter, Bennett Schechter Arcuri & Will LLP, Buffalo, NY, for Defendant.

### DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

**\*1** This action seeks unpaid overtime wages under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., and New York Labor Law § 650 et seq., and is within the Court's federal-question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs Anand Kattu, Patricia King, Meghan Mian, and Romesh Patel are former employees of defendant Metro Petroleum, Inc., an operator of convenience stores, who allege that they, and others who are similarly situated, are entitled to unpaid overtime wages, liquidated damages, interest, attorney fees, and declaratory relief.

Defendant Metro Petroleum has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that the bulk of plaintiffs' federal-law claims are barred by the statute of limitations, and that the Court should not exercise supplemental jurisdiction over any remaining state-law claims. Despite the strict pleading standards of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct.

1937, 173 L.Ed.2d 868 (2009), plaintiffs are not required to plead facts in a complaint to rebut a potential statute of limitations defense, an affirmative defense that is waived by a defendant if it is not alleged in an answer. See DeJesus v. HF Management Services, LLC, Dkt. No. 12–4565, slip op. at 18 n.7 (2d Cir. Aug. 5, 2013); Fed.R.Civ.P. 8(c)(1); Litton Indus., Inc., v. Lehman Bros. Kuhn Koed Inc., 967 F.2d 742, 751–52 (2d Cir.1992). Although plaintiffs' federal claims may later be shown to be barred by a statute of limitations in whole or in part, defendant's motion pursuant to Rule 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted is denied.

### DISCUSSION

***The Rule 12(b)(6) Standard.*** When deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a court must accept as true all of the allegations contained in a complaint." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. When evaluating the factual allegations of a complaint, a court is required to draw "all reasonable inferences in favor of the plaintiff." Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 730 (2d Cir.2013).

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible of its face." Iqbal, 556 U.S. at 678 (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." Id. "[O]nly a complaint that states a plausible claim to relief survives a motion to dismiss." Id. at 679.

**\*2** To determine "whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. A complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678.

*Elements of an FLSA Overtime–Wage Claim.* The Fair Labor Standards Act ("FLSA") provides that

> no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). An FLSA collective action overtime-wage claim has four elements: First, there must be "an employee-employer relationship" between plaintiff and defendant. *Zhong v. August August Corp.,* 498 F.Supp.2d 625, 628 (S.D.N.Y.2007); 29 U.S.C. § 207(a) (1). Second, the FLSA applies only to "employees whose work involved some kind of interstate activity." *Zhong,* 498 F.Supp.2d at 628. Third, the complaint must allege the number of hours worked and the amount of unpaid wages. *Zhong,* 498 F.Supp.2d at 628; *see also DeJesus v. HF Management Services, LLC,* Dkt. No. 12–4565, slip op. (2d Cir. Aug. 5, 2013). Fourth, if a plaintiff brings a collective action on behalf of others who are similarly situated, "the complaint should indicate who those other employees are, and allege facts that would entitle them to relief." *Id.; 29 U.S.C. § 216(b); see also Peck v. Hillside Children's Center,* 915 F.Supp.2d 435, 437 (W.D.N.Y.2013) (*citing Zhong,* with a two-elements formulation of a valid FLSA overtime-wage claim).

*Facts.* Accepting the factual allegations of plaintiffs Kattu, King, Mian, and Patel in the complaint as true, *Ashcroft v. Iqbal,* 556 U.S. at 678, defendant Metro Petroleum is a corporation organized and incorporated under the laws of New York State which operates several convenience stores across New York State, including one in Buffalo, New York, that sell gasoline, lottery tickets, groceries, and cash checks.

Plaintiffs Kattu, King, Mian, and Patel were all previously employed by defendant Metro Petroleum and worked at the store in Buffalo, New York. Throughout their employment with defendant, plaintiffs worked different hours, at different hourly wages, and for different periods of time. However, all plaintiffs routinely worked in excess of forty hours per workweek and never received overtime wages from defendant for all the overtime hours they worked.

Based on the wages of each plaintiff, and the number of overtime hours each worked, each plaintiff was underpaid by a different amount. Plaintiff Kattu was underpaid by approximately $78,962 annually over the approximate ten-year period of his employment. Plaintiff King was underpaid by approximately $4,000 during her eight-month period of employment by defendant. Plaintiff Mian was underpaid by approximately $14,000 during her period of employment by defendant. Plaintiff Patel, who worked 12– to 14–hour days, six days a week, was underpaid by at least $11,000, and by as much as $15,000, during his employment with defendant.

**\*3** Plaintiffs Kattu, King, Mian, and Patel commenced this action by filing their complaint on January 20, 2012. Dkt. No. 1.[1] Although plaintiffs' total monetary claims for compensation, liquidated damages, and interest are not specifically set forth in the complaint, it appears that they exceed $3 million. *See* Dkt. No. 8–1.

*The FLSA Claim in the Complaint.* In order to survive defendant Metro Petroleum's motion to dismiss, plaintiffs' complaint must allege facts sufficient to support the four elements of a collective FLSA overtime-wage claim. Fed.R.Civ.P. 12(b)(6). Plaintiffs have specifically alleged facts to establish that defendant Metro Petroleum was "an 'employer' and an 'enterprise engaged in commerce or in the production of goods for commerce,'" satisfying the first two elements of a FLSA overtime-wage claim. Dkt. No. 1, ¶¶ 3–7. Plaintiffs have also fairly specifically alleged the number of hours that each plaintiff worked, and the amount of unpaid overtime compensation that each plaintiff is owed. Dkt. No. 1, ¶¶ 12–27. These allegations satisfy the third element of a FLSA overtime-wage claim. *See Zhong v. August August Corp.,* 498 F.Supp.2d 625, 628 (S.D.N.Y.2007). Finally, plaintiffs have alleged generally that there are other persons similarly situated to plaintiffs, who were also employed by defendant Metro Petroleum in similar positions, who worked overtime, but were not paid overtime wages. These allegations are sufficient to satisfy the fourth element of a FLSA collective overtime-wage claim. Dkt. No. 1, ¶¶ 28–30.[2] For these reasons, plaintiffs' complaint alleges the elements necessary to state an overtime-wage claim upon which relief can be granted under the FLSA.

***Statute of Limitations.*** Under the FLSA, when a party fails to file an action to recover unpaid overtime compensation "within two years after the cause of action accrued," the opposing party can interpose a statute of limitations affirmative defense. 29 U.S.C. § 255(a). "[A] cause of action arising out of a willful violation [of the requirement to pay overtime compensation] may be begun within three years after the cause of action accrued." 29 U.S.C. § 255(a).

Defendant Metro Petroleum argues that most of plaintiffs' 29 U.S.C. § 207 overtime-wage claims should be dismissed pursuant to Rule 12(b)(6) because plaintiffs' claims are time barred by either the two- or the three-year statute of limitations period applicable under the FLSA. Defendant stresses that the complaint shows that only plaintiffs Kattu and Patel, and possibly plaintiff King, were employed by defendant beyond January 20, 2009, which is the latest possible bar date three years prior to the filing of the complaint on January 20, 2012. Dkt. No. 19–3, p. 4.

In response to defendant Metro Petroleum's motion to dismiss, plaintiffs argue that the statute of limitations in this case should be equitably tolled to the first time plaintiffs were not paid overtime. Dkt. No. 23, p. 4.[3] Defendant Metro Petroleum, in reply, asserts that plaintiffs' equitable tolling argument is unsupported by facts alleged in the complaint. Defendant also argues plaintiffs can present no further facts in support of their argument because the Rule 12(b)(6) standard requires evaluation of the claim be limited to the factual allegations in their complaint. Dkt. No. 24, pp. 2–3.

**\*4** It is well established that "[c]omplaints need not anticipate, or attempt to plead around, potential affirmative defenses." *High Falls Brewing Co., LLC v. Boston Beer Corp.,* 852 F.Supp.2d 306, 310 (W.D.N.Y.2011). As an affirmative defense, a statute of limitations defense must be alleged by a defendant in a pleading or it is deemed waived. Fed.R.Civ.P. 8(c)(1); *Litton Indus., Inc., v. Lehman Bros. Kuhn Koed Inc.,* 967 F.2d 742, 751–52 (2d Cir.1992) ("A claim that a statute of limitations bars a suit is an affirmative defense, and, as such, is waived if not raised in the answer to the complaint." *Id.*); *see United States v. Landau,* 155 F.3d 93, 107 (2d Cir.1998) (statute of limitations defense waived when only raised in a motion for summary judgment). Accordingly, "a statute of limitations is an affirmative

defense that need not be addressed in the complaint," and plaintiffs are not required to allege facts in their complaint to rebut a potential statute of limitations affirmative defense that might be waived. *E.E.O.C. v. Elmer W. Davis, Inc.,* No. 07–CV–6434 (CJS), 2008 WL 4415177 \*6 (W.D.N.Y. Sept.24, 2008).

Requiring plaintiffs to allege in a complaint facts sufficient to overcome a statute of limitations affirmative defense would shift the burden to raise and prove the affirmative defense from defendants, as the burden is allocated and imposed by Rule 8(c)(1) of the Federal Rules of Civil Procedure, to plaintiffs. The standards of *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) require the plaintiffs to plead a plausible, well-founded cause of action, but do not justify shifting the burden of raising the defense from the defendant to plaintiffs in contravention of Rule 8(c)(1). *See DeJesus v. HF Management Services, LLC,* Dkt. No. 12–4565, slip op. at 18 n.7 (2d Cir. Aug. 5, 2013).

Determining a statute of limitations defense ordinarily "requires a consideration of the merit of both parties' claims and defenses." *Addison v. Reitman Blacktop, Inc.,* 283 F.R.D. 74, 83 (E.D.N.Y.2011) (*quotations omitted* ). Because the defense requires consideration on the merits, it is heavily fact dependent, which makes a statute of limitations "[d]ismissal under Rule 12(b) (6) ... irregular." *E.E.O.C.,* 2008 WL 4415177 \*6 (*citing U.S. v. Northern Trust Co.,* 372 F.3d 886, 888 (7th Cir.2004)). Ordinarily, dismissal of a claim at the complaint stage based on a statute of limitations affirmative defense "is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999).

As plaintiffs stress, a statute of limitations affirmative defense, if not waived, may be equitably tolled "to avoid inequitable circumstances." *Johnson v. Nyack Hosp.,* 86 F.3d 8, 12 (2d Cir.1996); *Santos v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am., AFL–CIO,* 619 F.2d 963, 967 (2d Cir.1980). Equitable tolling "extend[s] the statute of limitations beyond the time of expiration." *Johnson,* 86 F.3d at 12. "Ordinarily, equitable tolling is an issue determined on a motion for summary judgment or at the time of trial since it is heavily fact dependent". *Kai Yan*

*Lai v. Wai Mon Leung,* No. CV 11–3561(SJ)(MDG), 2012 WL 4472155 at *5 (E.D.N.Y. Aug. 31, 2012) (Report and Recommendation *adopted by Kai Yan Lai v. Wai Mon Leung,* NO. 11–CV–3561 SJ MDG, 2012 WL 4472143 (E.D.N.Y. Sep 26, 2012)).

**\*5** In this action, some of plaintiffs' claims may have accrued before the two- or three-year statute of limitations bar date, but plaintiffs sufficiently raise equitable tolling in response to defendant Metro Petroleum's Rule 12(b)(6) motion to dismiss to avoid the dismissal of their claims for failure to state a claim. In light of plaintiff's response to the motion to dismiss, it is not clear from the complaint that any of plaintiffs' claims are time-barred. On the other hand, undisputed facts may later justify a motion for summary judgment to significantly narrow the issues for trial. At this juncture, the Court will not shift the burden of pleading and proving facts that underlie the potential statute of limitations defense, a defense that is waived if not alleged in an answer, from defendant to plaintiffs. *See In re South African Aparteid Litigation,* 617 F.Supp.2d 228, 287 n. 368 (S.D.N.Y.2009)).[4] Defendant's motion to dismiss plaintiffs' FLSA overtime-wage claims pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is therefore denied.

## CONCLUSION

For the foregoing reasons, the motion of defendant Metro Petroleum, Inc. to dismiss the complaint of plaintiffs Anand Kattu, Patricia King, Meghan Mian, and Romesh Patel pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure for failure to state a Fair Labor Standards Act overtime-wage claim under 29 U.S.C. § 207 is denied.

In light of this ruling, defendant's motion for dismissal of the state-law claims of plaintiffs for lack of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 is also denied.

Upon random assignment by the Clerk of the Court, the action is referred to Magistrate Judge Hon. Leslie G. Foschio. The Magistrate Judge is hereby designated to act in this case as follows: Pursuant to 28 U.S.C. § 636(b)(1) (A) and (B), all pre-trial matters in this case are referred to the above-named United States Magistrate Judge, including but not limited to: (1) conduct of a scheduling conference and entry of a scheduling order pursuant to Fed.R.Civ.P. 16; (2) hearing and disposition of all non-dispositive motions or applications; (3) supervision of discovery; and, (4) supervision of all procedural matters involving the aforementioned or involving the preparation of the case or any matter therein for consideration by the District Judge. The Magistrate Judge shall also hear and report upon dispositive motions for the consideration of the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). All motions or applications shall be filed with the Clerk and made returnable before the Magistrate Judge.

The parties are encouraged to consider the provisions of 28 U.S.C. § 636(c) governing consent to either partial or complete disposition of the case, including trial if necessary, by the Magistrate Judge. Consent forms are available from the office of the Magistrate Judge or the office of the Clerk of Court.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4015342

Footnotes

1   Since the complaint was docketed, there was a Clerk's Entry of Default, Dkt. No. 7, a Motion for a Default Judgment, Dkt. No. 8, which was delayed because of potential counsel conflict-of-interest issues, *see* Minute Entry July 13, 2012, and by negotiations among the parties, *see* Dkt. Nos. 10–14, which were followed by a Motion to Set Aside the Default, Dkt. No. 14, and, eventually, a Stipulation, Dkt. No. 17, to set aside the entry of default and withdrawing the Motion for Default Judgment. Counsel and proposed substitute counsel for defendant Metro Petroleum are directed to attend to Text Order 26, entered July 1, 2013, regarding an unresolved substitution-of-counsel issue by no later than August 20, 2013, so that the action may proceed without unnecessary delay.

2   While plaintiffs assert they are representatives of a collective and a class action, they have not yet been required to file a motion for conditional certification and notice pursuant to 29 U.S.C. § 216(b), or for certification of a class pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Court does not address whether a collective or class action is appropriate. *See Peck v. Hillside Children's Center,* 915 F.Supp.2d 435, 438–39 (W.D.N.Y.2013).

3    In claiming equitable tolling, plaintiffs raise two arguments in their Memorandum of Law in Opposition to Defendant's Motion to Dismiss that were not supported by factual allegations in plaintiffs' complaint. First, plaintiffs assert that they acted diligently throughout the course of their employment, but defendant Metro Petroleum prevented them from knowing their rights under the Fair Labor Standards Act. Dkt. No. 23, p. 4. Second, plaintiffs assert that defendant failed to post a required notice advising plaintiffs of their rights under the Fair Labor Standards Act. Dkt. No. 23, p. 6.

4    Defendant's contentions that plaintiffs' equitable tolling arguments are invalid as a matter of law are insufficient to prompt the Court *sua sponte* to exercise its discretion to convert defendant's Rule 12(b)(6) motion to dismiss to a motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 1660113
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Russell MERRIHEW, Jr., Plaintiff,

v.

THE TOWN OF ULSTER, the Town of Ulster
Police Department, the City of Kingston, the
City of Kingston Police Department, Detective
Robert Reynolds, Lieutenant Timothy Mathews,
Detective Brian Robertson, Detective John
Sheeley, and Robert Henry, Defendants.

No. 1:04-CV-1027(LEKDRH).
|
July 7, 2005.

**Attorneys and Law Firms**

John W. Cobb, Cobb, Cobb Law Firm, Tuxedo, NY, for
Plaintiff.

David L. Posner, McCabe, Mack Law Firm,
Poughkeepsie, NY, Robert D. Cook, Cook, Netter Law
Firm, Kingston, NY, for Defendants.

*MEMORANDUM-DECISION AND ORDER*

KAHN, J.

I. Background
 **\*1** On August 21, 2004, Plaintiff Russell Merrihew,
Jr. ("Merrihew") filed this action pursuant to 42 U.S.C.
§§ 1983 (" § 1983") and 1988, alleging that he was
subjected to various deprivations of his rights under the
Fourth and Fourteenth Amendments, specifically: (1)
malicious prosecution; (2) false arrest and imprisonment;
(3) excessive force utilized by police in making an
arrest; (4) illegal searches and seizures; and (5) denial
of medical care while imprisoned by police. Complaint
(Dkt. No. 1) at ¶ 17. Currently before the Court are
two motions to dismiss, one by Defendants Town of
Ulster, Detective Robert Reynolds, and Detective John
Sheeley (collectively, "Ulster Defendants") and one by
Defendants City of Kingston, City of Kingston Police
Department, Lieutenant Timothy Mathews, Detective
Brian Robertson, and Robert Henry (collectively,

"Kingston Defendants"). Ulster Motion (Dkt. No. 29);
Kingston Motion (Dkt. No. 43). In each motion, the
respective defendants seek the dismissal of Merrihew's
claims based upon excessive force and denial of medical
care as barred by the applicable statute of limitations.
Ulster Motion (Dkt. No. 29) at 2; Kingston Motion
(Dkt. No. 43) at 3. Merrihew has not responded to either
motion.

On or about the evening of April 23, 1998, Merrihew
was at Mid-Hudson Auto Upholstery and Boat Tops, his
place of business, to load a truck and meet a friend. [1]
Complaint (Dkt. No. 1) at ¶ 8. Merrihew alleges that he
was approached by four police officers who pulled him out
of his truck, threw him up against it, and then threw him
to the ground. *Id.* at ¶ 9. He claims that they proceeded
to beat him in the lower back, head, face, and neck. *Id.*
According to Merrihew, the officers searched him, took
money they found in his shirt pocket, and forced him to
open the business to let them search it. *Id.* Nothing was
found in the business. *Id.*

Merrihew states that police then brought him to the police
station, where he was told that he was being arrested for
"sale of cocaine on video." *Id.* at ¶¶ 9-10. Merrihew told
them he was never a drug dealer. *Id.* at ¶ 10. When police
told him they suspected that he had large quantities of
drugs in his basement safe, Merrihew said that he gave
them the combination because he had nothing to hide.
*Id.* The officers, armed with an allegedly valid search
warrant, searched Merrihew's residence and claimed to
have found four ounces of cocaine in the basement safe.
*Id.* at ¶ 11. Police then went back to his business, again
with an allegedly valid search warrant, and claim to have
found cocaine in a key box. *Id.* While in police custody,
Merrihew contends that he was denied requested medical
treatment, and that he had to go to the hospital after his
release from jail. *Id.* at ¶ 12.

Ultimately, Merrihew was charged with Criminal
Possession of a Controlled Substance in the Second
Degree, two counts of Criminal Possession of a Controlled
Substance in the Third Degree, Criminal Possession of
a Controlled Substance in the Fourth Degree, and two
counts of Criminally Using Drug Paraphernalia in the
Second Degree. *Id.* He was convicted on February 14,
2000. *Id.* at ¶ 13. On January 30, 2003, the Appellate
Division, Third Department vacated his conviction
because his pre-trial motion to dismiss on speedy trial

grounds should have been granted. *Id.;* Ulster Memo. (Dkt. No. 29) at 2; *People v. Merrihew,* 301 A.D.2d 970, 755 N.Y.S.2d 462 (3 rd Dept.2003).

## II. Discussion

**\*2** A motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure must be denied " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In assessing the sufficiency of a pleading, the Court must "assume all well-pleaded factual allegations to be true, and ... view all reasonable inferences that can be drawn from such allegations in the light most favorable to the plaintiff." *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999). Consideration is limited to the complaint, documents attached to the complaint or incorporated into it by reference, matters of which judicial notice may be taken, and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Amer. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Young v. Goord,* No. 01 CV 626(JG), 2005 WL 562756, at \*6 (E.D.N.Y. Mar.10, 2005).

Ulster Defendants and Kingston Defendants contend that the claims alleging excessive force and denial of access to medical care are barred by the applicable statute of limitations. Ulster Memo. (Dkt. No. 29) at 3; Kingston Memo. (Dkt. No. 43) at 5.

The statute of limitations period for § 1983 claims such as the two at issue in this motion is determined by the forum state's statute of limitations for personal injury actions. *Okure v. Owens,* 816 F.2d 45, 47 (2d Cir.1987); *Taylor v. New York State Dep't of Corr.,* No. 03 Civ.1929(PKC), 2004 WL 2979910, at \*8 (S.D.N.Y. Dec.22, 2004). Under New York State law, the statute of limitations period for personal injury claims is three years. N.Y. C.P.L.R. § 214(5) (1991). Because the complaint was filed on August 31, 2004, (Dkt. No. 1), claims accruing prior to August 31, 2001 are barred.

A claim pursuant to § 1983 "accrues when the alleged conduct has caused the claimant harm and the

claimant knows or has reason to know of the allegedly impermissible conduct and the resulting harm." [2] *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1994). The basis for Merrihew's excessive force claim is that on April 23, 1998, he was thrown to the ground and beaten by police officers in the course of his arrest. Complaint (Dkt. No. 1) at ¶ 9. The circumstances underlying Merrihew's denial of medical care claim occurred while he was in the custody of police after his arrest. *Id.* at ¶ 12. These were the only allegations in his complaint that could form the bases of claims relating to excessive force and denial of medical care. Based upon the facts as recited by Merrihew in his complaint, the conduct and harm underlying his claims regarding excessive force and denial of medical care occurred on April 23, 1998. *Id.* at ¶¶ 9, 12. Merrihew had knowledge of the force and the denial of medical care on that same evening. *See, Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980). His knowledge of the denial of medical care is evidenced by his request for medical treatment while in custody, which was denied. *Id.* at ¶ 12.

**\*3** As there are no allegations in the complaint indicating that the statute of limitations for these claims may be equitably tolled or otherwise extended, Merrihew's claims relating to excessive force and denial of medical care filed on August 31, 2004 are barred by the three year statute of limitations, which expired on April 23, 2001. That Merrihew was incarcerated for most (or all) of the statute of limitations period is of no matter; he could have pursued these claims from prison.

## III. Conclusion

Based on the foregoing discussion, it is hereby

ORDERED, that the motion to dismiss filed by the Town of Ulster, Detective Robert Reynolds, and Detective John Sheeley is GRANTED, and Merrihew's claims regarding excessive force and denial of medical care pursuant to 42 U.S.C. § 1983 are DISMISSED as to these defendants; and it is further

ORDERED, that the motion to dismiss filed by the City of Kingston, the City of Kingston Police Department, Lieutenant Timothy Mathews, Detective Brian Robertson, and Robert Henry is GRANTED, and Merrihew's claims regarding excessive force and denial of medical care pursuant to 42 U.S.C. § 1983 are DISMISSED as to these defendants; and it is further

ORDERED, that the Clerk serve a copy of this order on all parties.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1660113

Footnotes

1       As this is a motion to dismiss, Merrihew's factual allegations are taken as true. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999).

2       In certain circumstances, § 1983 claims do not accrue until a plaintiff's conviction is overturned or otherwise invalidated. *Heck v. Humphrey,* 512 U.S. 477, 489-90, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). If the basis for a § 1983 claim is "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," the plaintiff must prove that the conviction or sentence was reversed, expunged, invalidated, or called into question by the issuance of a writ of habeas corpus, and thus, the cause of action does not accrue until that point. *Id.* at 486-87; 489-90. When a "plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." *Id.* at 487. Because there is nothing in Merrihew's complaint that suggests that his claims regarding excessive force and denial of medical care are in any way related to the validity or invalidity of Merrihew's criminal conviction, the claims began to accrue when the harms occurred and he had (or should have had) knowledge of them.

---

**End of Document**                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 9511094
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Frank J. POVOSKI, Jr., Plaintiff,
v.
Steven LACY, et al., Defendants.

No. 9:14-CV-97 (BKS/CFH)
|
Signed 12/13/2017

**Attorneys and Law Firms**

Frank J. Povoski, Jr., 161 Hillview Drive, Rochester, New
York 14622, Plaintiff pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, OF COUNSEL: BRIAN W.
MATULA, ESQ., Assistant Attorney General, The
Capitol, Albany, New York 12224-0341, Attorney for
Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se Frank J. Povoski, Jr. ("plaintiff"),
a former inmate who was, at all relevant times, in
the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging
that defendants Corrections Captain ("Capt.") Steven
Lacy, Corrections Officer ("C.O.") Patrick Summo,
C.O. Brian Kelly, C.O. John Cruise, C.O. Richard
Mahuta, C.O. Thomas Tamer, C.O. James Pray,
Director of Special Housing ("Dir.") Albert Prack,
Lieutenant ("Lieut.") William Allan, Superintendent
("Supt.") Thomas LaValley, and Sergeant ("Sgt.") James
Archambault – who, at all relevant times, were employed
at Clinton Correctional Facility ("CCF") – violated
his rights under the First, Eighth, and Fourteenth
Amendments. Dkt. No. 106 ("Sec. Am. Compl."). At
all relevant times, plaintiff was incarcerated at CCF.
Presently pending is defendants' Motion for Summary
Judgment pursuant to Federal Rules of Civil Procedure
("Fed. R. Civ. P.") 56. Dkt. No. 132. Plaintiff did

not oppose the motion. For the following reasons, it is
recommended that defendants' motion be granted in part
and denied in part.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable
to the plaintiff as the nonmoving party. See subsection
II (B) infra. In his Second Amended Complaint, plaintiff
alleges that in May 2010, he was elected to the Inmate
Liaison Committee ("ILC") [2] at CCF. Sec. Am. Comp.
at ¶ 9. The ILC "investigate[s] and facilitate[s] facility-
wide grievances that effect the inmate population as a
whole or part, and communicate[s] those grievances to
administration...." Id. That year, the ILC's investigations
included the misappropriation of funds obtained through
vending machine sales in the visiting room; assaults by
staff members; and the death of an inmate, Leonard
Strickland, that occurred in October 2010. Id. ¶ 10. In
preparation for the November 2010 meeting, the ILC
prepared eleven grievances for the Executive Team at
CCF, which included Supt. LaValley and Capt. Lacy.
Id. ¶ 11. On November 22, 2010, the ILC met with
the Executive Team to discuss the grievances, which
included the death of Strickland, the misappropriation
of vending machine funds, and the failure to receive
inmate account statements. Id. ¶ 12. Plaintiff led the
discussion on these topics, stating that Supt. LaValley
and Capt. Lacy were "doing little to curtail the numerous
assaults that were being committed on inmates by staff."
Id. Plaintiff stated that requests to inspect the records
from the vending machines were being ignored, and asked
to inspect those records. Id. Plaintiff also complained
that inmate account statements had not been received
and were being discarded prior to distribution. Id. ¶ 15.
Plaintiff requested the reissuance of those statements. Id.
In response, Supt. LaValley told plaintiff that each inmate
would need to request the reissuance of their Inmate
Account Statement, and authorized plaintiff to draft a
prototype letter to assist inmates in making those requests.
Id. On November 23, 2010, plaintiff drafted the prototype
letter and sent it to Supt. LaValley. Id. ¶ 16.

**\*2** On November 24, 2010, plaintiff provided the
prototype letter to three inmates. Sec. Am. Compl. ¶ 17.

C.O. Mahuta observed plaintiff distributing the letter, and approached plaintiff. Id. ¶ 18. After plaintiff explained the contents of the letter, C.O. Mahuta confiscated the remaining prototype letters. Id. ¶¶ 18-19. Plaintiff alleges that C.O. Mahuta contacted defendant Sgt. Tamer and proceeded to the disciplinary office to inquire what charges could be brought against plaintiff regarding the prototype letter, and a non-party employee told C.O. Mahuta that plaintiff had not violated any standards of inmate behavior. Id. ¶¶ 20-21. C.O. Tamer informed C.O. Mahuta of plaintiff's statements at the November 22 ILC meeting, and of Supt. LaValley and Capt. Lacy's desire to issue plaintiff a Tier III misbehavior report to insure his confinement in the Special Housing Unit ("SHU")[3] and remove him from the ILC. Id. ¶¶ 22-23. C.O. Mahuta and C.O. Tamer planned to issue plaintiff a misbehavior report, charging him with solicitation and organization of an action detrimental to the order of the facility, despite knowing that the charges were false. Id. ¶¶ 24-25.

Following the confiscation of plaintiff's prototype letters, plaintiff proceeded to the scheduled inmate ILC meeting. Sec. Am. Compl. ¶ 28. At that meeting, plaintiff received a letter, sent to non-party inmate Hector Torres from a civilian, claiming that Capt. Lacy was an active member and the "Grand Wizard" in the local chapter of the Ku Klux Klan ("KKK"). Id. Officers confiscated plaintiff's ILC folder and legal notebook while he was picking up his medication, including the KKK letter. Id. ¶ 31. Plaintiff was keeplocked[4] in his cell. Id.

Plaintiff contends that, after inspection of the KKK letter, Supt. LaValley, Capt. Lacy, C.O. Tamer, and C.O. Mahuta mutually agreed to search plaintiff's cell, and if no contraband was found, they would plant contraband.[5] Id. ¶ 32-33. C.O. Tamer instructed C.O. Kelly and C.O. Crusie to conduct a search of plaintiff's cell and to make sure they found "something substantial" that would result in plaintiff receiving a Tier III misbehavior report and SHU placement. Id. ¶ 34. C.O. Tamer then told C.O. Kelly and C.O. Crusie that "if they could not find any contraband to come see him ... [because] he had 'something' they could justify the misbehavior report with." Id. C.O. Kelly and C.O. Crusie agreed to search plaintiff's cell. Id.

On November 24, 2010, plaintiff was instructed to wait in the "slop sink" area while C.O. Kelly and C.O. Crusie

searched his cell. Sec. Am. Compl. ¶ 35. During the search, plaintiff watched C.O. Crusie leave his cell and return a short time later. Id. ¶ 36. C.O. Kelly then exited plaintiff's cell and returned approximately fifteen minutes later carrying rolled up papers. Id. Both officers then exited the cell carrying items in a box. Id. Plaintiff returned to his cell and noticed that two legal notebooks were missing. Id. C.O. Kelly and C.O. Crusie issued plaintiff a misbehavior report for his possession of escape paraphernalia, stating that they had found a detailed, five-page pamphlet on how to pick locks in plaintiff's cell. Id. ¶ 37.

**\*3** Later that day, C.O. Tamer and non-party C.O. Trombley escorted plaintiff to SHU. Sec. Am. Compl. ¶ 41. During the escort, Sgt. Tamer said to plaintiff: "This is what you get for suing me and sticking your nose into things where it doesn't belong.... Lacy is going to give you two years. I've already talked to him about it." Id. The next day, plaintiff was served with two misbehavior reports stemming from the events of the previous day. Id. ¶ 45. C.O. Summo was assigned to provide assistance to plaintiff in his upcoming disciplinary hearing. Id. ¶ 46. Plaintiff provided C.O. Summo with two lists of requests for assistance, which Summo failed to complete. Id.

On December 6, 2010, Capt. Lacy sentenced plaintiff to twenty-four months of SHU confinement. Sec. Am. Compl. ¶¶ 49, 50. On December 17, 2010, plaintiff mailed a request for a thirty-day extension to file his administrative appeal. Id. ¶ 51. On or about January 3, 2011, plaintiff mailed his administrative appeal to Dir. Prack, raising violations of New York State law and procedural due process rights. Id. ¶ 52. On January 26, 2011, Dir. Prack affirmed the disposition and modified plaintiff's SHU confinement to eighteen months. Id. ¶ 54.

On December 22, 2010, Lieut. Allan and three unidentified non-party officers escorted plaintiff to the hospital for "special watch" following his hunger strike. Sec. Am. Compl. ¶ 136. During that escort, the non-party officers punched plaintiff multiple times on his head and face, and pushed him into a concrete wall. Id. Plaintiff was handcuffed and waist-chained throughout the assault. Id. Plaintiff suffered bruising, contusions, and "other painful physical injuries." Id. After failing to intervene in the assault, Lieut. Allan stated: "that will teach you for opening your mouth ... and writing grievances." Id. ¶ 137.

In March 2011, Supt. LaValley denied plaintiff transport to attend his father's funeral in retaliation for plaintiff's prior speech. Sec. Am. Compl. ¶ 61. On March 16, 2011, plaintiff mailed Supt. LaValley an appeal of the December 6, 2010 disciplinary hearing, raising various violations of New York State law and state procedural due process rights. Id. ¶ 62. Supt. LaValley failed to review the hearing. Id.

On January 26, 2011, defendant Sgt. Archambault and defendant C.O. Pray escorted plaintiff to a teleconference pursuant to a pending case in the New York State Court of Claims. Sec. Am. Compl. ¶ 139. Plaintiff was handcuffed and waist-chained during the escort. Id. Prior to leaving the SHU, C.O. Pray ordered plaintiff to hand him his legal papers for inspection. Id. ¶ 140. C.O. Pray read plaintiff's Court of Claims petition out loud to the officers present. Id. C.O. Pray stated: "So you are suing my buddy Kevin, we know how to fix inmates like you." Id. C.O. Pray and Sgt. Archambault escorted plaintiff to the teleconference without physical incident, but taunted plaintiff, stating that they would assault him after the appearance, and that they knew the "ideal place to assault inmates." Id. On the return escort, upon entering the Lower A/B Block corridor, Sgt. Archambault told C.O. Pray: "Go ahead, the hallway's clear." Id. ¶ 141. C.O. Pray pushed plaintiff into a brick wall and punched him multiple times on the head and neck while plaintiff was restrained. Id. ¶ 139. Plaintiff suffered bruising and contusions as a result. Id.

Plaintiff was confined in the SHU for three hundred and thirty eight days before being released to the general prison population on or about October 27, 2011,[6] after being credited a "time cut" for good behavior and cooperation. Sec. Am. Compl. ¶ 95. Plaintiff challenged Capt. Lacy's December 6, 2010 determination upon his transfer to Great Meadows Correctional Facility and was determined not guilty of all charges. Id. ¶ 98.

### B. Defendants' Recitation of the Facts

**\*4** In support of this motion, defendants filed a Statement of Material Facts.[7] On November 25, 2010, C.O. Mahuta and C.O. Kelly each issued plaintiff misbehavior reports charging him with (1) solicitation, (2) conduct detrimental to the order of the facility, and (3) possession of escape paraphernalia. Id. ¶ 45. Dkt. No. 132-2 ¶ 1. A disciplinary hearing commenced on

November 30, 2010, was adjourned to December 3, 2010, and completed on December 6, 2010. Id. ¶ 2. Plaintiff identified three inmate witnesses and two corrections officers that he wanted examined during the hearing. Id. ¶ 3. Plaintiff provided questions to the hearing officer to ask of the witnesses. Id. ¶ 4. The hearing officer told plaintiff that inmate witnesses could not testify in his presence because of security reasons. Id. ¶ 5. The hearing officer informed plaintiff that certain inmate witnesses and family members he requested were not relevant to the issues, and, therefore, would not be called. Id. ¶¶ 6, 7. The hearing officer based his hearing determination on a November 24 misbehavior report that alleged a pamphlet on how to "pick" or "bump" a lock was found in plaintiff's cell. Id. ¶¶ 8, 9. The hearing officer also took into account plaintiff's previous involvement in a conspiracy to escape plot. Id. ¶ 10.

On December 6, 2010, plaintiff was found not guilty of the solicitation charges set forth in the C.O. Mahuta's November 24 misbehavior report. Dkt. No. 132-2 ¶ 11. Plaintiff was found guilty of possession of escape paraphernalia, and Capt. Lacy sentenced him to twenty-two months in SHU. Id. ¶ 12. Capt. Lacy issued a written disposition which set forth the basis for his determination, together with the evidence relied upon. Id. ¶ 13.

On January 3, 2011, plaintiff appealed the hearing determination to Dir. Prack, and on January 26, his sentence was reduced to eighteen months. Dkt. No. 132-2 ¶¶ 14, 15. In April 2011, plaintiff's sentence was further reduced to eleven months after entering into a confidential agreement with C.O. Allan and facility administrators allowing plaintiff to act as an informant for CCF. Id. ¶ 16. On May 8, 2011, plaintiff transferred out of SHU confinement after serving 152 days. Id. ¶¶ 17,18. In connection with the December 6, 2010 sentence, plaintiff spent a total of ninety days in SHU. Id. ¶ 20.

Plaintiff initiated an Article 78 proceeding in state court challenging the November 2010 hearing and the December 6, 2010 decision. Dkt. No. 132-2 ¶ 21. Due to technical problems with the tape recording at plaintiff's initial disciplinary hearing, DOCCS requested that plaintiff's hearing and disciplinary decision be annulled, and the state court ordered plaintiff a *de novo* hearing concerning the charges. Dkt. No. 132-2 ¶ 21. Pursuant to this re-hearing, the charges against plaintiff

were determined to be unsubstantiated, and the entire matter was stricken from plaintiff's record. Id. ¶ 22.

As to plaintiff's December 22, 2010 and January 26, 2011 claims of excessive force, plaintiff first raised these claims in the Amended Complaint filed on August 1, 2014. Id. ¶¶ 29, 30. In the grievances regarding these claims, plaintiff failed to reference retaliation or his protected speech. Id. ¶¶ 34, 37.

## II. Discussion [8]

### A. Failure to Respond

**\*5** Plaintiff failed to oppose defendants' Motion for Summary Judgment. Plaintiff requested two extensions of time to file his response to the present motion, which the Court granted. Dkt. Nos. 135, 136, 137, 138. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 134. Given this notice and the two extensions for plaintiff to file opposition papers, plaintiff was adequately apprised of the pendency of defendants' motion and the consequences of failing to respond.

"Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding *pro se.*" Jackson v. Onondaga Cty., 549 F.Supp.2d 204, 209 (N.D.N.Y. 2008) (footnotes omitted). However, if "the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit." Id. at 210. "[T]o be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory." Id. Even if a verified complaint is deemed nonconclusory, "it may be insufficient to create a factual issue where it is (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Id. Plaintiff's Second Amended Complaint states on its final page, "I certify under penalty of perjury that the foregoing is true and correct." Sec. Am. Compl.

at 74. Therefore, as plaintiff's complaint is verified, [9] the undersigned will accept plaintiff's Second Amended Complaint to the extent that the statements are based on the plaintiff's personal knowledge or are supported by the record. See Berry v. Marchinkowski, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider an unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

### B. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*6** To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### C. Statute of Limitations

Defendants argue that plaintiff's claims are barred by the applicable statute of limitations. See Dkt. No. 132-1. Although there is no statute of limitations provision in § 1983, 25 U.S.C. § 1988 provides that state law may apply if it is consistent with the Constitution or federal law. 42 U.S.C. § 1988(a); Moor v. Cnty. of Alameda, 411 U.S. 693, 702-03, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). In New York State, the applicable statute of limitations for a § 1983 suit is three years, derived from the general or residual personal injury laws of the forum state. See N.Y. C.P.L.R. § 214(5) (MCKINNEY 2017); Owens v. Okure, 488 U.S. 235, 249-50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); Romer v. Leary, 425 F.2d 186, 187 (2d Cir. 1970); Lugo v. Senkowski, 114 F.Supp.2d 111, 113 (N.D.N.Y. 2000) (applying Owens in establishing a three-year statute of limitation for § 1983 claims). Thus, plaintiff's claims are subject to New York's three-year statute of limitations.

Federal law governs the determination of the accrual date for purposes of a § 1983 claim. Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002). A claim accrues "when the plaintiff knows or has reason to know" of the harm. Id. (citations and internal quotation marks omitted). "The

crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980). Additionally, "a pro se prisoner's § 1983 complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials." Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (citing Houston v. Lack, 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993) ).

**\*7** However, the Second Circuit has held that equitable tolling is applicable to claims brought under the PLRA, otherwise a prisoner would risk the dismissal of his or her complaint based on untimeliness if he or she were to wait for a final administrative decision before filing suit. Gonzalez v. Hasty, 651 F.3d 318, 323-24 (2d Cir. 2011) (noting that the Ninth, Fifth, Seventh, and Sixth Circuits have all held that equitable tolling applies during the time in which a prisoner is exhausting his or her administrative remedies). Under the Second Circuit's rule, the equitable tolling period begins when a plaintiff first raises his administrative claim, and ends when the plaintiff's administrative remedies are deemed exhausted. Id. at 324. The statute of limitations, however, is only tolled during the period in which a prisoner is "actively exhausting" his administrative remedies. See id. at 322 n.2. The statute of limitations is not tolled during the period between the accrual of the claims and when the plaintiff began the administrative remedy process. Id. at 324.

Further, the "continuing violation doctrine" delays the accrual date for a claim challenging a discriminatory policy " 'until the last discriminatory act in furtherance of [the discriminatory policy.]' ". Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) (quoting Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994) ) (additional citation omitted). Thus, "the continuing violation doctrine is an 'exception to the normal knew-or-should-have-known accrual date.' " Id. (quoting Harris v. City of New York, 186 F.3d 243, 248 (2d Cir. 1999) ).

Plaintiff filed his initial complaint in this action on January 16, 2014. Dkt. No. 1 ("Compl."). Therefore, absent exceptions, claims arising before January 16, 2011 are barred under the three-year statute of limitations.

### 1. Fourteenth Amendment Due Process

Plaintiff asserts due process violations related to his disciplinary hearing and confinement in SHU. See Sec. Am. Compl ¶¶ 96, 97, 164-165. Plaintiff's claim accrued on December 6, 2010 – when plaintiff received the hearing officer's determination sentencing him to SHU confinement. Id. ¶ 50. On or about January 3, 2011, plaintiff appealed his disciplinary hearing by mailing the administrative appeal to the Dir. of Special Housing. Id. ¶ 52. On January 26, 2011,[10] Dir. Prack affirmed the hearing judgment, and plaintiff's confinement was continued; however, Dir. Prack modified plaintiff's confinement to eighteen months. Id. ¶ 53. Defendants further argue that the defense of equitable tolling is inapplicable. Dkt. No. 132-1 at 7.

Here, the statute of limitations was tolled for a total of twenty-three days, from January 3, 2011 until January 26, 2011, while plaintiff appealed his disciplinary proceeding. As plaintiff did not appeal his disciplinary hearing disposition until January 3, which is twenty-eight days after the December 6, 2010 hearing, the statute of limitations was not tolled between December 6, 2010 and January 3, 2011. See Trapani v. Coryer, No. 14-CV-683 (GTS/CFH), 2016 WL 8732638, at *6 (N.D.N.Y. June 6, 2016) (citing Gonzalez, 651 F.3d at 322 n.2) ("[I]f an inmate claim accrues on January 1, 2010, and the inmate does not begin pursuing administrative remedies until December 1, 2010, any subsequent tolling that may be applicable would not include this eleven month period."). Therefore, the statute of limitations on plaintiff's Fourteenth Amendment claim arising out of his December 6, 2010 disciplinary hearing disposition began to run on December 6, 2010 and expired on December 29, 2013. Plaintiff signed the initial complaint in this action on January 16, 2014, eighteen days after the statute of limitations expired. See Compl. at 34.

**\*8** The continuing violation doctrine does not apply to plaintiff's Fourteenth Amendment due process claims because " 'each decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing he was entitled to.' " Crichlow v. Fischer, No. 6:15-CV-06252 EAW, 2017 WL 920753, at *5 (W.D.N.Y. Mar. 7, 2016) (quoting Bunting v. Fischer, No. 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y.

Aug. 4, 2016) ). Thus, although plaintiff exhausted his administrative remedies from January 3, 2011 until January 26, 2011, defendants' last discriminatory act was the December 6, 2010 disciplinary hearing, during which plaintiff claims that Capt. Lacy, C.O. Summo, Dir. Prack, and Supt. LaValley denied him a full and fair hearing. Id.; Shomo, 579 F.3d at 181. A "discrete violation" may accrue under the Fourteenth Amendment "each time that a defendant fails to provide an inmate with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches." Id. at 223. Plaintiff alleges that the defendants denied him a full and fair hearing at the December 6, 2010 disciplinary, which constitutes a discrete act that starts the running of the statute of limitations. Id. Therefore, because "each decision made without due process is a discrete act," plaintiff cannot benefit from the continuing violation doctrine. Crichlow, 2017 WL 920753, at *5. Accordingly, plaintiff's Fourteenth Amendment claim is time-barred.

### 2. First Amendment Retaliation

Plaintiff claims that Capt. Lacy, Supt, LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, Lieut. Allan, C.O. Pray, and Sgt. Archambault denied him "his right to be free of retaliation for exercising his right to free speech." Sec. Am. Compl. ¶¶ 166-67.

#### a. Defendants Capt. Lacy, Supt., LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan

Plaintiff contends that Capt. Lacy, Supt. LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan subjected him to retaliation for his protected speech. The accrual dates for these claims are: November 24, 2010, November 25, 2010, and December 6, 2010. See Sec. Am. Compl. ¶¶ 27, 39, 70, 75.

The Second Circuit has held that "[t]he mere fact that the effects of retaliation are continuing does not make the retaliatory act itself a continuing one." Gonzalez, 802 F.3d at 222. "First Amendment retaliation claims typically accrue at the time that the allegedly wrongful conduct occurred." Albritton v. Morris, No. 13-CV-3708 (KMK), 2016 WL 1267799, at *10 (S.D.N.Y. Mar. 30, 2016) (citing Smith v. Campbell, 782 F.3d 93, 101 (2d Cir. 2015) ) (additional citation omitted). Therefore, the

statute of limitations "begins to run when the defendant has 'engaged in enough activity to make out an actionable claim.' " Gonzalez, 802 F.3d at 22 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ). By contrast, the continuing violation doctrine only applies "to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of discrimination." Id. (citing Morgan, 536 U.S. at 114-15, 122 S.Ct. 2061). The continuing violation doctrine does not apply to "discrete unlawful acts." Albritton, 2016 WL 1267799, at *10 (quoting Gonzalez, 802 F.3d at 220).

Plaintiff claims that on November 24, 2010, Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan orchestrated an elaborate conspiracy to cause his wrongful confinement in SHU, including issuing retaliatory cell searches, false misbehavior reports, and tampering with his mail — all in retaliation for plaintiff's protected speech at the ILC Executive Board meeting. Sec. Am. Compl. ¶¶ 27, 39, 70, 75. On November 25, 2010, C.O. Mahuta and C.O. Kelly issued plaintiff two misbehavior reports charging him with (1) solicitation, (2) organization of an action detrimental to the order of the facility, and (3) possession of escape paraphernalia. Id. ¶ 40. On December 6, 2010, Capt. Lacy found plaintiff guilty of possession of escape paraphernalia and sentenced plaintiff to twenty-four months of SHU confinement. Id. ¶¶ 11, 49. The next day, Lieut. Allan issued plaintiff a false misbehavior report charging him with solicitation, stemming from a letter plaintiff wrote to his sister attempting to obtain the "personal identifying information" of two former DOCCS employees. Id. ¶¶ 73-75. On December 7, 2010, plaintiff drafted a grievance alleging that defendants had issued false misbehavior reports "in retaliation for lawsuits, and investigations of deaths and assaults and fraud that was occurring at C.C.F., perpetrated by staff and executive team.... Also grieving the practices of executive staff promoting and condoning these transgressions" and the "reputed involvement" of CCF staff members, including Capt. Lacy, in "racially motivated hate groups" such as the KKK. Dkt. No. 132-4 ("Pl. Dep.") at 232. Plaintiff also filed a separate grievance on December 7, 2010 against C.O. Mahuta alleging retaliation. Id. at 233-34. The Inmate Grievance Program Committee responded on December 23, 2010 to both grievances. Id. Plaintiff alleges

that he mailed appeals to the Superintendent on December 27, 2010, and never received a response.

**\*9** Affording plaintiff special solicitude,[11] the statute of limitations was tolled for a total of twenty days, from December 7, 2010 until December 27, 2010 while plaintiff exhausted his administrative remedies. Therefore, the statute of limitations on plaintiff's First Amendment retaliation claim expired on December 27, 2013. Plaintiff signed the initial complaint in this action on January 16, 2014, twenty-one days after the statute of limitations expired. See Compl. at 34. Moreover, plaintiff has not pleaded facts sufficient to show that he was suffering an ongoing wrong – i.e., " 'the existence of an ongoing policy ... and some non-time barred acts taken in the furtherance of that policy.' " Shomo, 579 F.3d at 182 (quoting Harris, 186 F.3d at 250). Accordingly, plaintiff's First Amendment claim, insofar as it relates to defendants Capt. Lacy, Supt. LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan, is time-barred.

### b. Defendants C.O. Pray and Sgt. Archambault [12]

Plaintiff's retaliation claim against C.O. Pray and Sgt. Archambault accrued on January 26, 2011, when plaintiff claims he was subjected to excessive force in retaliation for his complaints against other officers. Sec. Am. Compl. ¶¶ 139-41. Although there is some discrepancy whether plaintiff properly exhausted his administrative remedies,[13] plaintiff filed a grievance against C.O. Pray and Sgt. Archambault on March 1, 2011. Pl. Dep. at 221.[14] The IGRC received this grievance on March 15, 2011. Dkt. No. 123-15 at 1. The Superintendent issued a decision on April 18, 2011, finding no staff malfeasance. Id. at 5. On April 25, 2011, plaintiff appealed the decision to CORC. Id. On July 20, 2011, CORC unanimously denied plaintiff's grievance. Id. at 8. Plaintiff contends that he did not receive the CORC decision until August 8, 2011. Dkt. No. 103 at 22. Thus, affording plaintiff special solicitude, the statute of limitations was tolled for 153 days while plaintiff attempted to exhaust his administrative remedies. The statute of limitations on plaintiff's First Amendment retaliation claim against C.O. Pray and Sgt. Archambault expired on June 28, 2014. Plaintiff first raised this claim in his amended complaint, filed on June 16, 2014. See Dkt. No. 42. Because plaintiff was actively pursuing his administrative remedies during this period,

the excessive force claim that arose from the January 26, 2011 incident is timely, as plaintiff raised this claim before the statute of limitations expired. Accordingly, plaintiff's First Amendment claim, insofar as it relates to defendants C.O. Pray and Sgt. Archambault, is not time-barred.

### 3. Conspiracy to Discipline and Confine

#### a. Capt. Lacy, Supt. LaValley, C.O. Mahuta, Sgt. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan

Plaintiff claims that on November 24, 2010, Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, and C.O. Crusie entered into an agreement to write false misbehavior reports against plaintiff with the intent confine plaintiff to SHU in retaliation for his protected speech at the November 22, 2010 ILC Executive Team meeting. Sec. Am. Compl. ¶ 40. On November 25, 2010, plaintiff received two misbehavior reports charging him with (1) solicitation, (2) conduct detrimental to the order of the facility, and (3) possession of escape paraphernalia. Id. ¶ 45. Plaintiff further claims that on December 6, 2010, Lieut. Allan entered into an agreement with Capt. Lacy and Supt. LaValley to punish plaintiff for his protected speech, and pursuant to this agreement, Lieut. Allan read plaintiff's outgoing mail and issued a misbehavior report charging plaintiff with solicitation for attempting to obtain the "personal identifying information" of two former DOCCS employees. Id. ¶¶ 73, 74, 76. Plaintiff was served a misbehavior report in connection with this charge on December 7, 2010. Id. ¶ 77. However, plaintiff contends that he did not become aware of defendants' alleged agreement until sometime in "late 2011" when "unnamed individuals" informed plaintiff of the conspiracy. See Pl. Dep. at 72, 96-97.

**\*10** In Dory v. Ryan, the Second Circuit held that in assessing conspiracy claims, the doctrine of equitable estoppel extends the statute of limitations until the time when the plaintiff could have reasonably found out about the conspiracy. Dory, 999 F.2d at 681 (citing Keating v. Carey, 706 F.2d 377, 381, 382 (2d Cir. 1983) ) ("[W]hen the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.").

Here, following plaintiff's timeline of events, it does not appear that he, as an inmate, could have known about the alleged conspiracy prior to someone telling him. See Dory, 999 F.2d at 681. Pursuant to plaintiff's allegations, the statute of limitations on plaintiff's conspiracy claim accrued sometime in "late 2011" when he found out about the alleged conspiracy. See Pl. Dep. at 72, 96-97. However, "on a motion for summary judgment, [the Court] cannot rely on an unsupported inference ... to resolve disputed issues of fact." Keating, 706 F.2d at 383. Plaintiff has not offered evidence other than his self-serving testimony to demonstrate that unnamed individuals told him the conspiracy occurred. See Pl. Dep. at 72, 96-97. Moreover, plaintiff acknowledged that he did not have direct knowledge whether such conversations or agreements between defendants even occurred. Id. at 96-97. Therefore, because plaintiff has not offered any evidence to support his allegation that learned of the conspiracy in "late 2011," equitable estoppel does not apply/Thus, plaintiff's conspiracy claim, insofar as it relates to Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan, is time-barred. See Howard v. Cherish, 575 F.Supp. 34, 35 (S.D.N.Y. 1983) (internal citation and quotation marks omitted) ("[S]ince summary judgment is designed to quickly end frivolous or meritless claims, the opposing party may not rest upon mere conclusory allegations or denials as a vehicle for obtaining a trial."); Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1157-58 (2d Cir. 1995) (holding, on review of a motion for summary judgment, "[t]o take advantage of [the doctrine of equitable estoppel], ... a plaintiff must submit non-conclusory evidence of a conspiracy or other fraudulent wrong which precluded his possible discovery of the harms that he suffered."); Konovalchuk v. Cerminaro, No. 9:11-CV-01344 (MAD/ CFH), 2014 WL 272428, at \*14 (N.D.N.Y. Jan. 24, 2014) (citing Matsushita Elec. Indus. Co., 475 U.S. 574, 586 (1986) ) ("[S]peculative and conclusory allegations are insufficient to withstand a summary judgment motion.")

#### b. Defendants C.O. Pray and Sgt. Archambault

Plaintiff claims that on January 26, 2011, C.O. Pray and Sgt. Archambault reached an agreement "as to the place to commit misuse of force" motivated by plaintiff's verbal complaint prior to his escort from SHU. Sec. Am. Compl. ¶¶ 139, 142. Although plaintiff filed a grievance against C.O. Pray and Sgt. Archambault regarding alleged

excessive force, that grievance does not mention an alleged conspiracy. See Dkt. No. 132-15. Thus, plaintiff is not afforded the benefit of equitable tolling.

Plaintiff first initiated his conspiracy claims against defendants C.O. Pray and Sgt. Archambault in his amended complaint on June 16, 2014. Dkt. No. 42. Therefore, any wrongs that occurred before June 16, 2011 are time-barred under the three-year statute of limitations. Plaintiff has failed to allege that C.O. Pray or Sgt. Archambault committed at least one wrongful act within the statutory time period to invoke the continuing violation doctrine, as his conspiracy claims center on the January 26, 2011 transport from SHU to a teleconference. See Gonzalez v. Wright, 665 F.Supp.2d 334, 350 (S.D.N.Y. 2009) ("[I]n order for the continuing violation doctrine to apply, plaintiff needed to show that those specific individuals committed at least one wrongful act within the statutory time period"). Therefore, plaintiff's conspiracy claim, insofar as it relates to defendants C.O. Pray and Sgt. Archambault, is time-barred.

### 4. Access to the Courts

**\*11** Plaintiff alleges that Capt. Lacy, Supt. LaValley, and Lieut. Allan [15] interfered with his "constitutional right of access to the courts under Article IV, First Amendment, Fifth Amendment and Fourteenth Amendment of the United States Constitution." Sec. Am. Compl. ¶ 171. Plaintiff contends that on November 24, 2010, November 27, 2010, and December 9, 2010, defendants caused a search of plaintiff's cell and hindered his access to the courts by confiscating his legal papers. Pl. Dep. at 210, 212. The latest possible date of accrual for plaintiff's claim is on December 9, 2010 – when plaintiff became aware that he may be "suffering from a wrong for which damages may be recovered." Singleton, 632 F.2d at 192. Plaintiff claims that he submitted a grievance to the Inmate Grievance Review Committee ("IGRC") with regard to "legal materials taken and moved to the SHU, legal materials confiscated." See id. at 237, 109 S.Ct. 573. The DOCCS' database shows that plaintiff appealed a grievance for "missing items after cell search" on December 8, 2010, but it is unclear if that grievance relates to the instant claim. See Dkt. No. 132-13 at 3.

Because the December 8, 2010 grievance for "legal materials confiscated" pre-dates the December 9, 2010

search, plaintiff cannot benefit from equitable tolling. Therefore, the statute of limitations on plaintiff's denial of access to the courts claim expired on December 9, 2013. Plaintiff signed the initial complaint in this action on January 16, 2014. See Compl. All of the alleged acts constituting interference with plaintiff's access to the courts occurred before January 16, 2011, and are outside of either of the three-year statutory windows. Therefore, plaintiff's denial of access to the courts claim against Capt. Lacy, Supt. LaValley, and Lieut. Allan is time-barred.

### 5. Improper SHU Conditions

Plaintiff alleges that Supt. LaValley, Capt. Lacy, and Lieut. Allan violated his Eighth Amendment right to be free from cruel and unusual punishment "when the defendants acted with deliberate indifference or with malice, in deprivation of the Plaintiff's basic human needs, and conduct which amount to calculated harassment unrelated to penological interests, causing unconstitutional, actual and physical injuries to the Plaintiff." Sec. Am. Compl. ¶ 173. Plaintiff was confined in SHU from November 25, 2010 until May 8, 2011. See Dkt. No. 132-9 at 3. Plaintiff failed to specifically name Supt. LaValley, Capt. Lacy, or Lieut. Allan in any grievances he may have filed relating to improper SHU conditions. See Pl. Dep. at 228-29. Thus, plaintiff is not afforded the benefit of equitable tolling.

Plaintiff first raised claims against defendants Supt. LaValley, Capt. Lacy, and Lieut. Allan in his amended complaint, filed on June 16, 2014. Dkt. No. 42. Therefore, any claims that occurred before June 16, 2011 are time-barred under the three-year statute of limitations. Plaintiff has not alleged that Supt. LaValley, Capt. Lacy, and Lieut. Allan committed at least one wrongful act within the statutory time period to invoke the continuing violation doctrine, as any violation committed due to improper SHU conditions ceased on his release from SHU on May 8, 2011. See Wright, 665 F.Supp.2d at 350 ("[I]n order for the continuing violation doctrine to apply, plaintiff needed to show that those specific individuals committed at least one wrongful act within the statutory time period"). Accordingly, because plaintiff did not allege a constitutional violation within the statutory period, plaintiff's Eighth Amendment improper SHU conditions claim is time-barred.

### 6. Eighth Amendment Excessive
### Force/Failure to Intervene

Plaintiff asserts two Eighth Amendment excessive force claims relating to incidents on December 22, 2010 and January 26, 2011. Sec. Am. Compl. ¶ 175. The undersigned addressed the timeliness of plaintiff's excessive force claims in the February 8, 2016 Report-Recommendation and Order, concluding that plaintiff's excessive force claims were timely because the statute of limitations was tolled while plaintiff actively pursued his administrative appeals. Dkt. No. 105 at 10. On March 9, 2016, the Court adopted the undersigned's Report-Recommendation and Order. Dkt. No. 107. [16]

### D. Exhaustion of Administrative Remedies

**\*12** Defendants contend that plaintiff failed to exhaust his administrative remedies through the available grievance procedures. See Dkt. No. 132-1 at 16, 24, 33. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) to determine exhaustion. Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court of the United States recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). As such, the special circumstances exception Hemphill, is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860. Here, although plaintiff identifies consistent troubles with CCF's Inmate Grievance Program, [17] it is no dispute that, at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). [18]

### 1. Retaliation/Excessive Force [19]

**\*13** Defendant argues that plaintiff failed to exhaust his administrative remedies as to his excessive force claims against C.O. Pray and Sgt. Archambault. Dkt. No. 132-1 at 19. Defendants do not address plaintiff's retaliation claim against C.O. Pray and Sgt. Archambault. Plaintiff

contends that, on January 26, 2011, C.O. Pray and Sgt. Archambault subjected him to excessive force in retaliation for his complaints against fellow officers. Sec. Am. Compl. ¶ 140-141. Plaintiff claims that he filed a grievance on January 26, 2011, but that the IGRC failed to respond. See Dkt. No. 132-15 at 1; Pl. Dep. at 220-21. On March 1, 2011, plaintiff filed a second grievance regarding the January 26, 2011 incident. Pl. Dep. at 211. The IGRC received this grievance on March 15, 2011, but no decision is available. Dkt. No. 123-15 at 1, 7. The Superintendent issued a decision on April 18, 2011 finding no staff malfeasance. Id. at 5. On April 25, 2011, plaintiff appealed the decision to CORC. Id. On July 20, 2011, CORC unanimously denied plaintiff's appeal. Id. at 8. Plaintiff contends that he did not receive the CORC decision until August 8, 2018. Dkt. No. 103 at 22.

Even assuming that plaintiff first filed his grievance on March 1, 2011, the undersigned finds that plaintiff's filing his grievance thirteen days past the thirty-day time limitation was not so egregious as to constitute an unreasonable attempt to avail himself of the grievance process, as the IGRC accepted the grievance, and both the Superintendent and CORC issued decisions on the merits. See Hill v. Curcione, 657 F.3d 116, 125 (2d Cir. 2011) ("[T]he exhaustion requirement of the PLRA is satisfied by an untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority."). Thus, plaintiff has properly exhausted his administrative remedies. Defendants have not met their burden of showing that plaintiff failed to exhaust his administrative remedies as to his retaliation claim. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### 2. Excessive Force/Failure to Intervene

#### a. December 22, 2010 incident – Lieut. Allan

Plaintiff claims that, during an escort, three unidentified, non-party corrections officers punched him on the head, face, and body, and pushed him into a concrete wall. Sec. Am. Compl. ¶ 136. Plaintiff further argues that Lieut. Allan, as the ranking officer in the escort, failed to intervene and prevent the non-party officers' excessive force. Id. ¶¶ 137, 175. Plaintiff filed a grievance on December 26, 2010 concerning the December 22 incident, which states that he was "assaulted by staff," but fails

to name the staff members present. Dkt. No. 132-14. Defendants argue that plaintiff "readily acknowledges" the vagueness of his grievance, which lacks not only the officers' names, but the location of the assault, any mention of Lieut. Allan's involvement, or notice of the underlying facts. Dkt. No. 132-1 at 33. Defendants further contend that plaintiff's "obstructionist actions during the investigation completely defeated the purpose of the grievance process" and that "plaintiff should not be considered to have properly exhausted his administrative remedies." Id.

In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending corrections officer. Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009). "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' ... and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted). Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id.

Plaintiff's December 26, 2010 grievance states: "Assaulted by staff on December 22, 2010 causing various injuries. This violated my 8[th] Amendment rights." Dkt. No.132-14 at 1. On April 14, 2011, the Superintendent affirmed the IGRC's denial of plaintiff's grievance, finding that there was no staff malfeasance. Id. at 2. Three days later, plaintiff appealed to CORC. Id. On July 13, 2011, CORC upheld the Superintendent's determination. Id. at 3.

**\*14** Plaintiff's December 22, 2010 grievance, as written, fails to give adequate notice of his failure to protect claim against Lieut. Allan in order "to allow prison officials to take appropriate responsive measures." PLRA's exhaustion requirement is "not dissimilar to the rules of notice pleading." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004). It requires that prison officials be afforded the time and opportunity to address a complaint internally, "[i]n order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Id. The December 22 grievance only alleges an assault claim. Dkt. No. 132-14. Plaintiff testified that he first mentioned Lieut. Allan as one of the officers present during the incident in the IGRC interview, but there is no indication that plaintiff mentioned Lieut.

Allan's failure to intervene on his behalf. Pl. Dep. at 206. Moreover, neither the Superintendent's decision nor the CORC decision mention Lieut. Allan or a failure to protect claim. Dkt. No. 132-14 at 2-3. There is nothing in plaintiff's grievance that would alert prison officials to investigate a subsequent failure to intervene claim against Lieut. Allan; thus, such claim was not properly grieved. See Luckerson v. Gooard, No. 00 Civ. 9508(JSR), 2002 WL 1628550, at *2 (S.D.N.Y. July 22, 2002) (determining the plaintiff's claim to be unexhausted and stating, "[f]or [the defendants] now to have to litigate a federal lawsuit premised on allegations that ... they had no reason to address [in the IGRC] would make a mockery of the exhaustion requirement."). Indeed, "the mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance." Turner v. Goord, 376 F.Supp.2d 321, 324 (W.D.N.Y. 2005). Thus, plaintiff has failed to properly exhaust his administrative remedies regarding his failure to intervene claim against Lieut. Allan. Therefore, defendants have met their burden in showing that plaintiff failed to exhaust administrative remedies. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be granted.

### E. First Amendment

Plaintiff contends that C.O. Pray and Sgt. Archambault "denied [him] his right to be free of retaliation for exercising his right to free speech ... when the defendants took ... adverse actions solely motivated by the Plaintiff's protected speech, causing actual physical and unconstitutional injuries to the Plaintiff." Sec. Am. Compl. ¶ 167. Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section

1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal, 558 F.3d at 128 (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 992).

### 1. Protected Conduct

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. "Reporting the wrongdoing of corrections officers and other prison officials ... qualifies as protected speech under the First Amendment." Moore v. Peters, 92 F.Supp.3d 109, 120 (W.D.N.Y. 2015) (citing Ahlers v. Grygo, No. 02-CV-3256 (JG)(LB), 2009 WL 3587483, at *4 (E.D.N.Y. Oct. 27, 2009) ). Plaintiff claims that C.O. Pray and Sgt. Archambault retaliated against him based on his complaints of wrongdoing at the November 22, 2010 ILC Executive Team meeting, as well as for "exercising his right of access to the courts and for [plaintiff's] complaint related to [C.O. Pray's] reading of his legal paper[s]." Sec. Am. Compl. ¶ 139. At the time, plaintiff was engaged in a lawsuit against C.O. Pray's "buddy Kevin," a non-party corrections officer. Id. ¶ 140.

To the extent that plaintiff bases his retaliation claim against C.O. Pray and Sgt. Archambault on verbal complaints he made at the November 22, 2010 ILC Executive Team meeting, such statements amount to protected conduct. Dolan v. Connolly, 794 F.3d 290, 292 (2d Cir. 2015) (finding that "action as a member of an ILC, i.e. the filing or voicing grievances on behalf of a prison population, qualifies as constitutionally protected conduct under the First and Fourteenth Amendments."). Moreover, plaintiff's lawsuit against a corrections officer qualifies as protected conduct. Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); Smith v. Kelly, 985 F.Supp.2d 275, 279 (N.D.N.Y. 2013) (assessing a First Amendment retaliation claim where the plaintiff claimed that his complaints against a non-party corrections officer constituted protected conduct). As plaintiff alleged that

defendants retaliated against him due to his protected conduct of voicing grievances as a member of the ILC and filing a lawsuit against a fellow officer, he has established the first prong of the retaliation analysis.

### 2. Adverse Action

**\*15** "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." Moore, 92 F.Supp.3d at 120 (internal quotation marks and citation omitted). It is well-settled that excessive force constitutes adverse action for the purposes of a retaliation analysis. Baskerville v. Blot, 224 F.Supp.2d 723, 731-32 (S.D.N.Y. 2002) ("[The plaintiff's] claim regarding the retaliatory assault sufficiently describes adverse conduct that would deter a reasonable inmate from exercising his constitutional rights."); see Flemming v. King, No. 14-CV-316 (DNH/CFH), 2016 WL 5219995, at \*5 (N.D.N.Y. June 20, 2016) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis."). Therefore, plaintiff's allegation of excessive force constitutes adverse action.

### 3. Causal Connection

In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville, 224 F.Supp.2d at 732. "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." Id. The Second Circuit has established that no more than six months between the protected activity and the adverse action establishes the temporal proximity sufficient to support an inference of causal connection. Espinal, 558 F.3d at 129.

Plaintiff has plausibly suggested facts supporting two of the factors. Prior to the escort to the Court of Claims teleconference, plaintiff and C.O. Pray were discussing the basis for plaintiff's ongoing lawsuit, and it was determined that plaintiff had sued a fellow non-party corrections officer who was C.O. Pray's friend. Pl. Dep. at 216-17. During the escort back to SHU, C.O. Pray assaulted plaintiff. Id. C.O. Pray learned of plaintiff's lawsuit on the same day that he assaulted plaintiff; therefore, the temporal proximity between is well-within the Second Circuit's six-month time frame to sufficiently support an inference of causal connection. See Flemming, 2016 WL 5219995, at \*5 (finding the fact that assault occurred on the same day that the plaintiff threatened to file a lawsuit against the defendants sufficed to establish temporal proximity); Jordan v. Garvin, No. 01CIV4393LTS/GWG, 2004 WL 302361, at \*6 (S.D.N.Y. Feb. 17, 2004) ("[T]he existence of a temporal connection as close as the one present here – just two days – is sufficient by itself to establish the requisite inference of a causal connection."). Moreover, upon learning that plaintiff had sued the non-party corrections officer, C.O. Pray allegedly stated, "[s]o you are suing my buddy Kevin, [sic] we know how to fix inmates like you, Povoski," and then proceed to joke with Sgt. Archambault "about their intent to physically [injure him] on his return from the video court appearance." Sec. Am. Compl. at 57. Defendants' statements suggest a retaliatory motive and signify that plaintiff's lawsuit may have been a "substantial or motivating factor" in the defendants' alleged decision to assault plaintiff. Baskerville, 224 F.Supp.2d at 732. Although plaintiff's comments at the November 22, 2010 ILC meeting constitute protected conduct and fall within the Second Circuit's six-month time frame, there is no indication that C.O. Pray or Sgt. Archambault attended that meeting – in fact, the minutes confirm that neither defendant was present. Dkt. No. 132-5 at 1. Moreover, neither C.O. Pray nor Sgt. Archambault mentioned plaintiff's November 22, 2010 comments prior to the assault. Therefore, defendants have not met their burden of showing that there is no genuine issue of material fact as to plaintiff's

retaliation claim against C.O. Pray and Sgt. Archambault. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### F. Eighth Amendment

**\*16** Plaintiff claims that on January 26, 2011, C.O. Pray assaulted him during an escort to a Court of Claims teleconference. Sec. Am. Compl. ¶ 142. Plaintiff further contends that Sgt. Archambault, the ranking supervisor, failed to intervene to prevent the assault. Id. Defendants argue that plaintiff "has failed to provide any corroborating evidence of any assault on January 26, 2011." Dkt. No. 132-1 at 37. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) ). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)

The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, the malicious use of force to cause harm "[ ] constitute[s an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21

(internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

### 1. Excessive Force

Viewing the evidence in the light most favorable to plaintiff, the undersigned declines to recommend dismissal of plaintiff's excessive force claim because there exists a genuine issue of material fact whether C.O. Pray used excessive force, and whether that force was malicious. See Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (internal quotation marks and citation omitted) ("[T]he malicious use of force to cause harm constitutes an Eighth Amendment violation[ ] per se ... whether or not significant injury is evident."). Plaintiff testified that on the return escort, C.O. Pray led him to the secluded A-B corridor, and, after ensuring that the area was clear, "struck [him] ... three times ... [i]n the face and head." Pl. Dep. at 217. Plaintiff contends that he suffered bruising and swelling that lasted approximately one week. Id. at 219-20, 127 S.Ct. 910. However, plaintiff's medical records do not reference any injury he allegedly sustained during the assault. Dkt. No. 132-16 at 3-4. Still, "certain actions, including malicious use of force to cause harm, constitute Eighth Amendment violations *per se.*" Blyden, 186 F.3d at 263 (emphasis in original). Although plaintiff's medical records do not support the injuries plaintiff purports to have incurred, "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation." Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at \*9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005) ); Tafari v. McCarthy, 714 F.Supp.2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted)

(denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.")

**\*17** Assessing the subjective prong of the analysis, plaintiff testified that C.O. Pray assaulted him after learning that plaintiff had commenced a lawsuit against his friend, and that the assault was otherwise unprovoked. Pl. Dep. at 215, 217. A reasonable factfinder could find plaintiff's testimony credible and determine that C.O. Pray's actions were wanton and malicious. See Bylden, 196 F.3d at 263 ("[T]he malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se."). Further, plaintiff testified that he was restrained in a waist chain and handcuffs, weighing against the notion that C.O. Pray could have reasonably perceived plaintiff to be a threat. Scott, 344 F.3d at 291. Such testimony could establish that C.O. Pray used force not to restore or maintain order, rather, in retaliation for filing suit against a fellow corrections officer. See Sims, 230 F.3d at 21.

As the governing law dictates that the evidence must be viewed in the light most favorable to plaintiff, the undersigned must credit plaintiff's version of events for purposes of this motion. In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) ("In [reviewing all of the evidence in the record], the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."). Defendants have not met their burden of showing that there is no genuine issue of material fact as to plaintiff's excessive force claim. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### 2. Failure to Intervene

Plaintiff claims that during the January 26, 2011 escort to a Court of Claims video conference, Sgt. Archambault, the ranking supervisor, failed to intervene when C.O. Pray assaulted him. Sec. Am. Compl. ¶ 142. "A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation." Lewis v. Mollette, 752 F.Supp.2d 233, 244 (N.D.N.Y. 2010).

> In order to establish liability on the part of a defendant under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: (1) possessed actual knowledge of the use by another corrections officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force.

Id. (internal citation and quotation marks omitted). Viewing the facts in the light most favorable to plaintiff, Sgt. Archambault alerted C.O. Pray that no one was around, stood close enough to C.O. Pray to be able to intervene, and failed to intervene to prevent C.O. Pray from striking plaintiff. Pl. Dep. at 217. Based on these facts, a fact-finder could conclude that Sgt. Archambault had the ability to intervene. Therefore, defendants have not met their burden of showing that there is no genuine issue of material fact as to plaintiff's failure to intervene claim. Accordingly, it is recommended that defendants' Motion for Summary Judgment on this ground be denied.

### III. Conclusion

For the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment (Dkt. No. 132) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against Capt. Lacy, C.O. Summo, Dir. Prack, and Supt. LaValley,

(2) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan,

(3) Insofar as it seeks dismissal of plaintiff's First Amendment access to the courts claim against Capt. Lacy, C.O. Kelly, C.O. Crusie, C.O. Mahuta, Supt. LaValley, and Lieut. Allan,

**\*18** (4) Insofar as it seeks dismissal of plaintiff's § 1983 conspiracy claims Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, Lieut. Allan, C.O. Pray, and Sgt. Archambault,

(5) Insofar as it seeks dismissal of plaintiff's Eighth Amendment claim against Capt. Lacy, Lieut. Allan, and Supt. LaValley for improper SHU conditions,

(6) Insofar as it seeks dismissal of plaintiff's Eighth Amendment failure to intervene claim against Lieut. Allan,

the motion be **GRANTED**, and the claims be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 132) be **DENIED IN PART**:

(1) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against C.O. Pray and Sgt. Archambault,

(2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment excessive force claim against C.O. Pray,

(3) Insofar as it seeks dismissal of plaintiff's Eighth Amendment failure to intervene claim against Sgt. Archambault,

the motion be **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e). [20]

**All Citations**

Slip Copy, 2017 WL 9511094

Footnotes

1   This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   The ILC is a "group of inmates elected to communicate grievances to officials." Meriwether v. Coughlin, 879 F.2d 1037, 1039 (2d Cir. 1989).

3   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

4   "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

5   Plaintiff also alleges that on November 22, 2010, Supt. LaValley, Capt. Lacey, and Lieut. Allan mutually agreed to open and read plaintiff's incoming and outgoing mail which included correspondence with plaintiff's then attorney Neil Bubel and plaintiff's sister Sheila Povoski-Butler. Sec. Am. Compl. ¶¶ 64, 69, 70. These letters contained plaintiff's allegations of wrongdoing by staff members. Id. ¶ 70. Plaintiff alleges these letters were the bases for defendants' plan to issue

false misbehavior reports and punish plaintiff for his complaints and grievances at the November 22, 2010 ILC Executive Team meeting. Id. ¶¶ 71, 73.

6    In his Second Amended Complaint, plaintiff alleges that he was released to the general prison population on or about October 27, 2011. Sec. Am. Compl. ¶ 95. This statement is at odds with plaintiff's "Affidavit in Opposition of Request for Re-Hearing," in which he states he was released from SHU on May 8, 2011 to the general population, but remained under keeplock confinement until October 24, 2011. See Dkt. No. 132-9 at 3.

7    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

8    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

9    The fact that plaintiff's Second Amended Complaint is not notarized is immaterial under 28 U.S.C. § 1746. See Hameed v. Pundt, 964 F.Supp. 836, 840-41 (S.D.N.Y. 1997) (deeming an unnotarized document admissible in support of a summary judgment motion so long as that document contains the statement "I declare under penalty of perjury that the foregoing is true and correct.").

10   Plaintiff alleges he was not immediately notified of the January 24, 2011 appeal disposition. Sec. Am. Compl. ¶ 54. Plaintiff mailed the Dir. of Special Housing to inquire whether the hearing disposition had been reviewed. Id. ¶ 56. On or about February 15, 2011, plaintiff received a letter from the Dir. dated February 11, 2011, indicating that the hearing had been reviewed and the disposition affirmed on January 26, 2011. Id. ¶ 57.

11   DOCCS records confirm plaintiff's filing of a grievance and the administrative denial of that grievance, but fail to show that plaintiff filed an appeal. Dkt. No. 132-1 at 23. There is no evidence, other than plaintiff's own testimony, to establish whether he appealed to the Superintendent.

12   Defendants' motion does not address the retaliation claim insofar as it applies to C.O. Pray and Sgt. Archambault.

13   Plaintiff's exhaustion of his administrative remedies will be further discussed. See subsection III.D.1. infra.

14   At various points in his second amended complaint, plaintiff alleges that CCF had a policy of obstructing the mailing of grievances. See Pl. Dep. at 194-96. In calculating the equitable tolling period, the use of either March 1, 2011 or January 26, 2011 would deem plaintiff's claims regarding the January 26 incident timely under the statute of limitations. See subsection III.D.1. infra.

15   Plaintiff's claims against C.O. Mahuta, C.O. Crusie, C.O. Kelly and Sgt. Tamer were terminated by the Court's March 9, 2016 Memorandum-Decision and Order, adopting and incorporating the undersigned's February 8, 2016 Report-Recommendation and Order. Dkt. Nos. 105, 107.

16   The undersigned decided the timeliness of plaintiff's Eighth Amendment claims in the February 8, 2016 Report-Recommendation and Order. However, were the undersigned to address again the timeliness of those claims, the undersigned would still find the claims timely based on the copies of plaintiff's grievance submissions submitted pursuant to defendants' Motion for Summary Judgment.

17   Plaintiff details obstruction by DOCCS employees of delivery of grievances. See Sec. Am. Compl. ¶ 177; Pl. Dep. at 194-97.

18   First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's

determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

19   Exhaustion of plaintiff's retaliation claim is discussed in conjunction with plaintiff's excessive force claim, as they were grieved together.

20   If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**End of Document**                                           © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**Povoski v. Lacy, Not Reported in Fed. Supp. (2018)**

2018 WL 547392

2018 WL 547392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Frank J. POVOSKI, Jr., Plaintiff,
v.
Steven LACY, et al., Defendants.

9:14-CV-0097 (BKS/CFH)
|
Signed 01/17/2018

**Attorneys and Law Firms**

Frank J. Povoski, Jr. Rochester, NY 14622 Plaintiff, pro se

Brian W. Matula, Esq. Hon. Eric T. Schneiderman Office of New York State Attorney General The Capitol Albany, NY 12224 Attorney for Defendants

### MEMORANDUM-DECISION AND ORDER

Brenda K. Sannes, U.S. District Judge

**\*1** Plaintiff Frank Povoski, Jr., a former New York State inmate, commenced this action under 42 U.S.C. § 1983 alleging that the Defendants violated his constitutional rights under the First, Eighth, and Fourteenth Amendments during his confinement at the Clinton Correctional Facility. Dkt. No. 106. On April 7, 2017, Defendants filed a motion for summary judgment, seeking dismissal of the entirety of the Plaintiff's Second Amended Complaint. Dkt. No. 132. Plaintiff did not respond to the motion even though he filed two requests for extensions of time, which were granted. Dkt. Nos. 136 and 138. This matter was referred to United States Magistrate Judge Christian F. Hummel who, on December 13, 2017, issued a Report-Recommendation and Order recommending that Defendants' motion for summary judgment be granted in part and denied in part. Dkt. No. 139. Magistrate Judge Hummel advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the Report, and that the failure to object to the Report within fourteen days would preclude appellate review. Dkt. No. 139, pp. 42-43. No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 139) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 132) is **GRANTED IN PART AND DENIED IN PART**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 132) is **GRANTED** with respect to the following claims, and that the following claims are **DISMISSED WITH PREJUDICE**:

(1) Plaintiff's Fourteenth Amendment due process claim against Capt. Lacy, C.O. Summo, Dir. Prack, and Supt. LaValley;

(2) Plaintiff's First Amendment retaliation claim against Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan;

(3) Plaintiff's First Amendment access to the courts claim against Capt. Lacy, C.O. Kelly, C.O. Crusie, C.O. Mahuta, Supt. LaValley, and Lieut. Allan;

(4) Plaintiff's § 1983 conspiracy claims against Capt. Lacy, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, Lieut. Allan, C.O. Pray, and Sgt. Archambault;

(5) Plaintiff's Eighth Amendment claim against Capt. Lacy, Lieut. Allan, and Supt. LaValley for improper SHU conditions; and

(6) Plaintiff's Eighth Amendment failure to intervene claim against Lieut. Allan; and it is further

**Povoski v. Lacy, Not Reported in Fed. Supp. (2018)**

2018 WL 547392

**ORDERED** that the Defendants' motion for summary judgment is **DENIED** as to the following claims, which will be scheduled for trial:

   **\*2** (1) Plaintiff's First Amendment retaliation claim against C.O. Pray and Sgt. Archambault;

   (2) Plaintiff's Eighth Amendment excessive force claim against C.O. Pray; and

   (3) Plaintiff's Eighth Amendment failure to intervene claim against Sgt. Archambault; and it is further

**ORDERED** that the Clerk is directed to terminate Capt. Lacy, C.O. Summo, Dir. Prack, Supt. LaValley, C.O. Mahuta, C.O. Tamer, C.O. Kelly, C.O. Crusie, and Lieut. Allan as Defendants in this case; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 547392

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 951459
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael SHAW, Petitioner,

v.

SUPERINTENDENT, ATTICA
CORRECTIONAL FACILITY, Respondent.

No. 9:03-CV-0610 (NPM).
|
March 28, 2007.

**Attorneys and Law Firms**

Michael Shaw, Comstock, NY, Petitioner, pro se.

Hon. Andrew Cuomo, New York State Attorney General, Patrick F. MacRae, Esq., Assistant Att'y General, of counsel, Syracuse, NY, for Respondent.

### *MEMORANDUM-DECISION and ORDER*

NEAL P. McCURN, Senior United States District Judge.

**I.** *Background*

#### A. *State Court Proceedings*

 **\*1** According to the testimony adduced at trial, on May 15, 1998, Donovan "Romeo" Allen, lived on East Fayette Street in the City of Syracuse, New York. See Transcript of Trial of Michael Shaw (2/23/99) ("Trial Tr.") at 575. Allen had been involved in an ongoing dispute with Michael "Lucky" Johnson and his friends, including petitioner, *pro se,* Michael "Gem Star" Shaw. Trial Tr. at 578-579, 697-700. Specifically, the records reflect that several months before May, 1998, Allen had hit Johnson's car, Trial Tr. at 759, and the two had been involved in both verbal arguments and fist fights. Trial Tr. at 784-785.

Between 2:30 and 3:30 in the afternoon of May 15, 1998, Johnson, his girlfriend Sayeeda and Shaw drove to Allen's home. Trial Tr. at 693-695. At the time, people were sitting outside of that house, however Allen himself was not at home. Trial Tr. at 577. Johnson, Sayeeda and Shaw exited their vehicle and Johnson began talking with an individual who was standing in front of Allen's house. Trial Tr. at 579, 698. Their conversation ended when Orville "Sardine" Miller came out of Allen's house brandishing a knife and approached the group. Trial Tr. at 579, 698-700, 901. Miller and Shaw soon "exchanged words" and then "went to go fight." Trial Tr. at 701. At some point during that altercation, Miller discarded his knife and pulled a gun out from his back pocket. Trial Tr. at 582, 702. Miller's actions prompted Shaw to exclaim "this is the second or third time you pull a gun on me. I'll be back." Trial Tr. at 582, 705. Miller then put the gun back in his pocket and walked away. Trial Tr. at 704.

Shaw, Johnson and Sayeeda then left the area and met Omar Lutehman, a friend of both Shaw and Johnson. Trial Tr. at 582, 705-08. After a brief meeting, Lutehman entered his car and drove to the Western Lights area of Syracuse with Shaw, Johnson and Sayeeda following in their automobile. Trial Tr. at 708-10. Lutehman and Shaw then briefly entered a house together, after which they both entered Johnson's car and drove towards East Fayette Street. Trial Tr. at 711-713. After dropping Shaw off, Johnson parked his car and he, Lutehman and Sayeeda began walking towards Allen's home. Trial Tr. at 713.

Allen, who had returned to his home approximately fifteen minutes after the fight between Shaw and Miller had ended (Trial Tr. at 585), soon noticed Sayeeda, Johnson and Lutehman walking toward his house. Trial Tr. at 588-589, 714-715, 902-905. When Johnson and Allen met, the two began fighting. Trial Tr. at 537, 590, 716.

Around that time, Shaw was observed walking up East Fayette Street with a long, black gun at his side. Trial Tr. at 598-99, 717-718, 905-907. Around that time, Sayeeda apparently said something to Allen which prompted him to call her a "bitch." Trial Tr. at 592-93, 905. Johnson responded by moving toward Allen, who then brandished a knife. Trial Tr. at 592-93. Johnson turned and ran away, however Allen chased after him. Trial Tr. at 594, 716-717. Shaw then started shooting the gun he was carrying at Allen. Trial Tr. at 599-601, 718-19, 842-843, 849, 905-907. [1] After the shooting, Lutehman, Johnson and Sayeeda entered their car and drove away, however the trio soon returned to pick up Shaw. Trial Tr. at 719-20. At that time, Shaw informed Johnson that he had shot Allen. Trial Tr. at 722.

**\*2** The trial transcript also reflects that at approximately 4:19 p.m. on May 15, 1998, Syracuse Police Officer Ronald Brico was dispatched to the 1400 block of East Fayette Street in the City of Syracuse on a call that "started out with a man with a gun and it was updated to a shots fired and ultimately a man down." Trial Tr. at 510. Upon arriving at the scene, Officer Brico observed an individual later identified as Allen lying in the driveway of a residence bleeding profusely from his left side. Trial Tr. at 511-12. Allen was transported to Upstate Medical Center where he was pronounced dead at 4:46 p.m. on May 15, 1998, never having regained consciousness after the shooting. Trial Tr. at 512-513. [2]

As a result of the foregoing, on July 15, 1998, an Onondaga County grand jury returned an indictment against Shaw. *See* Indictment No. 98-0573-1 ("Indictment"). In that accusatory instrument, Shaw was charged with murder in the second degree, in violation of N.Y. Penal L. § 125.25(1), criminal possession of a weapon in the second and third degrees, contrary to N.Y. Penal L. §§ 265.02(1) and 265.03, and first degree reckless endangerment, in violation of N.Y. Penal L. § 120.25. *See* Indictment. Beginning on February 23, 1999, Shaw was tried before a jury on the foregoing charges in Onondaga County Court with County Court Judge J. Kevin Mulroy presiding. At the close of the prosecution's case-in-chief, Shaw's counsel moved to dismiss all counts in the Indictment based upon his claim that the prosecution had failed to meet its burden of proof as to each of the above-described charges. Trial Tr. at 1037. Judge Mulroy dismissed the charge of criminal possession of a weapon in the third degree after he determined that it was duplicitous of the other weapons possession charge brought against Shaw, however the County Court denied counsel's motion to dismiss the Indictment in all other respects. *See* Trial Tr. at 1038.

Following the arguments of counsel and the trial court's instructions, the jury began its deliberations. Trial Tr. at 1198. During the course of those deliberations, Judge Mulroy responded to several requests of the jury, which included a request that the testimony of a prosecution witness, Everod Reid, be read back to the jury. Trial Tr. at 1201-06. The jury thereafter returned a unanimous verdict in which it found Shaw guilty of the second degree murder, criminal possession of a weapon and reckless endangerment charges. Trial Tr. at 1207-09.

On April 16, 1999, Shaw appeared before Judge Mulroy for sentencing on the above convictions. At that proceeding, the County Court sentenced Shaw to a term of twenty-five years to life imprisonment on the murder conviction, and lesser, concurrent terms on the remaining convictions. *See* Transcript of Sentencing of Michael Shaw (4/16/99) at 12-13.

Shaw appealed his convictions to the New York State Supreme Court, Appellate Division, Fourth Department, which appeal was opposed by the Onondaga County district attorney. On November 13, 2000, the Appellate Division denied Shaw's appeal in all respects. *See People v. Shaw,* 277 A.D.2d 1052 (4th Dept.2000). On April 6, 2001, the Court of Appeals denied Shaw's application for leave to appeal to that court. *See People v. Shaw,* 96 N.Y.2d 806 (2001).

**\*3** On November 27, 2001, Shaw filed a collateral challenge to his state court conviction in the form of an application for a writ of error *coram nobis* filed with the Appellate Division. See State Court Record ("Record") at 1732-95 ("*Coram Nobis* Application"). In that application, Shaw alleged several theories in support of his claim that his appellate counsel rendered ineffective assistance. *See Coram Nobis* Application. That application was opposed by the district attorney, and on March 11, 2002, the Appellate Division denied Shaw's *coram* nobis request in all respects. *See People v. Shaw,* 292 A.D.2d 881 (4th Dept.2002).

On April 2, 2002, Shaw filed a motion to vacate his judgment of conviction pursuant to Section 440.10 of New York's Criminal Procedure Law ("CPL") with the County Court. *See* Record at 1800-46. Later that same month, Shaw filed a second CPL Motion with that court. *See* Record at 1856-79. The district attorney opposed those applications, see Record at 1880, 1883-84, and on July 22, 2002, Onondaga County Court Judge William D. Walsh denied Shaw's motions to vacate. *See People v. Shaw,* No. 98-573-1 (Onon.Cty.Ct. July 22, 2002) (Record at 1881-82) ("July, 2002 Order"). In its order dated February 27, 2003, the Appellate Division denied Shaw's application for leave to appeal that decision of the County Court to the Appellate Division. *See People v. Shaw,* No. KA 02-02099 (4th Dept. Feb. 27, 2003) (Record at 1885).

### B. *Proceedings in This Court*

Petitioner commenced this proceeding, *pro se,* on May 3, 2003. *See* Petition (Dkt. No. 1) at 7.[3] Now-Chief United States District Judge Norman A. Mordue thereafter directed Shaw to file an amended petition in this action (Dkt. No. 3), and on August 14, 2003, Shaw filed an amended petition herein. Dkt. No. 5. Shaw thereafter requested permission to file another amended pleading in this action (Dkt. No. 19), and on April 20, 2004, Magistrate Judge David E. Peebles granted that application. *See* Dkt. No. 21. Shaw thereafter filed such pleading in which he alleges that: i) he received the ineffective assistance of appellate counsel; ii) the prosecutor engaged in misconduct when he called a "false witness" to testify at Shaw's trial; iii) he was deprived of his right to a fair trial by the County Court; and iv) he received the ineffective assistance of trial counsel. *See* Dkt. No. 23 ("Am.Pet."). The respondent was afforded until July 30, 2004 to file his response to the amended pleading, *see* Dkt. No. 25, and on that day, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed an answer together with a memorandum of law in opposition to Shaw's amended petition. Dkt. No. 26.[4] Petitioner thereafter submitted a traverse in further support of his habeas application. *See* Dkt. No. 27.

On January 5, 2006, then-Chief United States District Judge Frederick J. Scullin, Jr. reassigned this action to the undersigned for disposition. *See* Dkt. No. 29.

## II. *Discussion*

### A. *Timeliness of Petition*

**\*4** Respondent initially claims that this action was not timely commenced by Shaw in light of the one year statute of limitations applicable to habeas corpus petitions as a result of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* Resp. Mem. at 11-12; *see also* 28 U.S.C. § 2244(d).

On October 17, 2003, United States District Judge Norman A. Mordue, who at the time was the assigned District Judge relating to this action, entered an order that specifically addressed the issue of the timeliness of Shaw's action. *See* Dkt. No. 8 ("October, 2003 Order"). In that order, Judge Mordue provided a detailed analysis relating to the state court actions filed by Shaw and the effect that those proceedings had on tolling the AEDPA's statute of limitations. *See* October, 2003 Order at 1-3.[5]

Judge Mordue ultimately concluded that "it appears as though Petitioner has timely filed his original Petition for purposes of the AEDPA." *See* October, 2003 Order at 3.

Under the doctrine of the law of the case, " 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.' " *Small v. Arch Capital Group, Ltd.,* No. 03 CIV. 5604, 2005 WL 2584158, at *2 (S.D.N.Y. Oct. 12, 2005) (quoting *Arizona v. California,* 460 U.S. 605, 618 (1982)).

Nothing in the record suggests that Judge Mordue's determination that this action was timely commenced by Shaw is erroneous in any way.[6] Therefore, under the doctrine of law of the case, this Court denies respondent's request to dismiss this action as untimely filed, and accordingly next considers the standard of review that is to be employed in considering petitioner's claims.

### B. *Standard of Review Applicable to Shaw's Claims*
Under the AEDPA:

> a federal court may award habeas corpus relief with respect to a claim adjudicated on the merits in state court only if the adjudication resulted in an outcome that: (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Rodriguez v. Miller,* 439 F.3d 68, 73 (2d Cir.2006) (quoting 28 U.S.C. § 2254(d)); *see also DeBerry v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005); *Miranda v. Bennett,* 322 F.3d 171, 177-78 (2d Cir.2003). "A state court adjudication is 'contrary to' clearly established federal law only if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.' " *Rodriguez,* 439 F.3d at 73 (quoting *Williams v. Taylor,* 529 U.S. 362, 413 (2000)). Under the "unreasonable application" clause of the AEDPA, a federal habeas court may only grant the writ where the state court's decision "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Rodriguez,* 439 F.3d at 73 (quoting *Williams,* 529 U.S. at 413).

### B. *Substance of Shaw's Claims*

#### 1. *Ground One*

**\*5** In his first ground for relief, Shaw argues that he was denied the effective assistance of appellate counsel. *See* Am. Pet., Ground One.

#### i. *Clearly Established Supreme Court Precedent*

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. This Amendment has been interpreted to require that indigents be provided with assigned counsel for their first appeal as of right. *Douglas v. California,* 372 U.S. 353, 358 (1963). Thus, an individual is entitled to the effective assistance of appellate counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970). The proper standard for evaluating a claim which alleges that appellate counsel was ineffective is the test enunciated in *Strickland v. Washington,* 466 U.S. 668 (1984). *See Smith v. Robbins,* 528 U.S. 259, 287-89 (2000). In *Strickland,* the Supreme Court held that to establish a violation of one's right to the effective assistance of counsel, a habeas petitioner must show both: i) that counsel's representation fell below an objective standard of reasonableness, measured in the light of the prevailing professional norms; and ii) resulting prejudice that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 688-90.

#### ii. *Contrary to, or Unreasonable Application of, Clearly Established Supreme Court Precedent*

In support of his first ground for relief, petitioner argues that he was not present at a hearing conducted by the trial court relating to a "juror that was forced to give a guilty verdict against the Petitioner," *see* Am. Pet., Ground One, and that his appellate counsel's failure to raise that issue on appeal constituted ineffective assistance. *Id.* In his traverse, Shaw argues that his counsel wrongfully failed to argue on appeal that: 1) his absence from that hearing deprived him of his right to be present during a material stage of his trial; and 2) trial counsel wrongfully withdrew a request that the County Court conduct "a hearing to inquire into the truth" regarding the letters

purportedly written by the former juror. *See* Traverse at 1-4 (citing CPL § 330.40).[7] Both of these theories relate to correspondence sent to, *inter alia,* the County Court by an individual who claimed to have been member of the jury that convicted Shaw. *See* Am. Pet., Ground One; *see also* Traverse. Therefore, a review of the state court record relating to such correspondence is warranted.

On March 22, 1999, Judge Mulroy presided over a hearing at which Shaw, his trial attorney and the prosecutor were present. The following exchange occurred at that hearing:

> THE COURT: I've received a letter for what it's worth, from somebody that has signed their name, "Unknown," alleging certain improprieties that took place in the jury room during the deliberations of this gentleman's case. I understand through conversations with Mr. Carey[8] that he's also received a letter and I also understand the Syracuse Newspapers have received a letter. I assume Mr. Carey is going to ask for some type of an adjournment .[9] I'll hear you, Mr. Carey.

> **\*6** MR. CAREY: I am, Judge. Judge, in light of the fact that the Court ... and myself, have received a letter from a person who identifies themselves as a juror in this case, who in my letter states that they were untruthful and they broke their oath, that they did, in fact, have reasonable doubt but they were somehow pressured by the other jurors into rendering a guilty verdict. This person does say in my letter, and I think in the Court's as well, that, as of now he or she wants to remain unknown, but it says, "I will stay unknown until I find the proper authorities and then I will deal with the consequences at that time." I would first ask the Court in light of this very serious matter, Judge, to recall the jurors singly, not en masse. Obviously this person is saying that he or she was coerced by someone or other people in the jury room and I think it's so important that the Judge should-the Court should bring back the entire jury and in-camera interview each one.

> THE COURT: Well, first of all, I think any request for the Court to do anything is premature. I think your request should be in writing so that Mr. Cuffy,[10] can have a chance to respond.... Mr. Cuffy, I'll make my letter available to you

for your response. If you'd like, stop by this afternoon and my secretary will make a copy of it.

MR. CUFFY: Your Honor, Mr. Carey has provided me with a copy of the letter.

THE COURT: Of my letter?

MR. CUFFY: Oh, excuse me.

MR. CAREY: The letter I received I gave it to him.

MR. CUFFY: I don't know if the Court has a copy of it.

THE COURT: I don't have Mr. Carey's copy. He doesn't have my copy and you don't have my copy .....

MR. CUFFY: Okay.

THE COURT: I don't, quite frankly, want anybody's copy.

MR. CAREY: Judge, I'm passing up a copy.

THE COURT: I'll read about it in some motion papers, I'm sure. All right? Now I'm not going to do anything, Mr. Carey, other than grant you an adjournment for you to formalize your request in writing to me and give Mr. Cuffy a chance to respond. How long will it take you to put that request down, sir?

MR. CAREY: Judge, I would ask for at least two weeks, because hopefully, whoever this person is will come forward by that time. I think that would be important if the Court had an opportunity but I'll need at least a couple of weeks to do this, Judge.

MR. CUFFY: Your Honor, could I be heard briefly on this?

THE COURT: Yes, sir. Yeah.

MR. CUFFY: Basically, the Court's presented with a typed-and it's important that it's typed-a typed letter from someone who signs, "Unknown," and claims to be a juror in this case. As far as I know, your Honor, I ... may have a different letter as I'm understanding. I

wasn't sent a copy of any letter at all on this case. From what I read in this letter you have a juror say that. Even if this letter is accepted as being truthful, it doesn't make grounds-it doesn't establish grounds for any change in the outcome of this because the letter basically says that, "I was persuaded by other jurors during jury deliberation," which the Court I know is well aware that's what happens in jury deliberations in every case. So based prima facie on what I have in front of me, I ask that sentencing go forward because there isn't a ground here to change the verdict.

**\*7** THE COURT: I don't disagree with you but I think for fairness sake and for proper appellate review we ought to just formalize it in writing. I don't know how you're going to make this person who's unknown, come forward. I do not intend with this information to start calling jurors, bringing them in and beginning an inquiry. I don't think that's-this information rises to that level yet. So that's just a gut reaction I have to this information, but I'll give you a chance to put it in writing and afford this person, if this person is a member of the jury, to come forward and see what else is new....

*See* Transcript of Hearing before Judge Mulroy (3/22/99) (Dkt. No. 26, Exh. J.) ("March, 1999 Tr.") at 3-7. [11]

Approximately three weeks later, on April 14, 1999, Shaw, his attorney and the prosecutor appeared before Acting Supreme Court Judge John J. Brunetti. The transcript of that proceeding reflects the following discussion relating to the above-described letters:

THE COURT: This was on today for arguments of motions relative to some information that came to your attention-my attention, and I understand the District Attorney's attention about some letters or whatnot. Today was the day to make motions addressed to that. No motion has been received. I intend to sentence this man....

MR. CAREY: Judge, with regards to my motion, my motion was for the court to conduct an in camera review of each and every juror particularly with regards to the letter that was received by numerous people. In light of the fact that the District Attorney's

office has conducted an investigation, and it's my understanding that all the jurors were questioned, no one stated that they sent that letter, and they continued their investigation, I would withdraw my motion for the court to do that investigation.

THE COURT: I wasn't going to do it anyway. Fine, now that I have your permission not to I'll not do it.

MR. CAREY: You do, judge.

*See* Transcript of Hearing before Justice Brunetti (4/14/99) (Dkt. No. 26, Exh. K) ("April, 1999 Tr.") at 2-3.

In addressing the merits of Shaw's *Coram Nobis* Application, the Appellate Division had the benefit of the above transcripts as well as an affidavit provided by the district attorney in opposition to Shaw's *coram nobis* application. In that affidavit, the district attorney noted that the investigation to the source of the letters conducted by the district attorney's office revealed that "the typeface of the letter had been traced back to a typewriter located in the Justice Center Jail, on the same floor where [Shaw] was being held." *See* Affidavit in Opposition to Shaw's *Coram Nobis* Application (2/1/02) (Dkt. No. 26, Exh. V) ("February, 2002 Aff.") at 2-3. That evidence-which was not refuted by Shaw in either the state courts or this action-is entirely consistent with the district attorney's finding that the above-mentioned letters were not written by any member of the jury at Shaw's criminal trial. [12]

**\*8** To establish that his appellate counsel's conduct was objectively unreasonable, " 'it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made.' " *Clark v. Stinson,* 214 F.3d 315, 322 (2d Cir.2001) (citing *Jones v. Barnes,* 463 U.S. 745, 754 (1983)); *see also Atkins v. Miller,* 18 F.Supp.2d 314, 320 (S.D.N.Y.1998) (citation omitted). Rather, to prevail upon such this claim, Shaw must demonstrate that his counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark,* 214 F.3d at 322. Thus, appellate counsel cannot be considered ineffective for making a strategic decision to abandon weaker arguments and, instead, develop only those arguments more likely to succeed. *See Gonzalez v. Duncan,* No. 00-CV-1857, 2001 WL 726985, at \*6 (E.D.N.Y. June 22, 2001) (citing *Jones,* 463 U.S. at

753) ("[a] brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound of strong and weak contentions").

Turning to the specific allegations asserted by Shaw in his first ground for relief, the undersigned notes that Shaw initially argues that his counsel wrongfully failed to argue on appeal that the hearing held by the County Court in Shaw's absence regarding the identity of the author of the letters referenced above violated the principles announced by New York's Court of Appeals in *People v. Antommarchi,* 80 N.Y.2d 247 (1992). [13] *See* Am. Pet. at (unnumbered) 7. However, the transcripts of the hearings referenced above establishes that the County Court ***never conducted*** a hearing where factual issues relating to the letters was explored. *See* March, 1999 Tr. at 7 (Judge Mulroy noting that he did not intend to contact jurors and question them about letters); April, 1999 Tr. at 2-3 (Justice Brunetti noting that he had no intention of questioning jurors about the above-referenced correspondence). Therefore, Shaw's claims that his attorney wrongfully failed to argue on appeal that: 1) the holding of such a hearing by the trial court in his absence violated his *Antommarchi* rights (*see* Am. Pet., Ground One; Traverse at 2); and 2) Shaw was wrongfully denied his right to be present at that hearing (*see* Traverse at 2-3), are clearly without substance.

Shaw also argues that his appellate counsel rendered ineffective assistance by failing to argue that petitioner's trial attorney "was not looking out for the petitioner's best interest, nor was he ... seeking out the truth" when trial counsel withdrew his motion which had requested that the County Court conduct an investigation into the source of the letters. *See* Traverse at 2. However, this claim appears to overlook the facts that: 1) the district attorney's investigation into the source of letters revealed that none of the jurors at Shaw's criminal trial had sent such correspondence (*see* April, 1999 Tr. at 2-3); 2) the investigation into the source of the letters established that they had been created by a typewriter located in the Justice Center Jail at which petitioner was incarcerated (*see Coram Nobis* Aff. at 2-3); and 3) the County Court specifically declared on the record that it would have denied defense counsel's motion to conduct a hearing into the matter (*see* April, 1999 Tr. at 3). The foregoing conclusively demonstrates that appellate counsel did not act unreasonably when he failed to argue on appeal that

trial counsel's strategic decision to withdraw the above-described application amounted to ineffective assistance.

**\*9** Finally, Shaw's argument that appellate counsel improperly failed to argue on appeal that the trial court erred when it did not conduct any hearing relating to the above-mentioned letters fails to recognize the fact that the County Court had determined that no hearing was necessary in light of the facts that were disclosed by the district attorney's investigation relative to the source of the letters.

In sum, the record fails to support Shaw's habeas claim that his appellate counsel rendered ineffective assistance. Accordingly, he has not demonstrated that the Appellate Division's decision denying his *Coram Nobis* Application, *see Shaw,* 292 A.D.2d at 881, is either contrary to, or represents an unreasonable application of, the above-cited Supreme Court precedent. Therefore, the undersigned denies Shaw's first ground for relief.

### 2. *Ground Two*

In his second ground, Shaw argues that his conviction was obtained as a result of prosecutorial misconduct. *See* Am. Pet., Ground Two.

It is well settled that a federal district court " 'may not grant the habeas petition of a state prisoner unless it appears that the applicant has exhausted the remedies available in the courts of the State....' " *Shabazz v. Artuz,* 336 F.3d 154,160 (2d Cir .2003)) (quoting *Aparicio v. Artuz,* 269 F.3d 78, 89 (2d Cir.2001) (other citation omitted); *see also Ellman v. Davis,* 42 F.3d 144, 147 (2d Cir.1994). This is because "[s]tate courts, like federal courts, are obliged to enforce federal law." *Galdamez v. Keane,* 394 F.3d 68, 72 (2d Cir.) (quoting *O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999)), *cert denied sub nom., Galdamez v. Fischer,* 544 U.S. 1025 (2005). As the Supreme Court noted in *O'Sullivan,* "[c]omity ... dictates that when a prisoner alleges that his continued confinement for a state court conviction violates federal law, the state courts should have the first opportunity to review this claim and provide any necessary relief." *O'Sullivan,* 526 U.S. at 844; *see also Galdamez,* 394 F.3d at 72 (quoting *O'Sullivan* ).[14]

Shaw never raised in the state courts-as an independent claim for relief-that his conviction must be reversed because of prosecutorial misconduct.[15] Rather, Shaw only argued that the prosecutor engaged in misconduct at petitioner's trial as one of the theories Shaw asserted in support of his claim that his appellate counsel rendered ineffective assistance. *See* Record at 1747-48; 1757-58.

"*Coram nobis* applications brought in state court do not exhaust the 'predicate' issues raised therein...." *Richards v. Berbary,* No. 01CIV.5524, 2003 WL 22076247, at \*5 (S.D.N.Y. Aug. 22, 2003) (citing *Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir.2001)); *see also Perez v. Hollins,* No. 02CIV.6120, 2004 WL 307271, at \*5-7 (S.D.N.Y. Feb. 5, 2004) (claims advanced in state court only as the predicate for ineffective assistance of appellate counsel claim are not exhausted for purposes of asserting such claims independent of appellate counsel claim); *Williams v. Bennett,* No. 99 CV 1119, 2003 WL 21143070, at \*5 n. 4 (E.D.N.Y. Jan. 3, 2003) (same). Thus, the claim asserted in ground two of Shaw's amended petition, which has never been asserted by petitioner as independent claim for relief in any state court, is necessarily unexhausted.

**\*10** However, for reasons best known to the respondent, he has not argued that Shaw has failed to exhaust this (or any) of his claims in the state courts.[16] Rather, respondent argues this claim must be denied on the merits. *See* Resp. Mem. at 16-17.

It is improper for a federal district court to *sua sponte* dismiss a federal habeas claim on the theory that such claim is unexhausted. *E.g., Acosta v. Artuz,* 221 F.3d 117, 121-24 (2d Cir.2000) (courts may not *sua sponte* raise nonjurisdictional defenses without affording inmate "notice and an opportunity to be heard" relative to the proposed dismissal); *Klem v. Brunelle,* 96-CV-0807, 1999 WL 603824, at \*2 n. 3 (W.D.N.Y. Aug. 9, 1999) (exhaustion requirement applicable to habeas petitions is not jurisdictional but rather a principle of comity) (citation omitted).

28 U.S.C. § 2254(b)(2) permits federal courts to consider the merits of an unexhausted habeas claim.[17] The Second Circuit, however, has not yet discussed the standard of review that district courts should employ when reviewing such a claim. *See Brown v. State of New York,* 374 F.Supp.2d 314, 318 (W.D.N.Y.2005). The majority of courts in this circuit that have addressed this issue have utilized a "patently frivolous" standard. *See Brown,* 374 F.Supp.2d at 318 (citing *Naranjo v. Filion,* No. 02-CIV-5449, 2003 WL 1900867, at \*8 (S.D.N.Y.

[Apr. 16, 2003](https://...)) (collecting cases) (footnote omitted). A minority of district courts have opined that the dismissal of unexhausted claims is appropriate when " 'it is perfectly clear that the [petitioner] does not raise even a colorable federal claim.' " *See Hernandez v. Lord,* No. 00-CIV-2306, 2000 WL 1010975, at *4 n. 8 (S.D.N.Y. July 21, 2000) (collecting cases); *see also Edmonson v. Artus,* No. 04-CV-5477, 2006 WL 3486769, at *11 (E.D.N.Y. Nov. 30, 2006); *Russell v. Ricks,* No. 02-CV-0940, 2006 WL 1555468, at *16 (N.D.N.Y. May 31, 2006) (Kahn, J.). Since the undersigned concludes that Shaw's prosecutorial misconduct claim must be dismissed under either standard, this Court need not determine which of the above-referenced tests should be applied in considering petitioner's unexhausted claims.

A criminal defendant's right to a fair trial is mandated by the Due Process Clause of the United States Constitution. *Albright v. Oliver,* 510 U.S. 266, 273 n. 6 (1994) (citing *United States v. Agurs,* 427 U.S. 97, 107 (1976)). [18] For habeas relief to be granted based on a claim of prosecutorial misconduct, however, the alleged misconduct must have " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)); *see, e.g., United States v. Shareef,* 190 F.3d 71, 78 (2d Cir.1999) (internal quotations and citations omitted). In considering such a claim, courts are to focus on "the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* 455 U.S. 209, 219 (1982).

 **\*11** In support of his claim that his conviction must be set aside due to prosecutorial misconduct, Shaw argues that the prosecutor "knowingly and willingly used fraud and misrepresentation to obtain a conviction against petitioner by putting a false witness on the stand to testify." Am. Pet. at (unnumbered) 8. Specifically, Shaw argues that the prosecution "used trickery" when it called Everod Reid as a prosecution witness, and that Reid thereafter provided "false testimony" at Shaw's trial. *Id.* Petitioner contends that "**no** justification ... can make up for the numerous blatant constitutional violations the D.A. bestowed upon the Petitioner," *id.* (emphasis in original), and that the "fraud and misrepresentation" of the prosecutor deprived Shaw of his right to a fair trial. *Id.*

A detailed record relating to Shaw's claim that a "false" witness was purportedly called by the prosecution was generated in the state court proceeding. Therefore, a review of that record is warranted.

Toward the conclusion of its case-in-chief against Shaw, the prosecution called Everod Reid as a prosecution witness. *See* Trial Tr. at 895. The following exchange occurred between Shaw's counsel, the County Court and the prosecution at the conclusion of that witness's testimony:

> MR. CAREY: Since discovery ... we have been by way of all the police reports informed an Everod Reid was another person. We have never been told that Everod Reid, as we had believed by the police reports, was in fact the witness that they just called. And I think it's improper, given the fact that the prosecutor knew that we had no knowledge that the Everod Reid that we thought was Sardine and the police report said was Sardine was, in fact, not this witness.

> THE COURT: Are you telling-

> MR. CAREY: Which should have been disclosed when that witness list came out, but they never agreed on.

> THE COURT: Are you telling me you've been misl[ed] by the fact that Everod Reid was somebody in the police report or described or some indication of what you thought this man was going to say, who he was, when in fact he takes the witness stand he's been misidentified in those police reports? As a matter of fact, there is no report-

> MR. CAREY: During the course of the investigation the name Everod Reid came up as a witness to the homicide. He was identified as Anthony Miller, Sardine, all the police reports we had. Not until five minutes before this witness took the stand was I informed that the Everod Reid that we had all the police reports was in fact not Sardine, it was someone else. I believe they have an obligation to tell us if the witness list has someone else on it that we don't know about.

> THE COURT: Let me ask you this. Mr. Cuffy, at what point in time did you realize that the Everod Reid discussed and identified in these police reports was, in fact, this individual who fled the area and you had no statement, no reports on.

**\*12** MR. CUFFY: Well, Your Honor, the Everod Reid who is identified in the police reports is identified as Sardine, so I never thought that was Everod Reid. He was identified as-identified as Oliver Miller, Sardine, and in fact gave a statement at which Sardine identifies himself as Elijah Bey, so there was never any dispute in the police reports that Sardine was not Everod Reid.

THE COURT: The point is, we had a discussion about Everod Reid that apparently the police have had some continual or contact with about this case.

MR. CUFFY: Yes.

THE COURT: ... [M]ay I ask when did you learn about this person?

MR. CUFFY: When I learned there was another Everod Reid, I learned the Everod Reid, I ... learned of [another] Everod Reid in late January.

THE COURT: ... Did you ever tell [defense counsel] that the Everod Reid you talked about in your letter was misidentified in these police reports?

MR. CUFFY: No, Your Honor, I did not.

THE COURT: Did you know that at some point during this preparing, did you know that person was misidentified in those police reports you have?

MR. CUFFY: No, Your Honor, the Everod Reid in the police reports is not misidentified. The police reports-

THE COURT: There's another Everod Reid.

MR. CUFFY: Yes, it is.

THE COURT: Oh. Oh. I'm sorry.

MR. CUFFY: The Everod Reid, Sardine uses the name Everod Reid. He also uses the name Elijah Bey. And that's clearly in the police reports.

THE COURT: Oh, so the misrepresentation has come from some witness.

MR. CUFFY: From the witness.

THE COURT: Who says I am Everod Reid.

MR. CUFFY: Yes. That's my position.

THE COURT: I see. Well, you know, Mr.-I don't know.

MR. CAREY: Judge, I have a problem with that. There's no indication in here that Everod Reid, and we have consistently seen with all the witnesses the prosecutor has called, they all have several names.

THE COURT: Yeah.

MR. CAREY: All right? They should have been under [an] obligation, ethical obligation, it's a homicide trial where this man is facing life, should have been under some ethical obligation to at least come back and tell us the Everod Reid that we gave you all these police reports on is not the Everod Reid that we told you about February 3rd, 1999.

\* \* \*

THE COURT: Well, I know. Let me give it some thought. I don't know what sanction, if there was a violation of something, some exculpatory rule.

MR. CAREY: That's what my motion is here today, Judge. My motion is for a mistrial.

THE COURT: Okay. Okay.

MR. CAREY: All right? Because I believe now, first of all, we're not given the opportunity to prepare for that type of witness, when obviously he's-he's disclosing some time in December of 1998 to his attorney about his involvement and what he saw. Now ...

THE COURT: Were you informed he was going to come in and make some identification here?

**\*13** MR. CAREY: No.

THE COURT: That came as a complete surprise.

MR. CAREY: Complete surprise.

THE COURT: When did you know that, Mr. Cuffy?

MR. CUFFY: I knew that. Your Honor. I thought I informed him.

THE COURT: When[?]

MR. CUFFY: I knew that when I spoke to him, when I sent that letter to Mr. Carey.

THE COURT: So in early February, I guess, you knew....

MR. CUFFY: Well, I did not know he would be able to identify him. I can't say that.

THE COURT: So when you asked him the question do you see the gunman in the courtroom.

MR. CUFFY: Yeah, I didn't know he was going to identify him. In fact-in fact, as you notice, I didn't ask him that question. He just pointed to the guy.

Trial Tr. at 958-64.

The following week, Judge Mulroy ruled on defense counsel's request for a mistrial based upon the foregoing. The County Court opined that the better course for the prosecution to have followed would have been to clearly advise defense counsel, prior to trial, that the Everod Reid to whom the police reports referred was an individual other than the Everod Reid whom the prosecution intended to call as a witness. Trial Tr. at 971-72. However, although the County Court noted that Reid's testimony was "important" for the prosecution, Judge Mulroy nevertheless concluded that such testimony was also "cumulative [of] other witnesses who came in and identified [Shaw] as being the shooter...." Trial Tr. at 971. The trial court therefore denied the mistrial motion and declined to *sua sponte* strike Reid's testimony. Trial Tr. at 971.

Initially, this Court finds that the prosecutor did not engage in misconduct with respect to calling Everod Reid as a witness. It is undisputed that before the trial started, the prosecution provided defense counsel with the federal criminal identification record [19] that related to the Everod Reid who took the witness stand. Trial Tr. at 968. The evidence at trial suggested that the rap sheet provided to defense counsel contained all of the aliases of the Reid who testified for the prosecution. [20] *See* Trial Tr. at 970 (prosecutor noting that federal rap sheets contain the aliases of the individuals about whom the rap sheet is created). Although the Everod Reid whom defense counsel believed would be testifying was also known by the aliases "Sardine" and "Elijah Bey," *see* Trial Tr. at 960, neither of those aliases appeared on the federal rap sheet that was provided by the prosecutor to defense counsel relating to Reid. Trial Tr. at 968-69. Therefore,

as the trial court properly noted, the omission on Reid's rap sheet of those known aliases should have caused defense counsel to inquire further about the identity of the Reid who was listed on the prosecution's witness list. [21] Trial Tr. at 970. The fact that Reid's rap sheet was provided to defense counsel in advance of the trial severely undermines petitioner's claim that the prosecutor engaged in misconduct through deceit or trickery.

**\*14** Regardless, it is undisputed that before Reid testified, the prosecution informed Shaw's counsel that the Everod Reid who was about to testify was not the same Everod Reid mentioned in the police reports. Trial Tr. at 970-71. Defense counsel never requested a delay in the proceedings upon learning that information, and went on to conduct what the County Court characterized as a "very vigorous cross-examination" of that witness. Trial Tr. at 971. During that cross-examination, defense counsel: i) fully explored Reid's prior criminal history (Trial Tr. at 914-20); ii) established that Reid had violated the terms of his federal probation and was testifying as part of a plea agreement with the United States Attorney relating to that probation violation (Trial Tr. at 921-23); and iii) elicited testimony from Reid in which he admitted that he had a history of illegally selling guns and had previously been arrested while in possession of at least six pounds of marijuana (Trial Tr. at 923-24). Significantly, Shaw has failed to articulate how defense counsel's cross-examination of Reid was impacted, in any way, by the claimed misconduct of the prosecution relating to Reid.

"To succeed in a habeas claim based on prosecutorial misconduct, the petitioner must demonstrate 'that he suffered actual prejudice because the prosecutor's [conduct] had a substantial and injurious effect or influence in determining the jury's verdict.' " *Johnson v. State of New York,* No. 01 CIV. 4219, 2002 WL 1974048, at *3 (S.D.N.Y. Aug. 26, 2002)* (quoting *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994)). Therefore, even assuming, *arguendo,* that the prosecutor improperly failed to inform the defense of the fact that the Everod Reid who was to testify at trial was an individual other than the Everod Reid mentioned in the police reports, Shaw's failure to establish that he was prejudiced by the timing of such disclosure is fatal to his prosecutorial misconduct claim.

Finally, in denying defense counsel's motion for a mistrial on the theory of prosecutorial misconduct, Judge Mulroy noted that Reid's testimony was cumulative of the

testimony provided by other prosecution witnesses. Trial Tr. at 971. After reviewing the trial transcript, this Court endorses that finding of Judge Mulroy. For example, Ricky Campbell testified that he had observed the fist fight between Johnson and Allen, and that he thereafter observed Shaw shoot Allen. [22] *See* Trial Tr. at 597-602. Campbell's testimony was buttressed by the testimony of Ameko Brooks, who specifically identified Shaw as the shooter when asked by the prosecutor to identify the person whom he observed holding the gun after Allen was shot. *See* Trial Tr. at 848-49. Additionally, Johnson testified that minutes after the shooting, Shaw admitted that he had shot Allen. *See* Trial Tr. at 721-22. Since Reid's testimony was cumulative of other evidence offered by the prosecution against Shaw, that evidence did not have a substantial and injurious effect or influence in determining the jury's verdict. *E.g., Smith v. Girdich,* No. 03-CV-5193, 2004 WL 1743946, at *3 (E.D.N.Y. Aug. 4, 2004) (admission of cumulative testimony did not have substantial and injurious effect or influence in determining the jury's verdict); *Richardson v. Artuz,* No. 97 CV 2128, 2004 WL 556688, at *21 (E.D.N.Y. Mar. 22, 2004) (admission of perjurious testimony "was merely cumulative, and could not have affected the jury's decision").

**\*15** In sum, Shaw has failed to demonstrate that the prosecutor engaged in misconduct with respect to the manner in which Everod Reid testified for the prosecution at Shaw's trial. Furthermore, Shaw has wholly failed to establish that he was prejudiced by that conduct in light of the facts that: 1) defense counsel thoroughly cross-examined Reid at trial; and 2) that witness's testimony was merely cumulative of other testimony offered by prosecution witnesses. Therefore, this unexhausted claim is patently frivolous. The undersigned alternatively concludes that it is perfectly clear that Shaw has not raised even a colorable claim alleging prosecutorial misconduct at his trial. Therefore, the second ground in his amended petition must be denied.

### C. *Ground Three*

Shaw next alleges that his conviction is constitutionally infirm because of the misconduct in which the County Court engaged at Shaw's criminal trial. *See* Am. Pet. at (unnumbered) 9. In support of this claim, Shaw alleges that Judge Mulroy: i) improperly allowed Everod Reid to

testify at Shaw's trial; and ii) was neither fair nor impartial at that proceeding. *See id.* at (unnumbered) 9-10.

Shaw raised these claims in his April 2, 2002 CPL motion, *see* Record at 1806-08, as well as in his April 29, 2002 CPL motion. *See* Record at 1856-57, 1873-78. Those applications were denied by Judge Walsh. *See* July, 2002 Order. This Court must therefore determine whether Judge Walsh's determination is either contrary to, or represents an unreasonable application of, clearly established Supreme Court precedent.

### i. *Clearly Established Supreme Court Precedent*
Petitioner's claim that the trial court was biased against him necessarily implicates his right to a fair trial. *See Albright,* 510 U.S. at 273 n. 6; *Agurs,* 427 U.S. at 107. Additionally, the Supreme Court has noted that "the floor established by the Due Process Clause clearly requires a "fair trial in a fair tribunal ... before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley,* 520 U.S. 899, 904-05 (1997).

### ii. *Contrary To, or Unreasonable Application Of, Clearly Established Supreme Court Precedent*
Addressing first Shaw's claim that the County Court improperly allowed Reid to testify, this Court finds such claim to be without substance. Shaw never alleges that he was unaware that the prosecution intended to call Reid as a witness, only that the defense was under the mistaken impression that the Everod Reid who was mentioned in the police reports would testify at trial, rather than a different individual with the same name. [23] Thus, there was no basis upon which the County Court could have properly precluded Reid's testimony at the subject criminal trial. Additionally, as noted above, since that witness's testimony was cumulative of that offered by other witnesses at Shaw's trial, this factor weighs against a finding that Reid's testimony deprived Shaw of his right to a fair trial. *E.g., Wray v. Johnson,* 202 F.3d 515, 526 (2d Cir.2000).

**\*16** Next, although petitioner claims that Reid provided "false and injurious testimony" at Shaw's trial, *see* Am. Pet. at (unnumbered) 10, the undersigned notes that Shaw provides no support for his claim that Reid's testimony was false. Rather, this claim appears to invite this Court to find the testimony of that witness to be not credible.

However, the undersigned notes that where evidence was presented from which the jury could have drawn an inference favorable to the accused but it chose not to, courts must " 'defer to ... the jury's choice of the competing inferences.' " *Daily v. New York,* 388 F.Supp.2d 238, 248 (S.D.N.Y.2005) (quoting *United States v. Kinney,* 211 F.3d 13, 18 (2d Cir.2000) (other citation omitted)); *see also Keller v. Bennett,* No. 98CV1437, 2002 WL 975306, at *4 (N.D.N.Y. Mar. 21, 2002) (Sharpe, M.J.) ("a habeas court, viewing a cold record, may not properly reassess the jury's finding of credibility concerning the testimony of witnesses offered at trial") (citations omitted), *adopted, Keller v. Bennett,* No. 98CV1437 (Dkt. No. 18) (N.D.N.Y. Apr. 15, 2002) (Kahn, J.), *appeal dismissed,* No. 02-2328 (2d Cir. Dec. 12, 2003); *Bellezza v. Fischer,* 01CV 1445, 2003 WL 21854749, at *15 (E.D.N.Y. Aug. 6, 2003) (on collateral review, a federal habeas court "must presume that the jury resolved any questions of credibility in favor of the prosecution") (citing *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.1996)) (other citations and internal quotation omitted); *Cottrel v. New York,* 259 F.Supp .2d 300, 308 (S.D.N.Y.2003) (citing *Marshall v. Lonberger,* 459 U.S. 422, 434 (1983)). Since there is no evidence before this Court which establishes that Reid's testimony was false or misleading, this unsubstantiated claim does not support a finding that petitioner is entitled to federal habeas intervention.

Finally, as to Shaw's claim that Judge Mulroy was biased against him, *see* Am. Pet. at (unnumbered) 9-10, the Court notes that mere allegations of judicial bias or prejudice do not state a due process violation. *Brown v. Doe,* 2 F.3d 1236, 1248 (2d Cir.1993) (citing *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 820 (1986)). Rather, when a judge is claimed by a party to have been biased against him, the entire record must be examined to determine "whether the jurors have been so impressed by the judge's partiality that it affected their deliberations." *United States v. Tocco,* 135 F.3d 116, 129 (2d Cir.1998) (citing *United States v. Filani,* 74 F.3d 378, 385-86 (2d Cir.1996)). "To state a due process claim that a judge is biased, the claimant must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias." *Frase v. McCray,* No. 01-CV-1704, 2003 WL 25459378, at *1 (N.D.N.Y. July 22, 2003) (citing *Phelps v. Hamilton,* 122 F.3d 1390, 1323 (10th Cir.1997)).

In the case *sub judice,* petitioner cites the fact that Judge Mulroy denied defense counsel's motion for a mistrial and

did not strike Reid's testimony as evidence that Judge Mulroy harbored a bias against Shaw. *See* Am. Pet. at 9-10. However, Reid's testimony at Shaw's trial was proper and in no way suggestive of bias on the part of the County Court. Moreover, this Court's review of the trial transcript fails to disclose conduct which indicated improper conduct on the part of the trial court towards Shaw. To the contrary, the state court record below reveals no conduct on the part of Judge Mulroy that suggests any bias against Shaw.

**\*17** Since petitioner has failed to demonstrate that the trial court erred in permitting Reid to testify for the prosecution, or that the County Court harbored any bias against Shaw, he has failed to demonstrate that the County Court's July, 2002 Order denying petitioner's CPL motions is either contrary to, or represents an unreasonable application of, the clearly established Supreme Court precedent noted above. Therefore, the undersigned denies Shaw's third ground for federal habeas relief.

### 4. *Ground Four*

In his fourth and final claim, Shaw argues that he received the ineffective assistance of trial counsel. *See* Am. Pet. at (unnumbered) 10-11. In support of this claim, Shaw contends that his trial attorney wrongfully allowed the district attorney "to question juror members out of his presence," and that counsel thereafter wrongfully withdrew his application to question the jurors about the letters that had been sent to, *inter alia,* the County Court and trial counsel which suggested that a juror was improperly coerced into finding Shaw guilty of the charges alleged in the Indictment. *See* Am. Pet., Ground Four.

The exhaustion requirement applicable to federal habeas petitions is satisfied where the habeas claim has been "fairly presented" to the state courts. *See Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997) (quoting *Picard v. Connor,* 404 U.S. 270, 275 (1971)). A claim has been "fairly presented" when the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye v. Attorney Gen'l of N.Y.,* 696 F.2d 186, 191 (2d Cir.1986); *Morales v. Miller,* 41 F.Supp.2d 364, 374 (E.D.N.Y.1999). Where certain theories in support of an ineffective assistance of counsel claim have been raised in the state courts and others have not, those theories that have never been asserted in the state courts are considered unexhausted when raised for

the first time in a federal habeas petition. *E.g. Edmonson, 2006 WL 3486769, at \*11-12.*

In his appellate brief, counsel argued that Shaw received the ineffective assistance of trial counsel because counsel's motion to dismiss the Indictment at the close of the prosecution's proof failed to specify the legal basis for that motion. *See* App. Br. at 36-40. Appellate counsel also argued that trial counsel improperly failed to move for a mistrial upon learning that "one or more of the People's witnesses had lied to the grand jury." App. Br. at 37. However, appellate counsel did not assert either of the theories now raised by petitioner in his fourth ground for relief in support of counsel's appellate claim which argued that Shaw's trial counsel rendered ineffective assistance. *See* App. Br. Additionally, as with the claims raised by Shaw in his second ground for relief, respondent has failed to argue that petitioner is procedurally barred from asserting his unexhausted claims alleging ineffective assistance of trial counsel in this action. *See* Resp. Mem. at 12-14. Thus, the undersigned considers whether Shaw's claim alleging ineffective assistance of trial counsel is patently frivolous or, alternatively, whether it is perfectly clear that Shaw has not raised even a colorable claim alleging ineffective assistance of trial counsel.

**\*18** As noted above, the Sixth Amendment mandates that criminal defendants be afforded the assistance of counsel for their defense to the charges against them. *See* U.S. Const., amend. VI. Thus, to prevail on his claim alleging ineffective assistance of trial counsel, Shaw must establish that his trial attorney's representation fell below an objective standard of reasonableness and that petitioner was prejudiced by such deficient representation. *Strickland,* 466 U.S. at 688-90; *see also Cuevas v. Henderson,* 801 F.2d 586, 589-90 (2d Cir.1986); *Simms v. Moscicki,* No. 06CIV2056, 2007 WL 162295, at \*4 (S.D.N.Y. Jan 19, 2007) (citations omitted); *Youngblood v. Brown,* 465 F.Supp.2d 270, 282 (S.D.N.Y.2006) (citations omitted); *Anwar v. United States,* 648 F.Supp. 820, 826 (N.D.N.Y.1986) (Munson, C.J.) (citation omitted).

With respect to Shaw's claim that the prosecutor improperly questioned the jurors outside of Shaw's presence, this argument appears to overlook the significant fact that the jury in his criminal trial was discharged from its duties on March 2, 1999, *see* Trial Tr. at 1209, and that the letters defense counsel and the trial court received alleging improper conduct during the

course of deliberations were written some time **after** the jury was disbanded. *E.g.* March, 1999 Tr. at 2.[24] Since those individuals had been formally excused from their service as jurors at the time they were questioned by the district attorney, there is no basis upon which this Court may properly conclude that the district attorney wrongfully asked the former members of the jury whether they had written the letters that form the basis of this aspect of Shaw's claim. In this regard, the Court notes that petitioner has not cited any authority, and this Court's research has disclosed none, which stands for the proposition that defense counsel and/or the defendant himself must be present where the prosecutor questions members of a jury that has been formally excused by a court after the completion of their service on the jury. Moreover, since the questioning of the jurors occurred **after** the jury had delivered its verdict, it is unclear to the Court how Shaw can properly claim he was prejudiced by the manner in which the jurors were questioned. Additionally, any claim of prejudice on the part of Shaw is further undermined by the fact that the investigation into the source of the letters ultimately demonstrated that those letters were not written by any of the jurors at Shaw's trial. *See* February, 2002 Aff. at 2-3.

As to his final theory in support of this ground, since the County Court specifically declared that it would not grant defense counsel's motion which requested that the trial court individually question the former jurors, *see* April, 1999 Tr. at 2-3, Shaw cannot demonstrate that he was prejudiced by trial counsel's decision to withdraw his application which requested that relief.[25] Thus, this final theory in support of his ineffective assistance of trial counsel claim is plainly without merit.

**\*19** Based upon the above, this Court concludes Shaw's unexhausted claim of ineffective assistance of trial counsel is patently frivolous. The undersigned alternatively finds that it is perfectly clear that Shaw has not raised even a colorable claim with respect to his fourth ground for relief. Therefore, the final ground in his amended petition must be denied.

### III. *Certificate of Appealability*

Finally, the Court notes that 28 U.S.C. § 2253(c) provides in relevant part that:

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from-

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court.... [26]

28 U.S.C. § 2253(c)(1)(A). A Certificate of Appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Since petitioner has failed to make such a showing herein, the Court declines to issue any Certificate of Appealability in this matter.

**WHEREFORE,** after having reviewed the state court record, the documents submitted by the parties in conjunction with this action, the applicable law, and for the reasons discussed herein, it is hereby

**ORDERED,** that Shaw's amended petition (Dkt. No. 23) is **DENIED** and **DISMISSED,** and it is further

**ORDERED,** that the Clerk of Court serve a copy of this Memorandum-Decision and Order upon the parties to this action by regular or electronic mail, and it is further

**ORDERED,** that any state court records that were not filed in this action be returned directly to the Attorney General at the conclusion of these proceedings (including any appeal of this Memorandum-Decision and Order filed by any party).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 951459

Footnotes

1    Witnesses heard multiple, rapid shots being fired at the time. Trial Tr. at 540, 594, 718, 843, 905-09.

2    An autopsy performed on Allen's body revealed that he had sustained "a number of gunshot wound injuries," one of which hit his right lung, traversed through his heart, went through his left lung and exited the left side of his body. *See* Trial Tr. at 877. Allen's death was caused by multiple gunshot wounds. Trial Tr. at 890.

3    Although Shaw's petition was file-stamped by the clerk on May 19, 2003, the Second Circuit has held that due to the unique difficulties faced by incarcerated *pro se* litigants, a prisoner's pleading is deemed to be properly filed at the time he hands the papers to the prison authorities for transmittal to the court. *Dory v. Ryan,* 999 F.2d 679, 681-82 (2d Cir), *modified on reh'g,* 25 F.3d 81 (2d Cir.1994); *Noble v. Kelly,* 246 F.3d 93, 97-98 (2d Cir.2001) (extending "prison mailbox rule" to petitions seeking writ of habeas corpus pursuant to 28 U.S.C. § 2254). Shaw dated his petition on May 3, 2003. See Petition (Dkt. No. 1) at 7. Therefore, applying the prison mailbox rule, the undersigned finds that Shaw should be deemed to have commenced this proceeding on May 3, 2003.

4    Respondent's memorandum of law in opposition to the amended petition ("Resp.Mem.") has been docketed as an attachment to his answer to that pleading. See Dkt. No. 26.

5    The AEDPA provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review ... is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

6    Respondent's argument that this action is time-barred appears to be based upon the erroneous assumption that Shaw's conviction became final on July 5, 2000. *See* Resp. Mem. at 11. However, New York's Court of Appeals did not deny Shaw's application for leave to appeal the Appellate Division's decision until approximately nine months ***after*** that date, i.e., on April 6, 2001. *See People v. Shaw,* 96 N.Y.2d at 806.

7    Article 330 of New York's CPL sets for the procedure that must be followed by attorneys who seek to set aside verdict based upon, *inter alia,* juror misconduct. *See* CPL §§ 330.30(2); 330.40(2).

8    Shaw's trial attorney was Paul G. Carey, Esq.

9    Shaw was scheduled to be sentenced on March 22, 1999. 11

10   Gordon G. Cuffy, Esq. prosecuted the criminal action brought against Shaw on behalf of the State of New York.

11   This Court was not provided with a copy of any of the letters to which the County Court refers in the March, 1999 hearing.

12   Petitioner seems to argue that his trial attorney wrongfully failed to conduct an independent investigation into the source of the letters. *See* Traverse at 2. However, Shaw has offered nothing short of sheer surmise which suggests that an independent investigation by the defense counsel would have somehow revealed that the letters were, in fact, written by a juror from Shaw's trial. Unfortunately for petitioner, federal habeas courts cannot grant habeas relief based upon

unsubstantiated conclusions, opinions or speculation. *See Wood v. Bartholomew,* 516 U.S. 1, 8 (1995) (federal courts should not grant "habeas relief on the basis of little more than speculation with slight support"); *Huntley v. Superintendent, Supt. of Southport Corr. Facility,* No. 00-CV-191, 2007 WL 319846, at *20 (N.D.N.Y. Jan. 30, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (citations omitted). Thus, Shaw is plainly not entitled to habeas intervention merely because his trial attorney failed to independently question the jurors at Shaw's trial as to whether they had written the above-described letters.

13    In *Antommarchi,* New York's Court of Appeals held that a criminal defendant has a right to be present at side-bar conferences held by the trial court with prospective jurors. *See Figueroa v. Donnelly,* No. 02 CIV. 6259, 2003 WL 21146651, at *9 n. 5 (S.D.N.Y. May 16, 2003) (citing *Antommarchi* ).

14    This exhaustion requirement "reduces friction between the state and federal court systems by avoiding the unseemliness of a federal district court's overturning a state court conviction without the state courts having an opportunity to correct the constitutional violation in the first instance." *O'Sullivan* 526 U.S. at 845; *see also Galdamez,* 394 F.3d at 72 (citing *O'Sullivan* ).

15    Although Shaw's brief on appeal refers to the conduct that forms the basis of Shaw's second ground for relief, *see* App. Br. at 37, that brief never alleges that Shaw's conviction should be reversed because of prosecutorial misconduct at Shaw's criminal trial. *See* App. Br.

16    As will be seen, petitioner has also failed to exhaust the claim he asserts in his fourth ground for relief.

17    A federal court may deny-but not grant-a habeas petition based upon an unexhausted claim. *Aparicio,* 269 F.3d at 91 n. 5; *Cuadrado v. Stinson,* 992 F.Supp. 685, 687 (S.D.N.Y.1998).

18    "A right to a fair trial is a right ... protected by the due process clause of the Fourteenth Amendment." *Adamson v. People of State of California,* 332 U.S. 46, 53 (1947) (footnote omitted).

19    The federal criminal identification record of an individual is commonly referred to as a "rap sheet."

20    For reasons that are not clear to the undersigned, the rap sheet that was provided to counsel regarding Reid is not included in the state court record provided to this Court.

21    Defense counsel informed Judge Mulroy that counsel could not recall whether federal rap sheets "provide[ ] an area for aliases." Trial Tr. at 969-70. However, federal rap sheets routinely list the aliases of criminal defendants. *E.g., United States v. Rodriguez-Arreola,* 313 F.3d 1064, 1067-68 (8th Cir.2002). In this Court's experience, federal criminal identification records contain the known aliases of the individual discussed therein.

22    Campbell testified that he was "right there next to" Shaw when he began shooting his gun. Trial Tr. at 600.

23    Defense counsel did not object to Reid's testimony until after that witness had completed his testimony. *E.g.,* Trial Tr. at 958.

24    The state court record does not reflect the date on which those letters were purportedly written, or when those letters were received by the addressees.

25    The post-verdict questioning of jurors by courts is generally disfavored. *See Tanner v. United States,* 483 U.S. 107, 120-21 (1987); *King v. United States,* 576 F.2d 432, 438 (2d Cir.1978).

26    Rule 22 of the Federal Rules of Appellate Procedure also provides that an appeal may not proceed "unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." *See* Fed.R.App.P. 22(b).

---

**End of Document**                                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.